Volume 18

Pages 3288 - 3486

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )   **NO. CR 18-00465 MMC**
                               )
UNITED MICROELECTRONICS        )
CORPORATION, INC.,             )
                               )
          Defendant.           )
_____)

                    San Francisco, California
                    Tuesday, March 29, 2022

          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS

**APPEARANCES:**

For Plaintiff:
                    STEPHANIE M. HINDS
                    UNITED STATES ATTORNEY
                    450 Golden Gate Avenue, 11th Floor
                    San Francisco, California 94102
             BY:  **LAURA E. VARTAIN HORN**
                  **NICHOLAS J. WALSH**
                  **ASSISTANT UNITED STATES ATTORNEYS**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**




REPORTED BY:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              CSR No. 12219, Official U.S. Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiff:

U.S. DEPARTMENT OF JUSTICE
National Security Division
950 Pennsylvania Ave, N.W.
Washington, DC 20530
BY:  **STEPHEN MARZEN**
**NICHOLAS O. HUNTER**
**TRIAL ATTORNEYS**


For Defendant:

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
BY:  **JACK P. DICANIO, ATTORNEY AT LAW**
**EMILY A. REITMEIER, ATTORNEY AT LAW**
**CHRISTOPHER McKINLEY, ATTORNEY AT LAW**

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
300 South Grand Avenue
Los Angeles, California 90071
BY:  **MATTHEW E. SLOAN, ATTORNEY AT LAW**

SKADDEN ARPS SLATE MEAGHER
& FLOM LLP
One Manhattan West
New York, New York 10001
BY:  **DAVID LAMB, ATTORNEY AT LAW**

Also Present:       **Special Agent Cynthia Ho**
**Aneela Bhatia**
**Todd Frank**
**Wayne Campbell**

**I N D E X**

Tuesday, March 29, 2022 - Volume 18

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **DYER, THOMAS (RESUMED)** | | |
| (PREVIOUSLY SWORN) | 3317 | 18 |
| Direct Examination (Resumed) by Mr. Hunter | 3317 | 18 |
| Cross-Examination by Mr. Sloan | 3394 | 18 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 140 | | 3357 | 18 |
| 448 | | 3350 | 18 |
| 969 | | 3359 | 18 |
| 985 | | 3364 | 18 |
| 1009 | | 3327 | 18 |
| 1009T | | 3327 | 18 |
| 1195 | | 3367 | 18 |
| 1488 | | 3324 | 18 |
| 1502 | | 3333 | 18 |
| 1505 | | 3342 | 18 |
| 4806 | | 3472 | 18 |
| 4817 | | 3463 | 18 |

**Tuesday - March 29, 2022**                              **9:01 a.m.**

P R O C E E D I N G S

---oOo---

THE CLERK:  All rise.  This Court is now in session.
The Honorable Maxine M. Chesney presiding.  Please be seated.

THE COURT:  Good morning.

Mr. DiCanio, I gather you may have something to report on the remote witness idea.

MR. DiCANIO:  Your Honor, if you think this is an appropriate time.

THE COURT:  That's fine.  Ms. Vartain, do you have any reason not to hear what he has to say right now?

MS. VARTAIN:  No.  I'm happy to hear it.  Thank you, Your Honor.

THE COURT:  Okay.

MR. DiCANIO:  Thank you, Your Honor.

So we did identify, there is a U.S. consulate close to Fujian in Guangzhou.  I also confirmed with the client, and I've been informed the witness as well, are willing to do the testimony at that U.S. consulate.  However, it is the client's understanding, based upon discussions with the Central Government, that some approval will be needed.

We've started that process yesterday, Your Honor.  It's going to continue today.  And I hope to be able to give the Court a little bit more of an update as to where we are

tomorrow morning.

THE COURT:  Okay.  That sounds encouraging, at least with respect to the procedure.  Do you know where this approval is supposed to come from?  Who is it that would give the approval?

MR. DiCANIO:  Yes, Your Honor.  There's a little bit of uncertainty, at least from our co-counsel, as to where.  They think it's to the Ministry of Justice, although I may not be using the right terminology for that.  But they were working on that yesterday, and I believe that they are -- intend to engage tomorrow.  It's a day ahead; so it's their nighttime.

THE COURT:  Yes.

MR. DiCANIO:  They did tell me, though, Your Honor, that, you know, obviously, no guarantees.  They're hopeful that, in light of the unique circumstances, particularly COVID and the lockdowns that are going on in China now, including Shanghai -- I don't know if you saw that in the news, Your Honor.

THE COURT:  Yes, I did see that in the news.  Go ahead.

MR. DiCANIO:  They're hopeful that this will give good cause for it.  So we're doing everything we can.  I should have hopefully more to report tomorrow at the beginning of the session.

THE COURT:  Okay.  Anything you want to add at the

moment, Ms. Vartain?

MS. VARTAIN:  I think as much detail as I can get from Mr. DiCanio about who the approving body is, et cetera, so that I can convey it on our end.

Two things.  The first one is I'd like to know the zone of witnesses that we're talking about because I am not sure that we would agree that all of those are suitable for remote testimony at all.  So I'd like to know who we're talking about and what the approving mechanism is.

THE COURT:  Sure.

So we have, I assume, the three witnesses -- well, you've got three witnesses that you state have certain health problems.  You've got lung problems in a couple of witnesses, one particularly severe.  The other is a heart problem.

But one of those people is in Fujian Province, and this consulate is adjacent but not in Fujian Province.  What would be the situation there, the lockdown, as affecting Mr. -- I forget if it's Wu or --

MR. DiCANIO:  Mr. Wu, yeah.  Albert Wu, Your Honor. The Government is correct.  There are two types of witnesses. So with respect to Albert Wu, who has the medical condition, he would have to wait until the lockdown is cleared so that he could travel from Fujian to Guangzhou.

With respect to the two witnesses that were prepared to come to the United States -- that would be Wu Junsheng and Jeff

Yu -- they're just waiting for clearance for the lockdown to lift so they could travel to the United States.

I would note, though, Your Honor, that the Shanghai issue is complicated because I think the only direct flights to the U.S. are from Shanghai at the moment.  And so it creates a little bit more of a complicated situation.  We'll have to monitor that as it goes.

THE COURT:  The lack of direct flight presents what issue?

MR. DiCANIO:  Just makes travel a little bit more difficult, may take a little longer.

THE COURT:  Okay.  But in terms of just -- just give me a second here.

In terms of getting here, you're just thinking it's harder to schedule when somebody would be able to arrive?

MR. DiCANIO:  Yeah.  Your Honor, it would just make travel a little bit harder and may take a little bit longer depending upon the route that they would have to take.  Not impossible but maybe not as direct, not as easy.

THE COURT:  So it's not like they have connections within a single day?

MR. DiCANIO:  I'm not sure, Your Honor, because of all of the shutdowns.  And the Shanghai was just announced, I think, yesterday.

THE COURT:  Yes, I just saw it for the first time

yesterday.

MR. DiCANIO:  But, Your Honor, I will get from Ms. Vartain the process.  I hope to be able to clear that up for her before tomorrow's session.

THE COURT:  Well, that at least sounds more helpful. I guess they don't have a consulate in Fujian Province itself.

MR. DiCANIO:  According to my sources, they do not.

THE COURT:  And I assume they know.

MR. DiCANIO:  I would think so.

THE COURT:  So you can cross-check some of this, Ms. Vartain, if you want.  And you're not obligated to agree to anything at all.  You can stay with your objection.  But my concern was, if we weren't even close to having something that replicated an official proceeding, that I was a lot less inclined to have a remote witness.

MS. VARTAIN:  I hear that.  And I don't -- I don't think that this is going to come close to being an official proceeding.  Is it closer than being at Jinhua?  Perhaps one step.

But I am interested and would suggest that the Court inquire a little bit about the scope of diligence because the Government's records indicate that only two witnesses ever applied for a visa to travel for trial.  So as I see this constantly expanding scope of people for whom remote testimony is being requested for, that seems to me to be a little bit

disconnected from any real effort to get people here in person for trial in a timely manner.

THE COURT:  I didn't see it expanding as to remote.  I mean, they have witnesses who I assume they gave you the names of earlier or you would be arguing these were late-disclosed witnesses.

Aside from the three that prompted the remote motion, if you will, they're not asking that those people be remote; they're just saying that they can't get out of the country at the moment and not because they didn't makes arrangements to get out in timely fashion.  Nobody is getting out, apparently.

So I don't think that that's really the diligence problem.  And the other three are just -- they're saying they have health concerns.  And you can say, well, one isn't that much of a concern; he's being monitored; he's on medication.  But just to the extent, if I do find there's enough of a health concern, then we have the remote question.  And one of those people can't get out anyway.  So -- but once he could, if this lockdown is lifted, then he would still say he can't come.

And I've already said I'm not terribly impressed with the government as picking one person that they're not letting out.  I'm talking about the whole, you know, province, not the individual who is on multiple boards and the Chinese government just doesn't want him to come here.

MS. VARTAIN:  So maybe I'm not being particularly

clear.  With respect to Mr. Jeff Yu, my question is is the defendant asking for a continuance or is the defendant asking to take his remote testimony?

THE COURT:  Yu is the board member?

MR. DiCANIO:  No, Your Honor.  He was on HR.  He worked for UMC --

THE COURT:  Oh, he's the HR guy.  I understood he would be coming here if he can get out.  Isn't that correct?

MR. DiCANIO:  It is, Your Honor.  Although I did -- in fairness to Ms. Vartain's comment, I did say if we felt -- because there's no endpoint, if we felt that it was too uncertain, if the remote access could speed things up.  I was not saying no to that.  I was just giving the Court and Ms. Vartain the option.

THE COURT:  Right.  He was saying we have people.  We can't get them out of the country.  They're willing to wait.  Okay.  We're willing to wait.  But you, the Government, said that you weren't really willing to wait.  What would you rather have?  Hiatus in the trial?  Or we call the witnesses remotely?  And, of course, you could say none of the above.  Okay?  I understand that.  But if we got down to that and if it looked like that was a fair choice -- I'm not making that finding at the moment because we're not there yet.

MS. VARTAIN:  Yes.

THE COURT:  But if it looked like it was a fair

choice, I give you the choice.  And they're saying, you know, it's up to you.  Which of these not-ideal situations is less onerous in the Government's view?

MS. VARTAIN:  Yes.  No.  Thank you, Your Honor.  I appreciate that.  I'm just trying to figure out the landscape so that we can -- because I anticipate the Court is going to suggest that at some point we have a choice, and I want to sort of start teeing up what the landscape looks like.

THE COURT:  Okay.  So you've got three people that there could be just a plain choice.  They're willing to come, but they can't get here.  Okay.

Then you've got three people who say, even if this lockdown didn't pertain -- and only pertains to one of those three anyway, Albert Wu -- three people are saying that our health concerns, according to our medical providers, cautions against an appearance here.  Our health may be put at risk. Okay.  And then you can argue they're not that sick, they should come, stop complaining, whatever you want to say about that.  But that's a different consideration.

And on top of one of those people who's not in the lockdown, apparently, but in the province and the provincial government said, gee, he's just too important to come and spend time in the U.S. on a trial, that one didn't impress me as much.  I thought that's a choice they're making that is not for the health of the country or otherwise.  But the other concerns

are still legitimate, at least facially.  Okay?

**MS. VARTAIN:**  Yep.  Got it.  Thank you, Your Honor.

**MR. DiCANIO:**  Thank you, Your Honor.  I'll continue to keep you updated.

**THE COURT:**  I'm sorry if I keep mixing them up because we have Liu and Wu and Yu and all their names are sort of the same, and I have to go back.  It's easier just to ask you.

**MR. DiCANIO:**  Thank you.

**MS. VARTAIN:**  Thank you, Your Honor.

**THE COURT:**  All right.  We're, I guess, back to Dr. Dyer.

**MR. HUNTER:**  Your Honor, this morning I hope to end Dr. Dyer's status as a permanent witness.

**THE COURT:**  I'm sure he would appreciate that.  Just a moment.

(Pause in proceedings.)

**THE COURT:**  You know, I was saying yesterday, how many more of these e-mails do you have?  If you are endeavoring with these e-mails to try to make some showing of knowledge on the part of Stephen Chen as opposed to just generic Project M access to and use of trade secrets, I don't want to slow you down in that respect because that is a significant -- not slow you down, speed you up, I guess, on that one because that is a significant issue in the case.

And in terms of showing Project M's possession of and to

the extent you also have use of each of the trade secrets, if you haven't covered each of the ones, I don't want to prevent you or think you shouldn't do that either because it's not just, like, you have one trade secret; you have multiple. And I haven't kept count of where they necessarily fit into some of the attachments, for example, that have been presented.

So I didn't want you to feel constrained. That's all.

MR. HUNTER: Thank you, Your Honor.

And I wanted to clear up something in the discussion we had yesterday with Mr. Sloan about some of the tech transfer documents.

I went back and just reviewed the portion of the record where we spoke about the stipulation. And by that point in the discussion we had moved on to P1196. We were no longer talking about P1192, which was that 2016 fourth quarter technology transfer package or flow package that the Government asserts was transferred to Jinhua.

So I just wanted to clear that up, Your Honor.

THE COURT: So were you talking about that with him? Because we have the interruption and all. So just going back to -- I'm trying to see where he was talking about those exhibits.

MR. HUNTER: Yeah. The first mention of P1196 that I see is on page 2978 of the transcript, which was from last Thursday.

THE COURT:  Right, I don't have that immediately handy, but just a minute.  Let's see if these notes match up.

Yes, that's, I think, where I first see it as well.  That's the 24th, was it?

MR. HUNTER:  That's correct.

THE COURT:  Right.  Then, yes.  It got mentioned with -- well, 1192 was mentioned and talked about separately, and then you had 1196 and a whole bunch of other documents in the 11s and 12s that you offered kind of as a group.

MR. HUNTER:  That's correct.

THE COURT:  And then we had a break and came back and kept . . .

MR. HUNTER:  And the discussion of the stipulation, I turned to Mr. Sloan to see if we shared a common understanding of the stipulation in the discussion of 1196.  And those subsequent exhibits you mentioned, those all relate to the September 2018 kind of final technology transfer package.

THE COURT:  The subsequent ones?

MR. HUNTER:  That's correct.

THE COURT:  But the first one, you had raised yesterday or Mr. Sloan did or you did collectively that there was a misstatement, not intentional, about the scope of the stipulation, and it was clarified it only went to authentication and not to actual delivery, if you will.

MR. HUNTER:  And that's where the confusion lies,

Your Honor.  That potential misstatement, I -- looking back, I did not think it was a misstatement at the time because I made it in regard to P1196 and the stipulation refers to the custodian of those September 2018 technology transfer documents as the September 2018 technology transfer package.

What I understand from talking to Mr. Sloan is the -- our -- his understanding of the stipulation is that that's UMC's representation of what the documents were, that that was what UMC is representing and Jinhua has stipulated to was the 2018 tech transfer package.

But Mr. Sloan is saying that it does not -- he does not share a common understanding that those documents were actually transferred to Jinhua.  So I just want to clear that up, and I'd like to put in some testimony through Dr. Dyer to clear that up on the record.

THE COURT:  But I understand -- I thought we did this yesterday.  Am I -- what's different today?

MR. HUNTER:  Your Honor, yesterday I think there was confusion about what we were -- what exhibit we were speaking about when we talked about the potential miscommunication.

THE COURT:  Yeah.  Well, which one did you -- which one did you think you were speaking about?

MR. HUNTER:  I was under the impression he was talking about 1192, the 2016 fourth quarter document.

THE COURT:  That a transferred document, according to

the Government?

MR. HUNTER:  Correct.

THE COURT:  Okay.  Well, whether or not it's acceded to, you're saying that was transferred; right?  You thought you were talking about that, and you think Mr. Sloan was talking about a different document?

MR. HUNTER:  I think we were kind of jointly confused and now we're on the same page about what documents we're speaking about.

THE COURT:  I don't know.

Mr. Sloan.

MR. SLOAN:  Can I correct that?

THE COURT:  Sure.

MR. SLOAN:  I think the document we spoke about yesterday was 1192.  And I think that that is clearly the document that was being referenced in the portion of the transcript that we talked about yesterday in which I had said, yes, it's stipulated to.  And I was concerned that, in the context of the conversation, the Court might think that we had stipulated that it actually had been transferred in March 2017, but, in fact, the only thing we stipulated to in the stipulation is that it was authentic.  I thought we had clarified that.

THE COURT:  Okay.  And I don't recall what my impression was of any stipulation at the time it was all

happening.  But I do recall that -- you see, I don't know now. Was it 1192 that you were trying to show by various circumstances must have been transferred, or was it 1196 that you now realize that goes to?

MR. HUNTER:  It was 1192 that we were relying on circumstantial evidence to show it had been transferred.

THE COURT:  Okay.

MR. SLOAN:  And, Your Honor, I think we have a disagreement about that.  I don't know that it's material.  I think that what we were talking about, what I understood and from reading the transcript -- what I understood we were talking about is 1192.  But --

THE COURT:  That's what he says.

MR. SLOAN:  Oh, I'm sorry.

MR. HUNTER:  No.  I say we were talking about 1196 at that point in the transcript.

THE COURT:  Yesterday?

MR. HUNTER:  On Thursday back at this point in the record when we were talking about this.

THE COURT:  Oh, okay.  Are you just talking about what the witness was talking about?  Because whatever you put in and this witness was maybe agreeing or talking about various markings on exhibits, you thought he was talking about 1196?

MR. HUNTER:  Correct.  And I thought our --

THE COURT:  What did he think?  Because that's more

important.

MR. HUNTER:  At that point, Your Honor, it was really the discussion we were having about the stipulation.  And I thought the discussion about the stipulation was with regard to 1196.

THE COURT:  Observation.

MR. HUNTER:  Because we had moved on --

THE COURT:  Just let's stop for a minute.  I'm not going to look at them right now.  What's 1192?

MR. HUNTER:  1192 is the 2017 fourth quarter, 2016 as its called -- it was delivered late -- process flow that the Government asserts was delivered to Jinhua.

THE COURT:  First?  Second?  Third?  Which delivery is that?

MR. HUNTER:  It's March 2017 is the actual delivery.

THE COURT:  In the sequence of deliveries, first? Second?  Third?

MR. HUNTER:  The first delivery of the process flow.

THE COURT:  Is that 1192?

MR. HUNTER:  That's 1192.

THE COURT:  Thank you.  All right.  So this is what you assert is the first time process flow was delivered to Jinhua from UMC.

MR. HUNTER:  Correct.

THE COURT:  All right.  That's 1192.

What's 1196?

MR. HUNTER:  1196 is the first in a series of 13 documents that the Government alleges was transferred to Jinhua in September 2018.

THE COURT:  Later.

MR. HUNTER:  Correct.

THE COURT:  Okay.  Now, as far as stipulations go, do you have a stipulation as to each of those exhibits or only one of them?

MR. HUNTER:  With regard to the September 2018, there's a stipulation as to each --

THE COURT:  That 1196?

MR. HUNTER:  1196.

THE COURT:  Let's call them by their numbers.  I don't care whether it's September 2018 or whatever just for now. All right.

What do you understand the stipulation is as to 1196?

MR. HUNTER:  We can pull it up on the screen. Ms. Bhatia has it.

THE COURT:  All right.  And is the stipulation the reference -- in the stipulation to the exhibit number, the date, or both?

MR. HUNTER:  It is to both.

THE COURT:  Fine.  Okay.  So we don't really have to look at it -- well, maybe you do to make sure you know what it

says.

But before, everybody was just kind of talking and not looking. So I don't know. My screen doesn't have anything on it. Does anybody else's?

MR. SLOAN: No.

THE COURT: No. Okay. Just a minute. I want to hear what Mr. Hunter thinks the stipulated says as to 1196. All right? What does it say?

MR. HUNTER: Your Honor, it's on your screen right now. 1196 has a file name, and it says the custodian is the September 2018 technology transfer package.

THE COURT: The custodian isn't -- can't be a package. Custodian is a person. So where does it say this? Makes no sense.

MR. HUNTER: This is Docket Number 390.

THE COURT: Have to change these glasses. Just a minute.

I'm sure I have it in paper form, but what line are you on here? Okay. 1196. It says September 18, technology transfer package. And where is the stipulation that goes with all these documents?

MR. HUNTER: So --

THE COURT: This is just a list the documents.

MR. HUNTER: This is Table D of the stipulation, which is, as you see at the top, the UMC documents that the

stipulation, which is at Docket 390, talks about.

So if Ms. Bhatia could pull up 390, this is the stipulation itself.  You'll see Item 4 lists that table we were just looking at, exhibits listed in Table D.

THE COURT:  All right.  Authentic.  All right.  That's all it says.  It says Jinhua reserves the right to object on any other ground they feel like.

So that is 1196.  Correct?  Okay.

A later asserted transfer.  The first asserted transfer is 1192.  And that wasn't on that document list for some reason?

MR. HUNTER:  It was on that document, but it wasn't titled under -- 2018 technology transfer.

THE COURT:  Well, it wouldn't be because it was a different transfer.

MR. HUNTER:  Correct.

THE COURT:  Are those only supposed to be the 2018, the one that you have on the screen right now?

MR. HUNTER:  That's right.

THE COURT:  Oh.  Okay.  Well, do you have another stipulation or not that would cover 1192?

MR. HUNTER:  1192 is also on this page, Your Honor.

THE COURT:  Well, that's, I thought, what I asked.

Okay.  Same -- same document.  And what does the stipulation say about that?

MR. HUNTER:  Same exact stipulation, Your Honor.  The

only difference is that the custodian listed on the table is just UMC.

THE COURT:  What do you mean?

MR. HUNTER:  Back on that Table D, you'll see under the last column where it says custodian, for 1192 the stipulation just says it came from UMC because it was not from a certain person's custodial file, as the Government received it.

THE COURT:  Well, I guess the question is what did anybody mean by technology transfer package?  Is that the issue here or --

MR. HUNTER:  That's exactly the issue.

THE COURT:  What was the heading "custodian" even supposed to mean?

MR. HUNTER:  Your Honor, the way we received this from UMC, there was not a person who held the technology transfer package; there was a server.  And that server just existed at UMC.

THE COURT:  Wait a minute.  No.  In other words, does the word "custodian" mean who has it?  Who had it?  I just don't understand how it fits in.  All of these documents purportedly came from UMC.  Correct?

MR. HUNTER:  Correct.

THE COURT:  All right.  And if you were just prosecuting UMC, they'd all be authentic and whatever UMC said

they are.  This defendant is not bound by whatever UMC says except to the extent they stipulate.

I don't understand the significance of the custodian column.  I'm -- I don't know what UMC meant it to be, what you understood it to be, and what your stipulation thought it was supposed to be.

Do you -- did UMC tell you what they meant, at least from their end, by the word "custodian."

**MR. HUNTER:**  Yes, Your Honor.  We requested from UMC and received the documents that UMC represented were transferred to Jinhua in 2018.

**THE COURT:**  All of -- in other words, this list is something that -- UMC makes an out-of-court hearsay statement to you -- were transferred on whatever dates they show to Jinhua?

**MR. HUNTER:**  Correct.

**THE COURT:**  All right.  But you don't have anybody from UMC to say that; right?

**MR. HUNTER:**  Correct.

**THE COURT:**  Even though they're supposed to be cooperating in their plea agreement and everything, that doesn't apparently encompass testimony?

**MR. HUNTER:**  Right.  We do have -- the documentation has been put into evidence of the technology transfer.

**THE COURT:**  I don't know what that means.  Okay.

I'm not sure what that sentence meant.  Do you want to elaborate or not?

**MR. HUNTER:**  Your Honor, at P1158 was a -- one of these UMC document receipts.  You'll see it's acknowledged as -- it's being pulled up on the screen now.  It's acknowledgement of document receipt to Jinhua.

**THE COURT:**  Well, wait a minute.  No, no.  If you acknowledge receipt, that's you acknowledge you got it, not -- it's not an assertion somebody else got it.  So it says "acknowledge of" -- well, that's already at -- is this supposed to be a translation?

**MR. HUNTER:**  This is a translation.  That's right.

**THE COURT:**  Well --

**MR. HUNTER:**  Already in evidence.

**THE COURT:**  It's already also not exactly correct grammar.  Okay.

I don't know what this was supposed to -- who testified about this?

**MR. HUNTER:**  Agent Ho.

**THE COURT:**  I don't know.  What did she say?

**MR. HUNTER:**  I believe this was probably a document that was just put into evidence by Ms. Vartain while Agent Ho was on the stand.

**THE COURT:**  I don't know what this is supposed to be. Can you scroll down a bit or -- all right.

There are five things, I guess, files of some sort.  It says, "To acknowledge the successful delivery of this document, please kindly reply to this e-mail or sign back the acknowledgment letter (as attached) by e-mail or fax."

Then there's a signature by someone at UMC.  Is there -- it appears that they are asking for someone at the receiving end at -- because they're sending it to Jinhua, all right, according to this document and asking for an acknowledgment of receipt from Jinhua.  But you don't have one; right?

**MR. HUNTER:**  Your Honor, my understanding is that is a signature of someone at Jinhua.

**THE COURT:**  Even though underneath it it says "United Microelectronics Corp"?

**MR. HUNTER:**  I think that's just an indication of whose form this is.

**THE COURT:**  Not --

**MR. HUNTER:**  You'll see the name Chen Huihuang is listed on the top on the "to" line under Fujian Jinhua.

**THE COURT:**  Maybe -- it seems strange.  Instead of saying, "please sign below," it says, "please sign on some other kind of document not there."

So -- but maybe that's what they meant.  Maybe this translation is not the greatest, but it says, "would you acknowledge delivery by either replying to the e-mail" -- okay.  That's not a reply -- or it says, "sign back the acknowledgment

letter (as attached)."  So not this document unless the word "attached" is in some way a mistranslation, but I'm going to assume it sounds like it's a separate document that says "we acknowledge receipt of these documents" or something, not just a signature.

But if you are using this as evidence that they sent it and got it back with some Jinhua signature, and assume for a moment that that's what you're offering it for, which exhibit does this refer to?

**MR. HUNTER:**  And that's where I would ask Dr. Dyer if this -- Your Honor, my understanding is this is a list of folders that were delivered to Jinhua.  As you see in the remark in the table, it shows -- for example, on Number 1 it says, "01 Technology Summary" is the spec name.  And then you go all the way over.  It says, "Remark."  It says, "3 files, 17 directories."

And I believe what Dr. Dyer would testify to is that, when he extracted those exhibits starting at P1196, he found them in a folder structure that matched the folder structure on this document receipt.

**THE COURT:**  Okay.  When he looked at the documents that constitute 1196, he thinks that something about them is consistent with Item 1?

**MR. HUNTER:**  That's --

**THE COURT:**  Which is pretty general.  It just says, "3

files, 17 directories." And then the next one says, "13 files, 23 directories," et cetera, et cetera. Did he find all of those documents somewhere so that there was something that all matched up, or he just found the one that he thinks matches or --

MR. HUNTER: Maybe I can ask him some questions about that.

THE COURT: Okay. But before we get to that, and just getting back to this so-called stipulation, when somebody wrote "custodian" -- I don't know -- that doesn't seem to make any sense at all. What UMC told you is, "We gave all this stuff to Jinhua, all the things here," which you can't use as evidence in the case in any way, shape, or form.

We have a stipulation as to authenticity. It is, let's say, a process flow or whatever -- fine -- that UMC created. Fine. That's what it purports to be. But the -- is that the same stipulation as to both 1192 and 1196; right?

MR. HUNTER: Correct.

THE COURT: And this one here is supposed to be -- I'm sorry -- again, 1192 or 6?

MR. HUNTER: This one relates to 1196.

THE COURT: Okay. Or you think the witness is going to connect it up if they haven't -- or maybe they already did. I don't know.

Then 1192, are you relying on something else? In other

words, you don't have one of these things for 1192.

MR. HUNTER:  Correct, Your Honor.  For 1192, I think that one was admitted and identified based on circumstantial evidence.  And I think the discussion is now past that one. I'm satisfied with the record on 1192.

THE COURT:  Okay.  I mean, I just -- we talked a little bit yesterday when everybody thought they were talking about 1192, or at least Mr. Sloan did and I think I did, about these banner confidentiality additions to various exhibits and all.

And we talked -- or I asked him quite a bit about why there were multiples of the so-called finished product.  And it turned out that the first delivery, according to Dr. Dyer, would be enough to get them going but not necessarily the very best that they would get, I guess.  I don't know.

All right.  Mr. Sloan, anything you want to add to this before Dr. Dyer is asked about this particular exhibit --

MR. SLOAN:  Your Honor --

THE COURT:  -- that's on the screen?

MR. SLOAN:  Your Honor, I think you understand.  Our understanding of the custodian designation which was provided by the stipulation prepared by the Government was essentially that -- that it came out of a file or a server that was titled "September 2018 technology transfer package."  And the only thing we stipulated to was that they received it from UMC and

that it was authentic, not that the fact that the custodian file was named by someone "technology transfer package" meant that it had, in fact, been transferred.

THE COURT: All right. Fair enough. And for the more generic just UMC, why didn't those documents have a file name of some sort?

MR. HUNTER: Your Honor, they didn't have a custodian because UMC provided them to us without reference to a person who they -- they pulled the document from that person's files; it was just provided by UMC.

THE COURT: Custodian meant the person's file from which the document came?

MR. HUNTER: Correct.

THE COURT: Well, that would have been easy to say earlier, frankly.

But okay. All right. Fine. Do you want to keep going? Have we cleared this up?

MR. SLOAN: I think it's been cleared up, Your Honor.

THE COURT: Right. Whatever it was, I never thought that Jinhua was stipulating to anything about what happened to a document.

MR. SLOAN: Your Honor, we just wanted to be sure that the record was clear. And I'm certainly satisfied.

THE COURT: Okay. Then we'll keep going.

MR. HUNTER: Thank you, Your Honor.

THE COURT:  Thank you.

MR. HUNTER:  If we could keep that document on the screen.  This is what has previously been admitted as P1158T.

**THOMAS DYER**,

called as a witness for the Government, having been previously duly sworn, testified further as follows:

**DIRECT EXAMINATION** (Resumed)

BY MR. HUNTER:

Q.   Dr. Dyer, when you -- you testified earlier that you reviewed documents that were in something called the technology transfer package?

A.   Yes, I did.

Q.   Does the designation of materials here on P1158T map to what you reviewed?

A.   Yes, it does.  I think there might have been some additional, but this was included.

Q.   And with reference to the documents that were admitted as part of the technology transfer package in P1196 through P1207 -- sorry -- through P1208, those were documents that you said you extracted the process flow information from for that fourth row in your Demonstrative A?

A.   Yeah.  I think you just referred to the 13 process documents that I've been referring to and that I used as part of my analysis.  And yes, I found that in this technology transfer package data business.  I think it was specifically in

Item 4 there, "Process Information."

Q.   So Item 4 lists -- on 1158 lists process information.  Was that a folder that you looked in on the technology transfer package to -- and where you found those exhibits we just listed?

A.   Yes, it was.

MR. HUNTER:  Your Honor, I'd also like to pass up to you P1162T, which has been previously admitted.

THE COURT:  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, do you see this says, "DRAM F32 Document Sharing"?

A.   Yes, I do.

Q.   Could you go ahead and read the -- under "Purpose" on page 1 of 1162T, could you go ahead and read the first sentence.

A.   Sure.  (reading):

"As the development of UMC Project M entered its second half, our company's R&D team has needed to share files with our client, Jinhua Integrated Circuits (JHICC), who has hired us to develop DRAM technology."

Q.   And if you go down in the second page, there is a Roman III called "Shared File Content."

A.   Yes.

Q.   Do you see items listed 1 through 18 there?

A.   Yes, I do.

Q.   Is that the folder structure that you viewed in the technology transfer package?

A.   Yes, it does.  That's a more comprehensive list, I think, of what was in there.  And it includes the five items we were just referring to.

Q.   And, again, Item 4 is process information.  Is that the folder where you extracted the process flow information?

A.   Yes.  As I mentioned, that -- that's where I found it.

Q.   Dr. Dyer, I'd like to direct your attention to page 5. And do you see on September 14, 2018?

A.   Yes, I see that.

Q.   Does it say that NBD manager Stephen Chen approved the transfer?

A.   Yes.  That September 14th date indicates an approval by Stephen Chen.

Q.   So Stephen Chen was essentially approving a transfer to himself at Jinhua; is that right?

A.   Yes, it appears to be.

          MR. HUNTER:  Your Honor, where we had left off yesterday, there was an exhibit that wasn't in your binder. That was P1488.  I'm going to pass that up to you now.  It's hole-punched if you want to put it in your binder.

          THE COURT:  Oh, I see you have created a tab for it as

well.  All right.  Give me a second.  I'm not sure if it's going to fit.

(Pause in proceedings.)

THE COURT:  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, the next set of documents, I believe you did an analysis of device names and parameters that were used in the technology at Project M and at Micron; is that right?

A.   Yes, that's right.

Q.   What is this first document, P1488?

A.   This was one of several monthly meeting presentations, meetings between UMI -- that's UltraMemory -- and UMC on the design aspect of the Project M DRAM project.

Q.   And if we go to page 3, what's on this page?

A.   This page lists the various devices that would be required to form the circuits that are specified in the UltraMemory design that they're providing to UMC.

Q.   And under "Symbol" is that the names you extracted from this for your analysis?

A.   Yes.  The symbols is sort of a brief name for each of these devices.

Q.   And on page -- if we can flip to page 27 and 28.

Did you use the information on page 27 and 28 for your analysis?

A.   Yes.  This is corresponding requirements for those various

devices in terms of how they need to perform for the circuit to function properly.

MR. HUNTER:  Your Honor, we'd move to admit P1488.

THE COURT:  Just a moment.  I'm just trying to just see the pages -- the second set of pages you referenced, but they're getting hung up on the binder rings.  Okay.

Okay.  Objection one way or the other?  Is there one?

MR. SLOAN:  Your Honor, one moment.

THE COURT:  Oh, okay.  Fine.

(Pause in proceedings.)

MR. SLOAN:  Your Honor, we're just trying to determine the basis of where it came from.  It's not -- it doesn't appear to have been produced by UMC, and it doesn't appear to be on our stipulation as to authenticity.  So --

THE COURT:  Are you saying you never have seen it before?  In other words, you didn't get it in discovery?  Is that -- are you saying it's just not part of the stipulation or what?

MR. HUNTER:  I can lay a little bit better foundation with Dr. Dyer.

THE COURT:  Okay.  Why don't you try that and then see if Mr. Sloan's question is answered; and if it isn't, we'll get back to it.

BY MR. HUNTER:

Q.   Dr. Dyer, did you find this PowerPoint presentation on one

of the seized devices, on Hard Drive 48?

**A.**   Yes.  I believe there were several copies in there.
Presumably different people that went to this meeting had their
own copy of the minutes or the notes.

**Q.**   And did you find it on Device 3?

**A.**   I don't recall offhand which device.

         **MR. HUNTER:**  Your Honor -- and this probably gives me
a good opportunity to pass up the chart of devices which has
now been agreed upon by the prosecution and defense.

         **THE COURT:**  That's a very elaborate list.  It looks a
lot like the devices -- or the documents we've been looking at
that are in evidence.  Maybe you've picked up UMC's manner of
creating documents.

     Let's see.  So you have -- wait a minute.  Before I get
too confused -- all right.  The numbers are the device numbers
that were given by BRG?

         **MR. HUNTER:**  Correct.

         **THE COURT:**  Okay.  Then there is the MJIB barcode
device number.  The BRG device number just tracks the device
number --

         **MR. HUNTER:**  That's right.

         **THE COURT:**  -- because that's where those first
numbers came from.

     Now, you have a description, location obtained.
All right.  That gets away from trying to attribute it to a

particular individual with possible disputes.  And the date seized.  Okay.

So you were asking him about Device Number 3?

MR. HUNTER:  I had asked him if this was obtained on Device 3.  I can represent to the Court it does come from Device 3.  Dr. Dyer doesn't remember exactly what device.

BY MR. HUNTER:

Q.   Do you remember whose devices you found this on?

A.   I believe Kenny Wang was one of the people that had possession of these documents on his devices.

THE COURT:  All right.  According to the chart -- and this is an agreed-upon chart, correct --

MR. HUNTER:  Correct.

THE COURT:  -- Mr. Sloan or someone for Jinhua?

MR. SLOAN:  That's correct, Your Honor.

THE COURT:  So thank you.  All right.  Well, this is helpful.  And 3 is a laptop found in Kenny Wang's UMC office.  And then it indicates what the source of that evidence would be.  This was from Special Agent Frank Pan of MJIB giving that testimony.

All right.  Well, that's -- I'm glad that you figured out a way to do that.  That's great.

I just have to put it somewhere where, given its coloring, I don't confuse it with other exhibits.  Because if you just looked at it with a quick glance, you'd say it came out of

UMC's files.

All right.  Okay.  So -- all right.  There we are with that.

MR. HUNTER:  So, Your Honor, we would then move to admit P1488.

THE COURT:  All right.  And then the question is is there an objection?

MR. SLOAN:  No, Your Honor.

THE COURT:  All right.  Then I'll go ahead and admit 1488.

(Trial Exhibit 1488 received in evidence.)

THE COURT:  Okay.

MR. HUNTER:  The next document is P1009T.

THE COURT:  1009T.  Now, is that going to be in the binder that I have up here which is the third binder for Dr. Dyer?

MR. HUNTER:  Yes, Your Honor.  It should be in that third binder.

THE COURT:  Do you have a hint as to where it might be located in the binder?

MR. HUNTER:  Actually, the very first and second document.

THE COURT:  Oh, I'm sorry.  It is the first -- it's covered up now by P1488 or where I put it.

Okay.  Fine.  All right.

BY MR. HUNTER:

Q.   And, Dr. Dyer, this looks to be an e-mail from Ming Te Wei to LT Rong; is that right?

A.   Yes.  That's correct.

Q.   And there was an attachment to this e-mail.

If we can go to the attachment and at page 5 specifically of the exhibit.

Dr. Dyer, what is the information on page 5 of the e-mail attachment?

A.   Let's see.  This is a table of devices with the device name and then some other information -- performance information for those devices.

Q.   And did you use this information in this UMC document to perform your comparison of devices?

A.   Yes, I did.

MR. HUNTER:  Your Honor, we would move to admit P1009 and P1009T.

THE COURT:  Just a minute.  Okay.  Are these people we've encountered before on this e-mail, Ming and Li or Le or whoever?

MR. HUNTER:  I don't think there has been much on Ming Te Wei.  LT Rong is an individual who is listed on your Key Individuals chart who we have seen some --

THE COURT:  Right.  Is this one going to Rong?  It says to Le Tien Jung and then -- where is Rong?

**MR. HUNTER:** Oh, Le Tien Jung is LT Rong.

**THE COURT:** Oh, okay. That's not even -- well, it's sort of close, I guess. Jung is Rong? Wow. Okay.

All right. And let's just see. I was so busy trying to figure out who those people were. Okay. Just a second.

(Pause in proceedings.)

**THE COURT:** Okay. And it's -- the attachment is -- did you look at a particular page here? Which page was that?

**MR. HUNTER:** That was page 5.

**THE COURT:** Okay. But you're offering the whole exhibit; right?

**MR. HUNTER:** That's right.

**THE COURT:** Okay. Now, the witness hasn't really talked in detail about this, though. Were you going to ask him more about it or not?

**MR. HUNTER:** It was really just that he -- what I just asked him was that he used the information in this table to perform one of his comparisons.

**THE COURT:** Were you then going to ask him about it afterwards or -- otherwise, it's just sitting there.

**MR. HUNTER:** There's actually a few documents that go into the comparison.

**THE COURT:** Oh, some comparison he made?

**MR. HUNTER:** Yeah, there's two more documents to move in before we show the comparison.

THE COURT:  Okay.  Well, all right.

Is there an objection to 1009T and 1009?

MR. SLOAN:  Your Honor, just with -- hearsay with respect to the declarative statement.

THE COURT:  In the e-mail?

MR. SLOAN:  In the e-mail.

THE COURT:  Let me take a look at it.  Let me see if I can find it.  Where --

MR. SLOAN:  Your Honor, the --

THE COURT:  Where are you reading?

MR. SLOAN:  The middle.

THE COURT:  It says "PP4 and 5 need your improvement." Is that it?

MR. SLOAN:  Yes, Your Honor.

THE COURT:  I don't know that that's so much declarative.  I guess in a way, whatever it means.

I'll overrule and admit 1009 and 1009T.

(Trial Exhibits 1009 and 1009T received in evidence.)

THE COURT:  I'm just taking this as one person at UMC asking another person for feedback about the document.  That's how I'm just interpreting it.  And under those circumstances, I would overrule on hearsay grounds.

MR. SLOAN:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. HUNTER:  Your Honor, the next document has been

previously admitted.  It's P606 and P606T.

THE COURT:  Okay.  That's coming up again in this binder.

MR. HUNTER:  That's right.

THE COURT:  From Albert Wu to Stephen Chen; right?

MR. HUNTER:  That's right.

THE COURT:  On December 26th of 2016.

BY MR. HUNTER:

Q.   Dr. Dyer, I believe the attachment is a document that is a Jinhua document, "Dynamic Random Access Memory, Research & Development, Progress Annual Report."

A.   Yes.  That's the title.

Q.   And if you look on page 9, is this information that you also used to perform your analysis of the devices?

A.   Yes, it is.  It's a very similar table to the one we looked at in the UMC document.

Q.   And, finally, if we could move to P1502.

THE COURT:  Now, let me see if I can find that, because the next one in the binder is 1510.  I see 1502.  Okay.

There is no T.  Okay.

This is purportedly a Micron document?

MR. HUNTER:  That's right.

THE COURT:  And what do you want to ask the witness about it?

\\\

BY MR. HUNTER:

Q.   Dr. Dyer, did you find this document on Hard Drive 48?

A.   Yes, I did.

Q.   And what is your determination of what this document is?

A.   This is a Micron document -- Micron confidential document, basically a device document describing the devices for Micron's DDR4 transistor parameter for circuit simulation.

Q.   And if -- did you find this on Device 13?

A.   I believe that's right.

THE COURT:   Okay.   Let me look at my handy chart.

Okay.   This is a flash drive turned over to Taiwan law enforcement.   The Government is attributing it to Kenny Wang, I gather, because it had his user ID on it or --

MR. HUNTER:   Correct.

THE COURT:   -- or indicia of something of interest to him.   Okay.   All right.

MR. HUNTER:   And, Your Honor, we would move to admit P1502.

THE COURT:   Any objection to 1502?

MR. SLOAN:   No objection, Your Honor.   I would, though, ask that counsel not continue to sort of lead the witness and tell him exactly where the document was found and actually ask the witness if he knows.   I haven't been doing that, but --

THE COURT:   Well, let's see.   In this instance, let me

see how the questioning went.

(Pause in proceedings.)

THE COURT:  Okay.  The question you're objecting to is, quote, did you find this on Device 13?

MR. SLOAN:  Yes, Your Honor.

THE COURT:  Yes.  And then the witness says, "I believe that's right."

Okay.  What you would prefer he says, "What device did you find it on?"

Okay.  Now, just because this really isn't -- this witness is not up here to fully test his memory.  So let me ask a question.

Are -- the locations of where various Micron documents were found, are those locations in dispute as to where they came from, not necessarily who was doing what with them wherever they were, but which device they came from?  Is that a disputed issue in this case?

MR. SLOAN:  Your Honor, I don't think it's a matter of substantial dispute.

THE COURT:  Okay.

MR. SLOAN:  I think I'm reacting more to this is a constant pattern of leading questions.

THE COURT:  I think he may be just saying to him, this one came from -- I mean, we could have -- let me see.  Is there other evidence showing where it came in -- where it came from

independent of Dr. Dyer?

MR. HUNTER:  Yes, Your Honor.

THE COURT:  And that evidence?  Just give me a quick is it from Agent Ho or --

MR. HUNTER:  Hard Drive 48 itself.

THE COURT:  Well, Hard Drive 48 has a collection of material on it that came from various devices; correct?

MR. HUNTER:  Correct.

THE COURT:  And how -- is it -- did somebody testify yet as to which devices had which documents on them?

MR. HUNTER:  Your Honor, there is an index -- I think it's P0533 -- of all the documents that Agent Chien said was an index of everything on Hard Drive 48.

THE COURT:  Agent Chien was the --

MR. HUNTER:  The MJIB forensic examiner.

THE COURT:  He's your witness who attributed the locations to various asserted Micron documents?

MR. HUNTER:  That's one way.  And Dr. Dyer himself actually has a copy of Hard Drive 48 that he has looked in and found these devices in.

THE COURT:  If you want Dr. Dyer to add to the record as opposed to simply acknowledge it and take it as a hypothetical -- okay -- then I'm going to sustain -- or at least approve their request that you not lead the witness on it.  Okay.

In other words, if you're really relying on him making that finding himself by making the search himself so that you can really nail down the location as opposed to just asking him, "Assume it came from; what's your opinion about XYZ?" then I think you should leave it to him to answer, and if he needs time -- you might find out if there's anything that refreshes his recollection as to where he found any given document that he could quickly check.  If it's going to be cumbersome, we'll figure out how to deal with it.  Okay.

MR. HUNTER:  Thank you, Your Honor.

MR. SLOAN:  Thank you, Your Honor.

THE COURT:  Oh.  All right.  Thank you.

Is it hard for you to find where you found -- where you located a particular Micron document?

THE WITNESS:  Not at all.  I wish I knew this was going to come up.  It would have been very easy for me to remember the numbers of everything.  I do recall this specifically being on a Kenny Wang device.

THE COURT:  The question is not really, you know, do you have a good memory or not.  That might apply if somebody was trying to, you know, recount how a robbery occurred or something and there's no record of it otherwise.

That's not what we're dealing with here.  It's just more a question of just -- I'm sure you have a record of it and you can then either rely on that if you need to or your total

recall if you've got it.  Either way.  All right.  It's not a test, in other words.

THE WITNESS:  I appreciate that.

THE COURT:  Okay.

THE CLERK:  Is 1502 admitted?

THE COURT:  1502, I think I did admit.  Did I? Ms. Geiger was asking did I admit it?  I will admit it if I didn't --

MR. HUNTER:  Thank you, Your Honor.

THE COURT:  -- because it's supposed to be a Micron device that was somewhere it shouldn't have been.  Okay.

(Trial Exhibit 1502 received in evidence.)

BY MR. HUNTER:

Q.   And, Dr. Dyer, if we go to page 2 of this Micron design rule document, what do you see on page 2?

A.   On page 2 I see a transistor table that -- similar information, formatted differently from the tables we just looked at previously.  But same information -- list of devices with various operating performance criteria.

Q.   And if we look at some of those device names starting on that first column on the left, I see device name likes NCH or N24.

Are those names of particular devices?

A.   Yes.  Those are the names of the devices.  I believe the NCH is referring to type of device and the N24 is referring to

the gate oxide thickness of that device.  So yeah.

Q.   Are those industry standard names for devices?

A.   Not to my knowledge.

THE COURT:  What did you say N24 was?

THE WITNESS:  Oh, the 24 refers to a gate oxide thickness.  You have two types of devices, each with a different thickness of a parameter.

THE COURT:  So the gate --

THE WITNESS:  Yes.

THE COURT:  What was the second word?

THE WITNESS:  Gate oxide.

THE COURT:  Yeah, that's what I thought you said.  So gate oxide thickness.

THE WITNESS:  Yes.  We talked a little bit about gate oxide earlier and how critical that is for the transistor performance.  And so that's one of the parameters they want to call out in the name.  It's important to know.

THE COURT:  How thick it is?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, we just discussed four documents that were admitted.

Did you create a comparison of the device names and parameters of some of these devices?

**A.**   Yes, I did.

**Q.**   Is that on -- if we pull up page 75 of your demonstrative.

Dr. Dyer, what are you showing across the top of this demonstrative on page 75?

**A.**   Across the top we see the four tables that we just referred to from the various documents and, maybe more importantly, various sources; right?

We had one Micron-sourced document, one UltraMemory-sourced document, a UMC-sourced document and a Jinhua-sourced document.

**Q.**   And what is the table below those documents?

**A.**   Just in order to facilitate the comparison between in this case just the device names, putting them side by side.  So I have device type, the first few columns on the left; and then the -- basically, again, the source and which document we saw those devices in -- Micron, UMI, UMC, Jinhua.

So you can just compare across the rows the naming that each of the different companies was using for their collective list of devices.

**Q.**   It looks like a complete match in terms of the naming except for maybe one instance under S.A.?

**A.**   Yeah.  That's what I recall, and that's what I'm seeing again here.  For some reason, that one is slightly different naming, but everything else has the exact same name.  Yeah, I don't know why they would have changed that.  But for UMC and

Jinhua, that particular sense amp device has a slightly different name.

THE COURT:  Where were we on that?

THE WITNESS:  Right in the middle, where it says --

THE COURT:  Oh, two of them say SAN?  Is that what you're looking at?

THE WITNESS:  Yes.

THE COURT:  The other says S.A.

THE WITNESS:  Yes.

THE COURT:  Okay.  Let's see.  So UMC and Jinhua are the same, and Micron and UMI are the same.  And then the -- they differ -- those two groups or duos differ.  Okay. All right.

BY MR. HUNTER:

Q.   Then, Dr. Dyer, on page 76 of your demonstrative, did you also undertake to perform a comparison of specific parameters in these devices?

A.   Yes, I did.

And I dropped off the UMC version because it was exactly the same as the Project M.  And so, yeah, everything highlighted in red there matched exactly.  Again, it's one of these cases where you've got things matching to three significant figures, probably higher degree of accuracy than is really important for the device itself.  But I think it just indicates copying or common source for those numbers.

Q.   Take us across what these parameters are.  I see -- so device type, there's some information.  And I see N24.  Is that the name of one of those devices?

A.   Yeah, that's right.  I mean, if we want to go into the details on some of that, we can.  But at the end of that device type, bigger column is the names of the various devices.

Q.   And then the parameters you're comparing are tox, L, and VT?

A.   Yes, hm-hmm.

Q.   Give us a sense of what these parameters are and their numbers.

A.   tox is the gate oxide thickness.  These -- a given collection of devices has two different gate oxide thicknesses, generally.  They have the thin gate ox, which we see here is about 2.73 -- you know, call it roughly 3 nanometers.  And the thicker oxide device, which would be the 5 -- roughly 5-nanometer thickness.

Q.   And how about the L?  What is L?

A.   L is the length of the device, basically how long the channel is.

Q.   And then VT?

A.   VT is the threshold voltage, and it basically indicates at what, you know, applied signal, what voltage you apply to the gate at which the device will turn on and start to conduct, basically closing the switch.

Q.   And it looks like you've coded across Micron, UMI, and Project M red if things are an exact match?

A.   That's correct.

Q.   What is yellow?

A.   Yellow are the ones that were not an exact match.  But again, from a process perspective, you only have two gate oxide thicknesses.  There's only two that is deposits.  These numbers could be actual measurements that they make because growing that -- a single oxide on different surfaces can give you slightly different thicknesses.  You know, there may be other things to explain that variation.

     But you will notice even those numbers, at least under the gate oxide thickness columns, they're either close to 5 or they're close to 3.  You know, there's two different thicknesses indicated.

Q.   Dr. Dyer, these are -- these devices are transistors; is that right?

A.   That's correct.

Q.   And I believe we've heard now that transistors or the electrical properties of the transistors are created through doping?

A.   Yeah.  They heavily depend on the ion-implant doping that determines their properties.

Q.   And just briefly describe again, what is doping?

A.   Doping is putting a nonsilicon atom into a silicon

material.  And doing so, you can either be adding -- enhancing the conductivity of the silicon or -- actually both by adding two different types of charge carriers.

Q.   And that creates the electrical performance of the transistor?

A.   That's right.

Q.   And with regard to the alleged trade secrets in this case, are alleged Trade Secrets 3 and 4 related to those doping parameters or ion implant conditions?

A.   Yes.  Alleged Trade Secrets 3 and 4 were ion implant tables, which list all the various parameters for all the various ion implant steps in the corresponding -- you know, for Micron's 25-nanometer technology.

        MR. HUNTER:  If we can pull up what's been previously admitted as alleged Trade Secret 3, P0131.

     Your Honor, this is an Excel spreadsheet that appears electronically.

BY MR. HUNTER:

Q.   Dr. Dyer, there is a tab here, P.307 II table.

     Do you see that?

A.   Yes, I do.

Q.   Does this table relate to those ion implants?

A.   It does.  It relates the ion implants to the various devices that we just looked at.

Q.   Where are the devices indicated on this table?

**A.**   The devices are indicated in Column F.  If you look closely at the entries there, you'll see NCH, indicating an N channel.  The N refers to the type of doping on this device. And N24, indicating it's a thin oxide in-channel device.

**Q.**   And as we go across the spreadsheet, I see indications of light, dark.  What are those indicating?

**A.**   Well, if you look at column -- I'm sorry -- Row 9, that's where it indicates, in just sort of a descriptive form, each of the implant steps.  And the light and dark indicate whether or not the device -- so let's just look at maybe column -- cell number Row 10, Column S.  We see that that's light.

So the particular device in that row is getting the particular implant in that column.  So it's getting that first channel implant for that device.

So this is a truth table that tells you all the implants that each device gets.  It relates the devices to the implants.

**Q.**   Did you find a similar truth table in the technology transfer package?

**A.**   Yes, I did.

**Q.**   That was the September 2018 technology transfer package?

**A.**   That's correct.

**Q.**   If we could pull up P1505.  This is an electronic spreadsheet.  I think there is a tab, "Design Truth Table."

Is that a truth table you found?

**A.**   Yes, it is.  Different format.  Instead of the light and

the dark shading, you've got a big dot or a little X, a big dot corresponding to the clear -- you know, the unshaded cells, and the X corresponding to the dark-shaded cells.

Q.   And I see device type, again, indicated at the top, one being N24?

A.   Yeah, it looks like, you know, again, the listed devices were predominantly the same.  So you've got the same devices listed.  And then here in Row 1, you have those descriptive names for what each of the implants is.

Q.   And the file name here, I see, indicates in the middle, Version 4_JHICC.

Do you see that?

A.   Let's see, file name.

Ah, yes, right there.  It -- in part it looks like there's a date, there's a V4 -- Version 4, I suppose -- JHICC, and AMO1 is referring to a particular test vehicle, I believe, that they'd be running.

MR. HUNTER:  Your Honor, we'd move to admit P1505.

THE COURT:  Where is this supposed to be coming from?  Or what is it?

MR. HUNTER:  This is one of the documents from the September 2018 technology transfer package.

THE COURT:  Okay.  Do you have some evidence that it was transferred?

\\\

BY MR. HUNTER:

Q.    Dr. Dyer, did you find this in the same grouping of files that we discussed previously as related to the technology transfer package?

A.    Yes, that's correct.  We'd been talking about -- you know, in the database that I have access to, there's a separate section that is identified as the technology transfer package. It was something that became available in the course of my analysis on this case, something we highly anticipated.  And, yes, this was found within that -- that collection of documents, within that directory.

        THE COURT:  All right.  But it's coming from UMC. All right.

    Is there objection?

        MR. SLOAN:  No, Your Honor.

        THE COURT:  So 1505 is admitted.

    (Trial Exhibit 1505 received in evidence.)

        THE COURT:  So this witness is comparing this document to alleged Trade Secret 3?

        MR. HUNTER:  Correct.

BY MR. HUNTER:

Q.    Is, Dr. Dyer, that comparison on page 77 of your demonstrative?

A.    I believe it's in there somewhere.  And as soon as it pops up, I'll confirm.  There it is, page 77.  That is the

comparison between what was in the Micron trade secret and what was in the UMC to Jinhua technology transfer package.

Q.   Now, this chart is hard to kind of interpret and read, but can you explain why it's hard to interpret and read and what it shows?

A.   Well, it does contain an awful lot of information; so that makes it somewhat difficult.  And the former formatting is different between the way Micron represented the information and the way UMC represented the information in the tech transfer package.

Q.   Did you try to preserve that formatting in your comparison?

A.   Yes.  I was just going to mention that, in general when I did comparisons, if possible I tried to preserve formatting as well.  But sometimes it does make it a little harder to sort out.

Q.   And explain the very top series of columns.  It looks like you've extracted some subset of the columns?

A.   Yes, I did.  And I just noticed here one way to help orient you in this comparison, I entered weaved rows because I wanted to compare corresponding rows between the Micron trade secret document and the UMC tech transfer information.

     Everything highlighted in purple came from the tech transfer, and then the other cells, which generally there will be a row above each purple row, came from the Micron document.

So you just asked me about the top.  That's the names of the implants, the various implants, both as named in the Micron document and as named in the tech transfer document below it.

Q.   And then let's just take a look at the kind of first comparison row where it says NCHN24 in white on the left and then below that it says N24.

A.   Yes.  Again, on top is how it appeared in the Micron trade secret, and in the purple underneath that is how it was presented in the tech transfer package.

Q.   And so the relevant comparison for that device is really looking across that -- those rows -- those two rows, N24 and N24; is that right?

A.   Yes.  Correct.

Q.   And then the Micron information has dark and light, whereas the Jinhua information has Xs and dots?

A.   That's correct.

Q.   How do we compare those to find similarity?

A.   Well, as I mentioned before when we -- after looking at the two source documents, the light and the dots indicate that device is getting that particular implant; so just connecting the device in that row and the implant in the column.

So basically what you see across this is a light cell in the Micron document corresponds to a big dot in the UMC, the Jinhua tech transfer package -- I should say Project M tech transfer package.

So, basically, bottom line here, if you're wondering -- I don't mean to make it overly confusing -- but it's just establishing they had the same collection of devices and those devices being defined by the same combination of implants.

And, by the way, if it's not clear, each of these implants is a step.  It's actually a series of steps because you have to pattern where you're going to put the implant, which device, and do the implant and then strip off some of the masking material.

So across the column those implants are steps in the sequence.  Just to make that point.

Q.   Dr. Dyer, to the best of your knowledge, does this type of detailed information exist in the public domain in any form whatsoever?

A.   Not no my knowledge.

MR. HUNTER:  If we can pull up now P0140, which is alleged Trade Secret 4, previously admitted.  And if we scroll to the -- let's go to the Imp table V90B tab at the beginning.

THE COURT:  You're in 4 now?

MR. HUNTER:  Alleged Trade Secret 4.

THE COURT:  This another spreadsheet?

MR. HUNTER:  Yup.

BY MR. HUNTER:

Q.   Dr. Dyer, now, what type of information is in alleged Trade Secret 4?  And I think we need to scroll to the right to

see it all.

A.   This document represents the various parameters that go into the -- all these ion implant steps.  So again, it lists all the steps -- these would be steps again in the process flow -- and the critical -- you know, the defining parameters for each implant.  And that's what we're looking at now.

Q.   And I see the parameters are, like, species, energy, dose, beam current, implant angle?

A.   Yes.

Q.   Just generally, without going into each one, what are those conditions?

A.   Well, species is what atom you are inserting into the silicon lattice.

Energy is at what -- with how much energy.  It determines how deep that particular implant goes into the silicon so you could tailor the depth profile.

Dose is how much -- how many atoms, basically, you're putting in a given area.  So it -- it's directly related to the concentration that you end up with.

Beam current is more of a tool parameter.

Dose plus beam current, technically, is what determines the total concentration.

Q.   Dr. Dyer --

A.   Actually, I shouldn't say that.  The dose determines the concentration; the beam current just indicates how fast all

that -- those species are being inserted into the substrate.

Q.   Dr. Dyer, how much work goes into determining these parameters?

A.   Oh --

MR. SLOAN:  Objection, Your Honor.  Foundation.

THE COURT:  Well, can you lay a little foundation for that?

BY MR. HUNTER:

Q.   Dr. Dyer, based on your experience in the DRAM industry, are you familiar with how much work goes into determining ion implant conditions?

A.   Yes, I am.

Q.   And how so?

A.   My first experience working in logic was focused on device fabrication, and I worked closely with device engineers who were the ones that are fine-tuning all these sorts of parameters to dial in the device properties to get what they need.

Q.   And --

THE COURT:  Is the same for memory and logic?

THE WITNESS:  Yes.  This part of the technology is going into the peripheral circuitry, which is considered logic.

THE COURT:  And it applies when you're making DRAM also?

THE WITNESS:  Yes.  The thing about DRAM is the chip

is -- primarily consists of these huge memory arrays, these cells. But to control the signals going in and out and to control the operation of it, you have a small amount of logic on that chip.

THE COURT: I see.

THE WITNESS: You also have, I mentioned earlier, the sense amps, these very tightly packed logic devices that connect directly to the array. And those are very specialized for being able to detect the signal so you can read the memory cells.

THE COURT: Okay. All right. Kind of the machinery that makes it work.

THE WITNESS: Exactly.

BY MR. HUNTER:

Q. Dr. Dyer, there's also transistors under the memory cells; is that right? One transistor per capacitor for DRAM; is that true?

A. That is true. The DRAM cell consists of one transistor and one capacitor. And that transistor in the memory cell is very specialized. It's a recessed access transistor. It's actually recessed under the surface. So it's a lot different than these but same idea.

Q. And now I think the original question I asked was how much work goes into developing these type of parameters for ion implant conditions?

A.   It's -- it's consistent with what I said before about the origin of technology and things continually being propagated forward.  So I would start with, you know, several generations back.  You're fabricating devices.  You have to adapt those to a smaller technology node the next generation.  You still utilize that information and that learning, but you can tweak things.

As you're doing that, you know, there's also all kinds of simulation tools to help kind of guide which direction you need to adjust things.

You have a whole separate class of engineers focused on devices.  These are people that have a deep knowledge of device physics, you know, how charge carriers move in a crystalline material.

And so an awful lot of work goes into this, as every aspect, really, of modern integrated circuit technology.

Q.   Did you find instances of ion implant conditions in Project M documents?

A.   Yes, I did.

Q.   If we could open P0448.

Dr. Dyer, is this the document within which you found some Project M ion implant conditions?

A.   I found ion implant conditions in a very large number of documents.  And this one was interesting because it had the closest degree of match.  You know, again, they all match --

all the earlier documents where I found those tables match very closely, but here's one that was almost exact, you know, what was found in the Micron trade secret.

Q.   Do you remember what device you found this particular document on, P0448?

A.   Again, I believe it was a Kenny Wang device.  But, you know, I didn't memorize all my device numbers.

MR. HUNTER:  Your Honor, we'd move to admit P0448.

THE COURT:  Okay.  Any objection?

MR. SLOAN:  No objection, Your Honor.

THE COURT:  All right.  448 is admitted.

(Trial Exhibit 448 received in evidence.)

THE COURT:  How hard would it be for you to go back and find which document -- I'm sorry -- which devices various materials would be found at?

THE WITNESS:  It would be very easy.  It would take me maybe five minutes on my computer.

THE COURT:  Do you have that available if we took, for example, a little bit longer in the break?  And you could just find those.  And what would you do?  Write them down somewhere so you'd have it available and could answer, then, based on that?

THE WITNESS:  Sure.

THE COURT:  Okay.  That's if you really want his testimony along with the testimony from the other witness.

MR. HUNTER: I think we can handle that on the break, which probably can get to pretty quickly here.

THE COURT: Yeah. So what's your question, then?

BY MR. HUNTER:

Q. Dr. Dyer, if we can go to page 5.

Dr. Dyer, while we're on page 1, who was the author indicated on page 1 of this presentation?

A. I believe that was Kenny Wang.

Q. And what is the information on page 5?

A. So here is an ion implant table, again listing all of those implant steps with a name sort of describing what the purpose of that implant is, along with various parameters, including the ones we just mentioned, also including equipment type and some consideration notes.

Q. And just briefly on page 8, Dr. Dyer, what is the information on page 8?

A. Here's a process condition comparison. It looks like they're specifically focusing on steps that have a thermal cycle, you know, where they -- raises the temperature of the wafer to a high temperature and then brings it back down.

Q. And I see the third column is something called "Other Fab"?

A. Yes, I see that.

Q. It has arrows then pointing from other fab to 25-nanometer DRAM?

A.    Yeah.  Yup.

Q.    Did you form an opinion about what that meant?

A.    Yeah.  To me, it looks like the implants from the other fab were brought into the 25-nanometer DRAM project; so the Project M DRAM project.

Q.    If we go back to page 5, did you create a comparison in your demonstrative of the parameters on page 5 of P0448 and the parameters in alleged Trade Secret 4?

A.    Yes, I did.

Q.    If we turn to page 78 of your demonstrative, is that the comparison that you performed?

A.    Yes, it is.

Q.    What did you find?

A.    I found that almost exactly the information in the Project M ion implant table that we just looked at matches what is seen in the Micron alleged Trade Secret 4.

I looked at all the various parameters, including that equipment type.  The equipment type is just indicating, you know, some implanters can do high energy.  HE would be high-energy implant.  MC, I think that's medium current.

Anyway, you've got different equipment type doing the implants.  You've got your species, you know, what kind of atom you're putting in there, what kind of ion specifically.  The energy of each of the implants, the dose of each of the implants, and the angles -- there's actually two different

angles, and then there's a step parameter just indicating at what angle relative to the surface of the wafer the implants are going in and how the wafer might be twisted when you do that implant.

So you've got -- what? -- seven parameters for each implant.  And I compared them parameter by parameter.  And just to help the eyeball a little bit, I color-coded.  Everything that matched up exactly is color-coded red; everything that did not match up is color-coded gray.

Q.   And I see there's one gray line.  Can you explain that?

A.   Yeah.  It -- in the Micron -- in the Project M -- I should say in the Project M table, they added a fourth channel that I didn't see in the Micron source document.

They didn't have conditions for it yet.  All they had for that particular row was that it would a medium current tool and a boron implant.  But as far as energy dose, angle twist, and step, it indicated "to be determined."  So it looked like something they were actively considering putting in.

And the one other thing that had a little bit of gray, I did half-gray, half-red.  The Micron trade secret document had two implant steps in that single step.  So it had two implant energies, really, same species, energy, angle and twist, but two different doses.  The Project M only had the first of those two doses listed.

Q.   And, Dr. Dyer, these numbers match, it looks like often,

to two decimal places.  So, for example, under 1HVLDD, I see a dose of 3.94 times 10 to the 13th, or E plus 13; is that right?

A.   Yeah.  It's pretty obvious to me that this is an exact copy job, where they had a couple things that -- small things that didn't match up exactly.

Yeah, again, the purpose -- part of the purpose is there's a lot of indications of Micron technology finding its way into the UMC process.  Some of them, it was my hope that it would be easier for a layperson to, you know, appreciate the degree of match even without understanding each individual parameter.

MR. HUNTER:  Your Honor, it's probably a good time for a break.

THE COURT:  Yes.  Now, we can take -- if you want to make it 20 instead of 15 so the witness can just put together the match of the device to the Micron document.  I could just have him do it during the break, but he's been working so hard. I just thought we'd give him 15 real minutes.  Okay.

THE WITNESS:  Thank you.

THE COURT:  So, anyway, we'll take 20-minute break, and that will take us back at just 11:00.  Thank you.

(Recess taken at 10:39 a.m.)

(Proceedings resumed at 11:04 a.m.)

THE CLERK:  Please remain seated and come to order.

THE COURT:  Okay.  Mr. Hunter, Ms. Geiger told me during the break that she did not see one of the exhibits that

you thought was in having been admitted.

MR. HUNTER:  Yes, Your Honor.  And I was going to try to correct that with Dr. Dyer.

THE COURT:  Okay.  This is sort of Trade Secret 4.

MR. HUNTER:  That's right.  Maybe we'll just start with that.

BY MR. HUNTER:

Q.   Dr. Dyer, I think you were testifying earlier about a version of P0140 -- or a version of alleged Trade Secret 4 at P0140.

If we could just pull that up.

(Pause in proceedings.)

BY MR. HUNTER:

Q.   Dr. Dyer, if you could take a look at P0140.

MR. HUNTER:  Your Honor, I believe that testimony of Agent Ho, this was a version of alleged Trade Secret 4 found on a Google Drive of Kenny Wang.

BY MR. HUNTER:

Q.   Dr. Dyer --

THE COURT:  Did this witness find it also?

MR. HUNTER:  He did not found it on the Google Drive.

THE COURT:  Oh.

MR. HUNTER:  But this version that we reviewed with him -- and I was just going to ask him if it's a copy of the version that has been admitted as P0142, which is from

Device 13.

THE COURT:  Oh, I see.  In other words, 142, does it look a lot like 140?

MR. HUNTER:  Correct.

THE COURT:  Okay.  But this witness actually did or didn't find 140?

MR. HUNTER:  He did not find 140.

THE COURT:  You say Agent Ho found 140?

MR. HUNTER:  Agent Ho found 140.

THE COURT:  And you didn't admit it then?

MR. HUNTER:  I believe it was on her summary sheet of the different locations of the alleged trade secrets on the Google Drive account.

THE COURT:  Was that put into evidence?

MR. HUNTER:  Yes.

THE COURT:  Okay.  So then are you offering 140?

MR. HUNTER:  Just to make sure the record was clear, I was going to offer P0140.

THE COURT:  That's 140?

MR. HUNTER:  Right.

THE COURT:  Well, that's my question.

MR. HUNTER:  Yes.

THE COURT:  Is there any objection?

MR. SLOAN:  No, Your Honor.

THE COURT:  All right.  140 or P0140 is admitted.

(Trial Exhibit 140 received in evidence.)

THE COURT:  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, during the break were you able to look at your copy of Hard Drive 48 and determine on what device you found the exhibit we reviewed as P0448?

A.   Yes, I did.

Q.   What device did you find that document P0448 on?

A.   It was -- I'm going to call it Device 3.  I don't remember the entire sequence of numbers; but yeah, Device 3.

Q.   And if we could briefly go back to page 78 of your demonstrative, the comparison of the ion implant conditions.

Dr. Dyer, based on expertise and your experience working with these type of parameters, what is the likelihood of two independent developments coming to this exact same sequence of parameters?

A.   I would say very close to zero.

Q.   Okay.

If we could now pull up P0969.

Dr. Dyer, did you find evidence in your review of the documents from UMC about their efforts to change the ion implant conditions over time?

A.   Yes, I did.

Q.   And is P0969 an e-mail that contains an attachment that shows how those ion implant conditions changed over time?

A.    Yes, it does.

Q.    And just briefly, who is involved in this e-mail, and what is the time frame?

A.    This e-mail was sent by Ming Te Wei -- I think he might have been a first-line manager in the device group -- and LT Rong, and the name here shown as Le Tien Jung.  But, again, it took me a while to get used to it as well --

        THE COURT:  Exactly.

        THE WITNESS:  -- but LT Rong.

    And there's a person copied here, Che Hung Huang.

BY MR. HUNTER:

Q.    And if we go down in the attachment.  The attachment is an Excel spreadsheet.  Is this the attachment that you determined showed how Project M changed the ion implant conditions over time?

A.    Yeah.  And just like most of this, there was a variety of information supporting that.  But this one, I thought, you know, really summarized it nicely and concisely.

Q.    You did not create this document?

A.    No, I did not.

        MR. HUNTER:  Your Honor, we would move to admit P0969.

        THE COURT:  Just one moment.

                (Pause in proceedings.)

        THE COURT:  Is there any objection?

        MR. SLOAN:  No, Your Honor.

THE COURT:  All right.  969 is admitted.

(Trial Exhibit 969 received in evidence.)

BY MR. HUNTER:

Q.   Okay.

Maybe if we zoom out a little bit on the screen to show a little bit more.

Dr. Dyer, what's your understanding of the information in this document, starting from left to right?

A.   Well, starting at columns on the left, listed row by row are -- you know, basically, it appears to be all of the implant conditions in the process sequence, all of the implant steps are listed there.  And then across the, you know, top row there, you see a bunch of dates.

And then it's indicating a condition.  You know, it's kind of coded, but I'm just going to look at the first one under 12/15/2016, the first row with a number in it.

P900K100E13T7, that indicates a phosphorus implant at 900 kiloelectron volts, 900,000 electron volts.  The 100E13 is indicated -- actually, they leave out a decimal point -- is 1E to the 13th.  And the tilt angle is 7 degrees.

Q.   This is, then, kind of a condensed representation of some of those ion implant conditions.

A.   Yes, it is.

So I just read the one cell.  But, you know, going down the column, you see similar information, but giving you the

species, energy, dose, and angles.  And you see that all the way across for different dates as listed in the heading there.

Q.   Those dates are listed on the first row?

A.   Correct.

Q.   So in Column F it looks like we're looking at February 17, 2017?

A.   Yes.

Q.   And some of the other rows have multiple dates.  How did you understand -- I'm sorry.  Some of the other columns had multiple dates.  How did you understand those columns?

A.   I understood that to be, you know, they sort of took an inventory at various points in time.  And there may have been several dates where there were no changes indicated.  So I think they just listed the dates there, but I'm not sure.

Q.   And then going from left to right, what is your understanding of the yellow cells?

A.   Yeah, I should make it clear.  As you do go left from right, you notice the dates are progressing.  So you're going across time, the earlier times being on the left, later times being on the right.

The yellow highlighted cells indicate where a change appeared.  So, again, looking at the cell that I just referenced before, at that next point in time -- actually, you see almost everything yellow.  But you see a change.  It's no longer 900K; it's 1MEV, 1 million electron volts.

And the dose changed as well.

Q.    It looks like essentially on February 17, then, the whole column is yellow?

A.    Yes.

Q.    What does that indicate to you?

A.    It indicates they kind of did a wholesale change in the ion implant conditions.  If you scroll down just to confirm that -- I'm just curious about -- yeah, so it was kind of a wholesale -- yeah, there's one thing I see that didn't change on that particular day.

But, anyway, this was something that I had noticed in other documents initially, that there seemed to be a very abrupt change in ion implant conditions.  And in most cases not just an abrupt change but kind of a significant change, a drastic change, not just a small adjustment.

And this one sums it up nicely.  Yeah, it was mid-February 2017.

Q.    If we could go back up to the top, please.

And as you scroll from left to right from February 17, 2017, what did you observe just generally?

A.    More of a continuous progression.  I had seen other documents where they, you know, as is -- would be routine for device optimization running sort of a controlled experiment or a designed experiment, where they're going to start looking at slight adjustments to various implant conditions to see what

the effect is -- you know, might be on the device performance.

So if you have a starting point and you're developing your process and other things might be changing here and there, you can kind of tune in and optimize those implant conditions to make sure you get the device performance that you want.

And, yeah, so it just shows more of a gradual -- things not changing as frequently. There's, you know, points in time where implant conditions are changed, but you can track it all the way through.

Q. From the date of that yellow column where things all changed at once, that was within days after the last raid on UMC; is that right?

A. Yeah. I was aware of the raids. I was provided various interrogations and all of that, and I was aware of that. It did immediately come to mind that this activity seemed to take place right after that.

MR. HUNTER: If we could now pull up P0985.

THE COURT: Is that in the binder?

MR. HUNTER: Yes, Your Honor, I think.

THE WITNESS: Yes.

MR. HUNTER: It's in Binder 3 sort of in the middle.

THE COURT: I have it. Okay.

MR. HUNTER: My binder -- Your Honor, I don't know if yours has the actual document. Mine -- my binder appears to be missing it; so I was going to look at it electronically.

THE COURT:  Oh.  Well, I have the e-mail which is somebody unknown to -- I guess that's Rong.

MR. HUNTER:  Probably just my binder.  So that's fine.

THE COURT:  And then following it, there's a rather lengthy -- very lengthy attachment with dividers in the attachment.  So I'm not sure what that all reflects.

BY MR. HUNTER:

Q.   Dr. Dyer, is this a document you found in your analysis?

A.   Yes, it is.

Q.   And the e-mail is from Lawrence Chen to LT Rong on March 15, 2017; is that right?

A.   Yes.  This e-mail is from Lawrence Chen to LT Jung or LT Rong on March 15th, 2017.

Q.   And the attachment starts on page 2.  What is the attachment?

A.   The attachment is a version of project -- Project M's design rules.

Q.   And is this -- this is a pretty lengthy attachment?

A.   Yes, it is.

Q.   And alleged Trade Secret 5 in this case is Micron's design rules; is that right?

A.   That is correct.

MR. HUNTER:  Your Honor, we'd move to admit P0985.

THE COURT:  Any objection?

MR. SLOAN:  No objection, Your Honor.

THE COURT:  985 is admitted.

(Trial Exhibit 985 received in evidence.)

BY MR. HUNTER:

Q.   And, Dr. Dyer, in your demonstrative did you undertake to put side by side alleged Trade Secret 5 from Micron, which is admitted as P0154, with information from UMC's design rule P0985?

A.   Yes, I did.

Q.   And if we could look at page 67 of your demonstrative.

THE COURT:  Now, is 154 in evidence?

MR. HUNTER:  I believe, so, Your Honor, but I see Tracy is going to check.

THE COURT:  All right.

Ms. Geiger, what do you show?

THE CLERK:  I do show it in.

THE COURT:  All right.  So then you're going to page 67 in the demonstrative.  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, I believe you have a few pages of comparisons -- can you -- that go through roughly page 73; is that right?

A.   I'm looking at page 67.  This looks like the beginning of the comparison.

Q.   And, just roughly, can you explain what the comparison -- the side-by-side comparison shows?

A.   Yes.  I have -- I took information from the Project M

design rule manual that we just looked at and compared it with the corresponding information in Micron's design rule manual that's alleged Trade Secret 5.

Before I start looking closely at the numbers, I'll note, again, I retained formatting as much as possible; so you've got to do some conversions in your head for the comparison.

But this first page is just looking at the active area-related design rules.  And you see there are six of them.  And the first one is a density rule specifying active area density with some details.  But, anyway, just looking at the numbers, in both cases the density rule is 25 percent.

The next one is another density.  In this case, it's a maximum density.  And you get 95 percent.

So going down -- the next one is where you have to do a unit conversion.  The Project M design rules were specified in units of microns.  The Micron design rule manual was specified in units of nanometers.  There's 1,000 nanometers in a micron.  So you've just got to move the decimal place over three units to compare.  So you see .14 microns is 140 nanometers, and similarly going down the list.

Q.   Dr. Dyer, we can not spend much time on this and just flip through, but do the rest of your demonstratives starting on page 67 show similar parameters that you found matched between the Project M design rules and the Micron design rules?

A.   Yes.  I grouped them by -- more or less by level.  But

there were a number of rules in the Project M design rule manual that matched up very well with the Micron design rules.

MR. HUNTER:  If we could pull up P1195.

THE COURT:  Sorry.  Microphone is in the way.

Is that in the binder?

MR. HUNTER:  Yes, Your Honor.  It should be the very next exhibit.

THE COURT:  Oh, the last one?

MR. HUNTER:  Oh, no, the very next one after --

THE COURT:  After 985?  Oh, I see it.  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, do you recognize this document as something you found?

A.   Yes, I do.

Q.   What was this document?

A.   This was another version of the Project M design rules. And I believe this one came out of the tech transfer package. And you can -- yeah, it did.  And you can see that it also has the confidential markings that we've seen before characteristic of those documents that, you know, we believe were transferred to Jinhua, "UMC/JI" -- I'm sorry -- "JHICC Confidential."

MR. HUNTER:  Your Honor, we'd move to admit P1195.

THE COURT:  Any objection?

MR. SLOAN:  No objection.

THE COURT:  All right.  1195 is admitted.

(Trial Exhibit 1195 received in evidence.)

**BY MR. HUNTER:**

**Q.** Dr. Dyer, did you compare the design rules that were in this technology transfer document to the Micron design rules in alleged Trade Secret 5?

**A.** Yes, I did.

**Q.** Does that comparison appear in page 74 of your demonstrative?

**A.** Yes.  That's it.

**Q.** With reference to page 74 of your demonstrative, can you explain what you found.

**A.** Yeah.  The -- you know, overall, design rules were another thing that there seemed to be an effort to change.  And this just shows that the effort to change from the Micron design rules maybe wasn't complete.  There were a few -- a smaller number than we had before matching up.  But a few that -- two things I noticed:

One, there were a number that changed, but it appeared to just be kind of in a systemic way that they just kind of incremented the design rules by one increment in a particular direction.

And so that's how I would characterize the first one going from 25 in the Micron design rule document to 30 percent in the Jinhua tech transfer design rule document.

Similarly, 95 became 90, 140 became 35, you know, going

down the list. So everything that I highlighted in kind of the light red or the pink were the ones that struck me -- again, it's just an impression -- but struck me as just sort of an incremental change to make it different. The bright red ones still matched. There were a few that still matched up with the Micron source information.

Q. And, Dr. Dyer, so that the record is clear, the comparison that you're speaking to is of alleged Trade Secret 5, admitted as P0154, and a version of the design rules you found as -- and has been marked as P0985 that you found in the technology project package?

A. Could you verify the one in the Jinhua package?

Q. I'm sorry. P1195.

A. Yeah. That's correct.

Q. Dr. Dyer, I want to now just move back in time briefly to wrap up some of your testimony.

Dr. Dyer, how many times have you testified in court before this?

A. Well, yeah, this is my fifth day. Before this, I had never testified.

Q. And had you ever been deposed before?

A. No, I have not.

Q. How many times have you served as a hired expert in litigation?

A. In -- yeah, maybe three times prior to this but in much

smaller roles, one that I would characterize as kind of significant that we were talking about possibly going to trial but ultimately settled.

MR. HUNTER: And, Your Honor, we have a supplement of two pages to add to the back of Dr. Dyer's demonstrative that I'll hand up.

THE COURT: Okay. So just stick them under the clip?

MR. HUNTER: Yup. And they should be consecutively numbered. I learned my lesson the hard way about unnumbered pages on demonstratives with Scott DeBoer.

THE COURT: Okay. That works.

BY MR. HUNTER:

Q. Dr. Dyer, I just want to go back in time now to the December 7, 2015, series of meetings that started on December 2015.

And we had some question, when you testified earlier, about the names of these various people who were involved in that meeting and the lead-up to it and the distribution of information after it. Do you remember that?

A. Yes, I do.

Q. Did you, in the demonstrative's page 79 and 80, attempt to clarify some of that confusion and show who some of the names of these various people were?

A. Yes, names, and I think there's information here to identify roles of most of the individuals.

Q.   And if we start -- the first document was P -- what's been admitted as P0741T.  And that was an e-mail sort of leading up to the first meeting on December 7; right?

A.   Correct.

Q.   And you show that here, December 6, the sort of people involved in that kind of here's what we're going to do at the meeting; is that fair?

MR. SLOAN:  Objection, Your Honor.  I'm going to object just to the narrative nature of these questions.  They are very leading.  If he wants the witness to testify about what they are, that's appropriate, I think.

THE COURT:  Okay.  I'll sustain.

But let's go back for a minute.  Are all of the exhibits that are listed at the far left of the two pages that were added, 79 and 80, e-mails that have been admitted already?

MR. HUNTER:  Yes, Your Honor.

THE COURT:  All right.  Okay.  And then what this witness has done is blown up, let's say, certain aspects of those e-mails, showing -- now, he's using different colors. And he can indicate what he's trying to do with the colors, but what are you asking him?  He -- well, did you ask him what he's trying to show by this in some way?

MR. HUNTER:  I'll do a better job of that.

THE COURT:  Okay.

\\\

BY MR. HUNTER:

Q.   Dr. Dyer, let's start with P0741, the first e-mail shown here.

Do you remember what that e-mail was about?

A.   Yes.  I believe this was the e-mail from Stephen Chen to SF Tzou, as indicated at the top there concerning the meeting that they were going to have around this December -- December 7th, 2015, time frame.  So this was sent out, looks like, the Sunday before that Monday meeting.

Q.   Was this e-mail preceded by an e-mail from SF Tzou in that same e-mail string?

A.   I'm sorry.  Could you repeat that?

Q.   Was this -- well, let's just pull up P0741T.

Dr. Dyer, is this the e-mail that you've excerpted in your demonstrative?

A.   Yes.

Q.   What's shown at the bottom of the e-mail?  "Dear ATD colleagues"?

A.   Right.

Q.   Who sent that e-mail?

A.   This was e-mail from SF Tzou.

THE COURT:  Is there something this witness is going to provide by way of expertise explaining something about the significance of these e-mails other than what somebody might just argue at the end of the case?

**MR. HUNTER:**  Yes, Your Honor.  Dr. Dyer had testified about what his understanding of the December 7 meeting minutes were and what they were doing in that meeting.

**THE COURT:**  I'm not sure he did, but -- I'm sorry.

Mr. Sloan, you popped up here.

**MR. SLOAN:**  Your Honor, I just -- again, I would object to the extent that he asked questions -- I mean, Dr. Dyer is called as an expert on sort of technical issues. To the extent that he is asking him to divine what's going on in an e-mail --

**THE COURT:**  Well, I agree except to the extent that it might be from a technical standpoint.  But I'm just not sure, again, as an overarching concept, why are you showing these to the witness?  In other words, what is it that he apparently hasn't said already that you want to obtain from him?

**MR. HUNTER:**  Your Honor, Dr. Dyer was able to determine the departments that these other people came from and what departments within UMC -- technical departments they came from and had an opinion about how they were contributing to the December 7 series of meetings.

**THE COURT:**  Well, he can't say exactly.  I suppose he could say what that particular area of expertise, what role that plays in development or something like that.  Again, I would suggest that, however you frame your questions, that they are questions that clearly ask for that and not something like,

"And what do you think this person was doing back then?" Because every time you ask a question like that, it's objectionable, and then we're just back to waiting until you ask the question some other way.

But, my understanding from your -- you know, your answer to my question about what he's going to add is he is going -- he has -- since the time these documents were addressed either by him or someone else, he's gone back and figured out in some way what the job descriptions were for people who were copied or on the e-mail or to whom the e-mail was sent.

And he got that information from where?

MR. HUNTER: Your Honor, in the meeting minute document itself, P0482T, there is a list of names. And as you can see on the demonstrative, it shows the departments that those names came from. So, for example --

THE COURT: Well. All right. Assume that for a minute. Then you already have where they came from, and you're just going to ask him what, for example, somebody in dry etching does or something like that. Is that the point?

MR. HUNTER: Well, the point was really, Your Honor, that these same series of names showed up on these three different exhibits.

THE COURT: Yeah. Well, you want to say that, but then after you say that, what? You're trying to get him to say why that's significant in some way, that it suggests they'd

gotten to some step or something?  Or what's the point?

MR. HUNTER:  Your Honor, the ultimate point is that Dr. Dyer had offered opinions on -- we spoke extensively about the December 7 meeting minutes file, and he had opined that what the members of that meeting were doing were going step by step through UMC's or through Micron's process in creating, line by line, a UMC flow.

THE COURT:  He can't really say what they were doing; he can say what the document reflects.  You want to get up and argue later what the people were doing who were behind the document, that's something else.  But I'm sure that he didn't say what you just said because there would have been, again, vociferous objection over here from the defendant.

I still don't know what you're trying to do.

In other words, if there is a general point you're trying to make instead of telling me the testimony he's going to give, because I don't see where the point is at the moment, but it would help if I knew the point you were trying to make.  After all, it's a demonstrative.  It is not an exhibit.  And to the extent that it may just be argumentative, he may not be able to talk about it.  You can bring it up at the end of the trial, hold it up and show big picture of it.

So I'll just wait to see what you're going to do because I'm not getting an answer to my question.

You should sit down, but get ready to stand up.  Okay?

All right.

MR. HUNTER:  Your Honor, it's probably easiest just to go to the exhibit that I was leading up to, which is P0972 and P0972T, which I need to hand up to you.

THE COURT:  Okay.  Because it's not in the binder.

MR. HUNTER:  That's right.

THE COURT:  Okay.  The defendant has both now already?

MR. HUNTER:  I'm about to hand Mr. Sloan --

THE COURT:  Okay.  Let me see what's in the binder, first of all.

Are either of these in the binder, or they are being added?

MR. HUNTER:  972 and 972T are not in the binder.

THE COURT:  Now, for an added exhibit that you gave me a while ago, it had, like, a divider tab on it.  But this one doesn't come with a divider tab.

MR. HUNTER:  Right, Your Honor.  I neglected to do that.

THE COURT:  Okay.  I can put it, I guess, at the front.  I just want you to know that Binder 3 is not going to accept any more documents.  Okay?  Just so you have that clear. And I'm risking some physical injury trying to close it at this point.  So let's see.  I can do it.

Hang on.  I'll just put these in the front.  All right. I'm just going to highlight that so I can spot it.  And T.

Okay.  All right.  So you're at 972T.  Okay.

BY MR. HUNTER:

Q.   And, Dr. Dyer, with reference to 972T, it looks like this is an e-mail from Joyce Huang to z_Dept_Project_M.

Do you see that?

A.   Yes, I do.

Q.   And there is an attachment here on page 3.

Do you see that?

A.   I see the name of the attachment, and I see the attachment.

THE COURT:  Wait a minute.  I don't.  Hold on.  I've got 972 and 972T.  972 has an attachment.  Then there is -- and that's -- oh, this is strange.  Just a minute.  Okay.

I'm not sure this is quite divided right.  Okay.  There's an attachment and it's labeled "attachment."  So there's the e-mail and one page.

Then there's 972T.  Let's see if this works.  Ah.  Then there is a page that says "attachment" -- oh, yes.  It's there.  Fine.  It's just one page.

MR. HUNTER:  That's right.

THE COURT:  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, are you familiar with e-mail programs?

A.   Yes.  I use them regularly.

Q.   Did you use them going back to your time at IBM?

**A.**    Yes.  We used Lotus Notes at the time.

**Q.**    And based on your experience with e-mail programs, do you have any idea what this attachment is?

**A.**    This attachment looks like a distribution list.  A distribution list is where -- they're often useful in semiconductor process development.  If you do have a team of people that you want to communicate with regularly and you want to inform of certain activities that are going on, you create such a list.  And then you can -- in fact, I have one right now with a group that I'm involved with.  You just put in the name of the group, and it -- e-mail goes off to everybody on that list.

**Q.**    So what was the name of this e-mail group name?

**A.**    The name appears to be z_Dept_Project_M@UMC.com.

**Q.**    And I see there's a listing of a number of members of that e-mail group.  Is that right?

        **MR. SLOAN:**  Objection.

        **THE WITNESS:**  Yes.

        **MR. SLOAN:**  I'm -- unless he is going to move this into evidence, I'm going to object.  And I have an objection to the document.

        **THE COURT:**  Okay.  Let's go back for a minute.  The e-mail was sent January 25 of 2016.

    Is this Joyce that was interviewed?  Is that the Joyce?

        **MR. HUNTER:**  That's right, Your Honor.

THE COURT: So she's somebody's secretary. I don't remember whose. And okay. What the witness is testifying to is not really based on his own unique area of expertise. He is saying there are times when you are going to send an e-mail to a defined group of people and you don't want to put their names in every time individually. So you clump them together into a group. And then you give that a name and you send it that way.

And I'm familiar with that. I can't tell how he knows who's in the group because ordinarily -- ordinarily, does it show all the names once you -- you know, once you put the group label in whatever it is? Then the names do show up. I think they do.

But I don't know if it ordinarily shows members. I thought it just shows in the "to" box, in effect. I don't remember Lotus Notes anymore. There's a different program the court is using. But they did use Lotus Notes, but I don't remember.

Are you familiar with Lotus Notes in particular? Or you can't tell that this is Lotus Notes.

THE WITNESS: No, I haven't been able to make that determination.

THE COURT: Have you ever seen anything where it actually says members and then says multigroup description and all that type of things --

THE WITNESS: No nothing --

THE COURT:  -- in the e-mail heading.

THE WITNESS:  Yeah.  That's not something I'm used to looking at on a regular basis --

THE COURT:  Right.

THE WITNESS:  -- that part.

THE COURT:  Okay.  It is -- let's see.  Whatever it is, it's a statement by somebody working for somebody in Project M to a bunch of -- well, we don't know.  It purports to be going to the people that include Stephen Chen and -- I don't know -- a bunch of other people.

But is there an objection to 972?  Let's start with that.

MR. SLOAN:  Yes, Your Honor.  Hearsay.

THE COURT:  Okay.  So what this seems to be is that -- let's see.  Is Joyce saying these are the people that I'm going to put in one of these groups and asking if -- that's what she's going to use to send sort of mass communication out to these people and if there's anybody who either needs to be in or out, let her know.

And I forgot.  Who's Huang Wanjun?

MR. HUNTER:  It was one of the secretaries.

THE COURT:  That's another secretary.

MR. HUNTER:  That's Joyce.

THE COURT:  That's Joyce.  Oh, okay.  So she's sending it to herself.  No.  She's sending it to -- oh, LT Rong.  Okay.  At the bottom, saying, "Dear Assistant Manager, the group was

set to" whatever.  "Let me know if the members need to be changed."

So I think she's, like, created a member list, sent it to Rong to see if he thinks it's okay or just to let him know that she understands it's okay and if it's going to change, it's going to change.

And so that's what's going on here, it looks like to me.

Now, is the objection -- I forget.  Is that your hearsay objection that you're making or a different one or no objection?

MR. SLOAN:  It is, Your Honor.  I think she's effectively saying these are the people who are in the department.

THE COURT:  Well, yes, that's what they are offering it for.  So the question is what's the exception, then, to the hearsay objection?

MR. HUNTER:  Your Honor, I would say that this just goes to Stephen Chen's knowledge.  He's a member of the group, and he's receiving this list.  I would say it goes to his knowledge of the membership and the Project M group.

THE COURT:  And that is significant because?

MR. HUNTER:  Because I think, for one, these are a number of the people who show up on the meeting minutes list as the attendees of the December 7 meeting.

THE COURT:  Well, okay.  Then he would know they were

part of the group that way too; right?

MR. HUNTER:  Well, if he received that document.  I don't think we've put in evidence that he received the December 7 meeting minute.

THE COURT:  All right.  What he is being told, according to what you're arguing then, is that these are people that are going to be working in Project M -- or on Project M or however you want to look at it.

So there is a declarative installment, that these are the Project M people.  And then you are offering it so -- to show he knew that.  But they may not be Project M people, you know.  It's who somebody says is in Project M, I guess.  It's who Joyce thinks is in Project M.  And, of course, her state of mind is irrelevant.

So I don't know.  I don't know if it goes in your major, but there's also next to it descriptions of these people or their jobs.  And you're offering that also for the truth, in effect.  At the moment it's not clear that his -- for example, he's not being asked to -- wait a minute.  Did he even -- did he get this?

MR. HUNTER:  Your Honor, on the top e-mail --

THE COURT:  It goes to the group.

MR. HUNTER:  Correct.

THE COURT:  First she sends it to JT, and then she either doesn't hear back or whatever.  At the bottom it says,

"Winners see possibilities; losers see problems."  I don't know who's supposed to be saying that.

In my event, she either doesn't get anything more or she's just telling them and now she's going to send it out and she does.

Well, I would say that the hearsay objection applies to what -- she's saying these are the people in the Project M group.  So she's not in any way part of a conspiracy.  Stephen, or any of the other alleged conspirators, didn't direct this in any fashion.

And so at the moment, I'm going to sustain the objection to it.  And then you may find some way that his knowledge of what people do is shown in some other way perhaps, but at least not at the moment through this one.  Okay.

**MR. SLOAN:**  Thank you, Your Honor.

**MR. HUNTER:**  Thank you, Your Honor.

**THE COURT:**  Now you have a bunch of e-mails that are apparently in with people's names, but whether he needs this document to say what they do, I can't tell you.

**MR. HUNTER:**  That's fine, Your Honor.

**THE COURT:**  Okay.

BY MR. HUNTER:

Q.   Dr. Dyer, I now want to move to P0709T, which has been previously admitted.

And, actually, Dr. Dyer, before we look too closely at

this, can I ask you a question about the sequence of steps?

A.   Sure.

Q.   Now, my understanding is that a wafer is built up from bottom to top.  Is that right?

A.   More or less, yeah.

Q.   Why is it or -- and you've testified that you can't reverse-engineer the sequence of steps from looking at cross sections of a chip; is that right?

A.   That's correct.

Q.   How come -- if you can determine materials that are built up on a chip from top to bottom, how come you can't determine the overall consequence of steps from that?

A.   Okay.  Well, let me qualify.  It's not strictly built up from top to bottom.  You're building structures, you know, colinear with each other on the same level.

     But to answer your question, there are -- you know, I just looked at this this morning.  There's roughly 70 -- actually, 67, roughly, structural features in the final product that you could possibly identify on some physical analysis.  And that's in 500 steps.

     So the point I want to make is, for every step that deposits a material that can be found in the final structure, there's a large number of steps that leave no trace and cannot be inferred from the final structure.

Q.   And do some of those steps do other things than just build

structure on a wafer?

A.    Yes, they do.  Those other steps are used to pattern, modify, configure, protect, facilitate processing of the various structures that you are building on the wafer.

Q.    Now, Dr. Dyer, going even further back in time to P709T, I'd like to -- which has been previously admitted -- direct your attention to page 8.

THE COURT:  Can I find that in the binder or not?

MR. HUNTER:  I think this might be back in Binder 1, Your Honor.

THE COURT:  Oh.  Maybe I'll just try to look at it on the screen.

MR. HUNTER:  We're just going to do this one slide.

THE COURT:  That's fine.  So this was actually a slide.  Okay.  Was this a presentation or what?

MR. HUNTER:  Yeah.

THE COURT:  What was this coming from?

MR. HUNTER:  Maybe we should reorient to that first.

BY MR. HUNTER:

Q.    If we go back up to the e-mail on page 1, this was an e-mail from Bowen Huang to Stan Hung and Stephen Chen on October 12th, 2015.

And if we --

THE COURT:  What's the attachment supposed to be?

MR. HUNTER:  Go down to the first page of the

attachment, please.  It's called "Memory Project Discussions," with a date of October 13, 2015.

THE COURT:  Okay.

BY MR. HUNTER:

Q.   If we go to Slide 8.

Dr. Dyer, what's your understanding of the information on Slide 8?

A.   This looks like they're considering ways to acquire memory chip technology.

Q.   And it shows three different ways?

A.   Apparently, yes.

Q.   Three different potential ways.  Is that --

A.   Yup.  That looks like what they're communicating here.

Q.   What's the first way listed to acquire memory technology?

A.   The first way indicates purchasing the company.

Q.   And is Micron coded in red there?

A.   Yes, they are.

Q.   What does it say about how much it would cost to acquire Micron?

A.   In the red lettering it says -- I think that says $16.8 billion.

Q.   And on the far right part of that, it looks like it says at least $4 billion for 20 percent equity?

A.   And that's more or less consistent with the price on the company there, yes.

Q.   What do you understand the second row to be describing?

A.   The second row says "procuring technology."

Q.   What would procuring technology be?

A.   I think that would refer to licensing the technology from an established company, somebody who has the DRAM technology. I see that, you know, they're just looking at the three main advanced competitive stand-alone DRAM companies here.

     So I guess they are contemplating procuring -- in fact, they just list Micron and hynix as potential sources to license or procure technology from.

Q.   And the first item under feasibility study for that way says "Greater than 300 million per generation excluding royalties."

A.   Yes, it does.

Q.   Do you understand that to be -- what do you understand that to be referring to?

A.   That they would expect it would cost at least -- well, something greater than $300 million to license technology from Micron or hynix, but they would also have to fact -- they would have to pay royalties, I guess, on the technology that they manufactured based on technology.

Q.   Then there's this third way listed to procure memory technology.

     What's that one called on this document?

A.   Team building.

Q.   And what's the cost of team building listed as?

A.   Under Feasibility Item 3, it says cost 300 million per generation.

Q.   That's less than the cost of the previous two ways of procuring technology; is that right?

A.   Yes, it is.

Q.   Dr. Dyer, based on your review of all the documents, did UMC acquire a company to procure memory technology?

A.   No, they didn't.

Q.   Did it acquire Micron?

A.   No.

Q.   Did it pay $4 billion to acquire 20 percent equity stake to get technology?

A.   No, I don't think so.  I haven't seen anything to that effect, no.

Q.   Did it procure licenses for the technology from a company, such as Micron or SK hynix?

A.   No.  As far as I'm aware, they didn't, and there was no indication of that in anything I saw.

Q.   Dr. Dyer, did UMC then, in your opinion, engage in team building to acquire the technology?

A.   Yeah, I think that's fair to say.

Q.   Dr. Dyer, what is your opinion about what that team did?

A.   They basically copied the Micron technology, the Micron process technology.  You know, part of that was validating that

technology on a design that was sourced also from the Micron technology.

Q.   Dr. Dyer, how extensively did that team copy Micron's technology, in your opinion?

A.   In my opinion, it was very extensive.  I hope that I, you know, showed that effectively to -- you know, over the past five days.  It was very extensive.  And, you know, that's what they started with.

MR. HUNTER:  And, Your Honor, that was sort of the end of Dr. Dyer's direct.  There are some documents, though, that I was hoping to move in now that you've heard his testimony.  I'm happy to do that after lunch.  I don't think it will take too long before we move to cross.

THE COURT:  Are these documents -- what kind of documents are they?

MR. HUNTER:  They're e-mail messages, primarily.

THE COURT:  Well, there could be objections to them. This witness did not use them.

MR. HUNTER:  Correct.

THE COURT:  But you think they relate in some way to his testimony?  In other words, you're picking this break, you know, in the proceedings to put those in.

MR. HUNTER:  Potentially relate, although I don't expect Dr. Dyer would serve any purpose for these documents except being an extra-fancy reader.

THE COURT: At least to the extent that there may be some objections, because there have been to almost all the e-mails -- how many have you got, by the way? I'm just curious. I think we should probably wait until after lunch.

MR. HUNTER: Yeah, I think that makes sense to wait until after lunch. There's documents and translations. I think it's about six.

THE COURT: Okay. You might give the numbers to Mr. Sloan in advance just so he knows which ones they are and he can see. But for almost all the e-mails themselves, there's been something in there that he's objected to on hearsay grounds.

All right. Well, that was a catchy conclusion to his testimony. And it is probably a good time to break. So let's just come back at 1:00, and we'll go to those exhibits and then cross.

MR. HUNTER: Thank you, Your Honor.

MR. SLOAN: Thank you, Your Honor.

THE COURT: Thank you.

(Luncheon recess was taken at 12:00 p.m.)

**AFTERNOON SESSION**                                          **1:03 p.m.**

THE CLERK: Please remain seated and come to order.

Mr. Hunter, you have an exhibit you wanted to offer.

MR. HUNTER: Your Honor, I think we're going to push that maybe until after -- maybe tomorrow even to deal with some

of those exhibits.  So I think I'm done with Dr. Dyer for now.

THE COURT:  Okay.

So are we going to cross-examination?

MR. HUNTER:  That's right.

MR. SLOAN:  We are, Your Honor.

THE COURT:  Okay.  We made some progress here.

MR. SLOAN:  Your Honor, before we start, I have six binders.  And I don't want to scare you, Your Honor.  It's -- some of the documents are very long.  I don't think I'll use all of them.  I feel guilty about killing so many trees.  Don't report me to the Sierra Club.  But, unfortunately, we have that many.  I can either hand them up to you when I'm going to use them, or we bring them all up right now.

THE COURT:  Let me think first of all about what I'm going to do with the last binder that I got from the Government with respect to Dr. Dyer.  In other words, are you going to go back to any of their binders or -- so whatever exhibits you're going to ask him about, are they all in your binders even if they're duplicates of their exhibits?

MR. SLOAN:  I have some of their exhibits.  I think that I have marked them in my volumes.

THE COURT:  Also?

MR. SLOAN:  In mine also, yes.

THE COURT:  Well, okay.  Just give me a second here.  At one point I was stacking things up.  I can always put them

on the floor.  I think that's what I'll do.

(Pause in proceedings.)

THE COURT:  Then as far as how you want to handle this, if you're going to be using them sequentially and not jumping around in them, we could just do one at a time.

But if you think you're jumping around, I probably ought to just get them all up here.  I'm probably going to put them on the floor and just pick them up when you say.

MR. SLOAN:  Your Honor, unfortunately, I'm jumping around, although the one good news is that they are in sequential order of exhibits.  So -- and we actually have a -- sort of a cheat sheet that shows you where the documents are.  So, like, Volume 1 has D3049 through D3738.  So they're in order that way, but they're not in order --

THE COURT:  All right.  You have them, though, somewhere now?

THE CLERK:  They are in boxes.  Do you want them in the boxes or --

THE COURT:  I'm trying to think.  Maybe I don't want to put them on the floor because that will be too hard to get to.  And how thick are these binders?  Are they all like -- thick?  Yeah.  Okay.

I could put them over here at the far end of the bench maybe.  Why don't we have him come around with them.  Come over here on the far side of Ms. Ekhaus maybe.  And then hand them

up to -- well, to Ms. Geiger, and I could take them and try to put them somewhere.

I may have to just move all this over and see -- this was -- I have this free-floating 1162T, which is something that says DRAM or -- DRAM, rather, document sharing and -- did that get admitted?  And if so, why is it floating around like this?

**MR. HUNTER:**  Your Honor, that was one of the documents I handed up this morning.  It had been previously admitted through Agent Ho.

**THE COURT:**  So this is an extra that -- rather than have to go back.  Okay.

**MR. HUNTER:**  That's right.

**THE COURT:**  All right.  I'll just put it next to -- okay.  Well, you think these are all going to have to go over and --

(Pause in proceedings.)

**MR. SLOAN:**  Sorry to make you rearrange your whole bench, Your Honor.

**THE COURT:**  That's all right for now.  Let's see. Just by way of an estimate, how long do you expect to be with Dr. Dyer?  Hours?  Days?  Weeks?

**MR. SLOAN:**  Your Honor, I promise that I'll be shorter than Mr. Hunter, which is no offense to him because I think he did a great job.  But I would estimate, Your Honor, the rest of the day and some tomorrow morning.  But I don't think -- I

think -- I plan to certainly finish before lunch tomorrow and hopefully well before.

THE COURT:  I'm not trying to rush you in any way. I'm just curious because there is so much volume here in these binders.  But as you say, they may encompass not that many exhibits, just big ones or something.

Okay.  Anyway, they're in a workable format at the moment; so that should be fine.  And I think we're probably ready to go.

MR. SLOAN:  Your Honor, the other thing I can provide which may be helpful is this is the cheat sheet that I mentioned.  And I'll give one to the Government as well.  It just lists what's in each volume.  So I think it will make it easier to find things.

THE COURT:  All right.  You've also marked it on the spines themselves.

MR. SLOAN:  That's right.

THE COURT:  That will help.  But you'll probably say, you know, it's in volume whatever because you have your own sheet; right?

MR. SLOAN:  I have my own cheat sheet, yes, Your Honor.

THE COURT:  Okay.  I have one too.  That's fine. Okay.  I'm going to sit back and get ready to hear your cross-examination.

**MR. SLOAN:** Thank you.

**CROSS-EXAMINATION**

BY MR. SLOAN:

Q. Dr. Dyer, we've met several times outside, but it's nice to meet you in court. I've introduced myself before, but my name is Matt Sloan, and I represent Jinhua and have some questions for you.

Let's start with some questions about your background. So you testified, I think, that you spent approximately 16 years at IBM; is that correct?

A. Something like that. 15 or 16.

Q. Okay. From approximately October 1997 through August 2013?

A. That sounds about right.

Q. And you testified last week, I believe, that you spent about your first two to three years working on DRAM, another two to three years working on logic chips, and then three or four years working on embedded DRAM; is that correct?

A. Something like that. I mean, to the best of my recollection, yes.

Q. And am I correct that the last DRAM node that you worked on at IBM was a 90-nanometer node?

A. That could be.

Q. Well, would it refresh your recollection to look at your report, because I think that's what you indicated in your

report?  Or are you satisfied that that's correct, that it's 90 nanometers?

A.    Again, it's a long time.  I do remember working on 90 nanometers.  That sounds like one of last technologies I worked on.  But yeah, I can't be more specific than that.

Q.    Okay.  Why don't you take a look at your report.  If you look in Volume 2, it's D4793.  And let me know whether you recognize that.

          THE COURT:  Is this his report?

          MR. SLOAN:  Yes.

BY MR. SLOAN:

Q.    That's your report, isn't it, Mr. -- Dr. Dyer?

A.    I presume it is.  I mean, it looks like it.  It's been a long time since I referred to this, but sure.

Q.    You prepared this in July of last year; is that correct?

A.    Again, the dates -- I'm not real great on dates, but I did submit a report.  I can't say it wasn't.

          THE COURT:  Do you sign them or not?

          THE WITNESS:  I don't think -- I don't remember signing it.

          THE COURT:  All right.  Do you want to check the last page just to see if there's either a date or a signature?

          MR. SLOAN:  Your Honor, I don't think actually this is signed.

          THE COURT:  Okay.

**BY MR. SLOAN:**

Q.   But you do recognize --

**MR. HUNTER:** Objection. This is a Rule 16 disclosure; it's not a report authored by Dr. Dyer.

**THE COURT:** Okay. There's a distinction being made here.

**MR. SLOAN:** Let me clarify, Your Honor.

**BY MR. SLOAN:**

Q.   Dr. Dyer, this is -- as counsel said, if you look at page 1, it's identified as "Disclosure of Expert Testimony of Dr. Thomas Dyer," right?

You recall -- did you prepare this document?

A.   I did write a report. It's been a long time since I've looked at it. You know, presumably this is it, but I'd have to look through it and probably --

**THE COURT:** Counsel, is it your mutual understanding that there was more than one document, one a disclosure by counsel, which may have been authored by the witness himself, and then one an actual report?

**MR. SLOAN:** Your Honor, there's a report and a rebuttal report -- or a disclosure which this is. There was a cover letter from the U.S. Attorney's Office which attached this as an exhibit. It's identified as a disclosure. It's written in the third person; but, colloquially, I understand that this is essentially his report.

THE COURT:  Oh, okay.  In other words, you didn't have a report after that or a long report, or is this long?

MR. SLOAN:  This is pretty lengthy, Your Honor.

THE COURT:  All right.  It's your understanding this is what constitutes the equivalent of a report?

MR. SLOAN:  Yeah.

BY MR. SLOAN:

Q.  I mean, why don't you take a look at it, Dr. Dyer.  Can you tell me whether you've reviewed this document?

A.  Yeah, again, you know, it is hard for me -- you're really trying to pin me down on dates and specifics.  I do believe that I, at the very least, provided some of the information in this report.  But, again, I don't remember the details of writing it and every piece of information that went into it.

Q.  Well, were you aware that, pursuant to the federal rules, that we had requested the Government to provide an expert disclosure about any experts and that, in connection with that, they produced this document to us?

A.  Well, I'm not a lawyer.  I did what I was, you know, asked to do and understood was proper, but I don't know, you know, about the laws and that sort of thing.

Q.  That was an unfair question.  Let me ask it a different way.

    Were you aware that the Government was preparing some type of a disclosure pursuant to which they were going to try to

summarize what they expected you to testify to in court?

**A.**    Yeah, again, I think I already mentioned that I was involved in producing a report.  I'm just -- don't want to say more than I can on the spot right now about exactly, you know, what this is and what I wrote which might have been a year ago or something.

**Q.**    Okay.  So to the best of your recollection, you -- did you ever review this report before it was submitted?

**A.**    I -- probably.

**Q.**    But you're not sure?

**A.**    I'm not.

**Q.**    Let's just look at page 2, this first full paragraph.  You recall I had asked you about the last DRAM mode that you had worked on.  And if you look at the top full paragraph, it says, "At IBM, Dr. Dyer worked on all aspects of device fabrication" --

          **THE COURT:**  You're reading really fast.  Okay.

          **MR. SLOAN:**  Sorry.

BY MR. SLOAN:

**Q.**    "He developed deep-trench capacitor and shallow-trench isolation processes for quarter-micron through 90-nanometer DRAM technologies and optimized device structures and performance in 90-nanometer and 45-nanometer CMOS technologies."

          Do you see that?

A.    I do.

Q.    Is that accurate?

A.    I believe so.  But I don't think it says that -- well, I don't see what the point is.  But yes, I worked on quarter micron through 90 nanometer.  There may have been some involvement in DRAM after that, but yeah.

Q.    You left IBM in August 2013 to go to SEMATECH; is that correct?

A.    Yes, that's about right.

Q.    And while at SEMATECH you managed projects that involved developing semiconductor manufacturing techniques and process flows?

A.    That's part of what I did, I think.

Q.    You didn't work on any DRAM while you were at SEMATECH, though, did you?

A.    No, I did not.

Q.    So in August of 2015, I believe the State University of New York, SUNY College of Nanoscale Science and Engineering, acquired SEMATECH; is that correct?

A.    Again, I don't know all the legal involvement, but basically they took over and we became part of SUNY Poly.

Q.    As of August of 2015, you were working for SUNY College of Nanoscale Science and Engineering; is that correct?

A.    Yes.  The name has -- there's various names that it's referred to.  I don't know if that's the current official name,

but I worked for the SUNY system at the campus that used to be called CNSE, College of Nanoscale Science and Engineering.

Q.   While you were at SUNY, you didn't work on any DRAM process flows or production or manufacturing, did you?

A.   That's true.

Q.   So you haven't worked on any DRAM manufacturing production or process flow since 2013 when you left IBM; correct?

A.   If you want to include -- well, since I left IBM, yeah, that's true.

Q.   Okay.  Now, you also said that you had worked on embedded DRAM; correct?

A.   That's correct.

Q.   And can you explain for us what embedded DRAM is?

A.   Embedded DRAM -- you know, maybe I'll start with what is DRAM.  I don't know if we fully went into it.  But DRAM refers to specific memory technology where each memory cell consists of a single transistor and a single capacitor.  So that encompasses a huge range of technological capabilities and manifestations of that technology.

Embedded DRAM that I worked on at IBM refers to taking your base logic technology -- they're primarily interested in this logic at IBM, but putting DRAM, this type of memory, on the logic chip.

And what that requires is greatly relaxing cell dimensions and device structures so that it fits in with logic technology.

You also have to worry about thermal processing, this kind of thing, because the technology is optimized for the logic.  The DRAM is sort of an added feature, but it can't interfere with the logic performance.

Q.   And so embedded DRAM is different than DRAM; correct?

A.   Again, it's DRAM.  It has a single transistor and a single capacitor, but it is different from standalone advanced DRAM that we're -- you know, referring to -- that's relevant for this case, for example, the DRAM that Samsung, hynix, and Micron are involved in.  That's a different thing.

Q.   Would you agree, however, that having a background and experience in embedded DRAM would be relevant to understanding the process and manufacturing of standalone DRAM?

A.   Yeah, actually, I think that experience has been highly valuable here because a big part of this case is distinguishing between what UMC normally does as a business, which is logic -- you know, logic products, logic semiconductor processing -- from the type of DRAM that I just described that Samsung, hynix, and Micron are involved in.  There's an important difference between those two.

     And embedded DRAM is, you know, very much a relaxed and watered-down version of that advanced standalone DRAM that those three dominant companies are involved in.

Q.   I want to ask you some questions about what the Government asked you to do in this case.  In the disclosure that we just

looked at, D4793, you indicated that the Government had asked you to do basically two things -- or I should say the disclosure indicates that.

So let me know whether this is accurate.  It says, first, you were asked to determine whether the Micron documents that the Government alleges the defendants took from Micron satisfied the legal definition of a trade secret; and, secondly, whether the defendants used information belonging to Micron, including alleged trade secrets, to develop their own DRAM technology.  And if they did, the extent and nature of their use.

Is that a fair summary of what you were asked to do?

**A.**   Yeah, I think it is.

Before even putting the -- answering the trade secret question, there was some guidance as to even -- that there's a legal definition of what it -- I have a concept of what a trade secret is from working in the industry for so many years.  And so, you know, I have a good sense for what's considered a trade secret.

I've also been involved in intellectual property development at IBM for 14 years.  So I know what a trade secret is to a company in the semiconductor business --

**Q.**   Let if he ask you this --

**A.**   -- but the legal definition might have -- you know, I wanted to really understand that.  And there's, you know,

various parts to it.  And I wanted to make sure any opinion I came up with on that was consistent with the legal definition as well as my experience.

Q.   Right.  And as you probably know, there's been some litigation, and you're not allowed to actually offer an opinion about what is or is not a trade secret.

A.   Yeah.  I think that was understood as well, and that was explained to me, I do recall.  Specifically, I'm not the lawyer here; so I'm not making that determination.

But, again, I have a lot of background in what a company considers a trade secret, which I think is relevant to -- ties into the legal definition.  And I also think it was helpful becoming familiar with that legal definition.

Q.   I want to focus specifically on the second -- the second part of that question that the Government asked you, which is the task of determining what information the defendants purportedly --

THE COURT:  Used.

MR. SLOAN:  Yes, your Honor.

BY MR. SLOAN:

Q.   -- used to develop their DRAM technology and the extent to which they used it.  So in connection with that, am I correct that you reviewed thousands of documents; correct?

A.   I think it was over a thousand.  There was, you know, a number that I actually tagged in our database.  But I didn't

necessarily tag everything that I scanned.  So I'm guessing roughly a thousand documents.

Q.   Dr. Dyer --

THE COURT:  Hang on.

What do you mean by "tagged in our database"?

THE WITNESS:  The relativity database that the Government gave me access to, which also had powerful search features so it allowed me to navigate, you can tag it that you had reviewed a certain document.  And it was a way to keep track of certain things that you might have not wanted to look at more than --

THE COURT:  What you've seen?

THE WITNESS:  Correct.

THE COURT:  Not necessarily the importance you put on it but just that you saw it?

THE WITNESS:  Yes.  Not necessarily the importance, although I would have to go in and manually hit this tag.  And it was kind of time-consuming and you know how software can kind of hang up.  So if I was -- I spent a lot of time in this system, and I scanned a lot of documents.  And some of them you just real quick just take a peek and quickly move on.  So I didn't necessarily tag all of those.

THE COURT:  Okay.

BY MR. SLOAN:

Q.   Dr. Dyer, overall, you said the Government gave you access

to their entire database of documents; correct?

A.   Well, I don't know what the entire database you're referring to, but there was a particular database.  I came to know it as their relativity database.  It looked like it was probably just a subset or just documents relevant to this particular case and not necessarily other cases.

And -- yeah.  And so I had access to about 6 million -- a little over 6 million documents in the end.  It started off smaller than that, but things were added.  Like I mentioned, the tech transfer package came in sometime in the course of my investment, but --

Q.   Let's talk about some of things you reviewed.  You reviewed or had access to all the documents that UMC produced to the Government; is that correct?

A.   I believe so.  I think they -- the database they gave me access to was pretty comprehensive as far as relevant material for this case.

Q.   You reviewed the technology transfer package which was part of that; correct?

A.   Yes.  There was -- again, that is something that showed up, you know, sometime into the case.  And there was a separate section on that, and I did look at documents in that.

Q.   You reviewed the documents on Hard Drive 48; correct?

A.   Yes.  So this was a separate source of documents for me.  But, of course, there's a lot of overlap.  And I think

eventually they tried to get most, if not all, of Hard Drive 45 in their relativity database.  But I was also given a copy of that Hard Drive 48 with all the folder structure, you know, file system structure intact.

Along with that came information as to where the various devices -- you know, these -- we talked about Device 14, Device 3, where they came from in terms of, you know, JT Ho USB drive at his office, you know, Kenny Wang's laptop at his home. So that was also useful in establishing relevance of certain documents that I came across.

Q.   So you reviewed GDS files, technical presentations, spreadsheets?

A.   That's true.

Q.   Okay.  Documents that were provided by UMC in connection with the cooperation agreement with the Government?

A.   I believe that's true.

Q.   And you said that you had -- prior to your testimony, you had spent over 2400 hours reviewing those materials in preparing your reports; correct?

A.   I believe that's right.  I might have been projecting a little bit into, you know, what I expected it would end up being.  But yeah, around 2400 hours over two and a half years.

Q.   And in connection with your assignment, you also interviewed a number of Micron employees; is that correct?

A.   Yes.  I had an opportunity to ask questions to -- I think

it was four Micron employees, two in Taiwan and two in Boise.

Q.   So let's talk about that.  You spoke to Duke Hung, who is the manager in process integration; is that correct?

A.   That sounds right.

Q.   And you discussed Micron naming conventions, the fabs at Micron in Japan and Taiwan; correct?

A.   Yeah, that sounds right.

Q.   And he's someone who is at Micron in Taiwan?

A.   Yeah.  I'm pretty sure Duke was one of the ones in Micron Taiwan.

Q.   You also spoke to Jan Bissey, the director of patent analysis at Micron; correct?

A.   Yes, I did.  In fact, I talked to him twice.

Q.   And you spoke to Austin Chen, who is a division manager of manufacturing equipment; correct?

A.   Yeah.  I don't remember.  What was the title again?  Could you repeat that?

Q.   Manufacturing equipment division manager Austin Chen.

A.   Yeah, I remember talking to -- he was the second person in Taiwan.  I don't remember him being an equipment guy, at least not in the relevant time frame of the case.  But yeah, I -- he was one of the people.

Q.   And you spoke to a gentleman who goes by the name of Nagasubramaniyan Chandrasekaran, who's a senior vice president of technology development?

**A.**   Yeah, I did have that opportunity.  I was more of an eavesdropper on that one, though.  I think the arrangement -- he had some relevant stuff that I found interesting.  But the purpose of the call was for other purposes.  But I was allowed to hear him discuss some aspects of the technology that I found relevant.

**Q.**   And would you agree that you interviewed those people because you thought they would be relevant to helping you understand the facts of the case and render an expert opinion?

**A.**   Well, yes.  Yeah, I had some specific questions.  And yeah, they were helpful in answering them.

**Q.**   So they were useful in helping you prepare your expert opinion in this case; correct?

**A.**   That sounds -- I mean, they were helpful in double-checking maybe some things that I, you know, had concluded on my own.  They were very useful in that regard, that they were able to, you know, validate certain conclusions that I had arrived at.

**Q.**   Now, sir, given the fact that part of your assignment was to determine why and whether -- or I should say -- let me rephrase that.

Given the fact that part of your assignment was to determine whether UMC had used any Micron confidential information and the extent to which they used them, would it have been valuable for you to interview people on the Project M

engineering team?

A.    I suppose.  That's a little tricky because I think there's sort of an adversarial thing maybe.  I don't know did they perceive it that way.  I don't know.  I haven't been involved in this sort of case.  But it would certainly be useful to know what they know.

Q.    So putting aside any conception you have, it would have been useful to talk to them; correct?

A.    Again, you know, that seems kind of hypothetical.  I'm not sure what they would have said if I had talked to them.  So I -- I really can't answer that.

Q.    Dr. Dyer, are you aware that the Government has a cooperation agreement with UMC pursuant to which UMC had an obligation to provide access to UMC witnesses?

A.    I -- my role in this case hasn't been focused on those sorts of arrangements.  I did hear something about that, but I was focused on the technology as represented in the documentation in this extensive database that I had access to primarily.

Q.    So you were aware that there was an agreement and that, pursuant to that agreement, UMC had an obligation to provide witnesses?

A.    I'm sorry.  But I can't agree with that because I don't know the details of -- I've heard the term "cooperation agreement."  I don't know what the conditions were.  I don't

know what they were obligated or not obligated to provide.

I did make use out of the information that found its way into the databases.  I think maybe some of that was under that sort of agreement.

You know, I don't know to what extent -- you know, what an agreement might have said and what actual in practice might have happened; so I can't really give you a precise detailed answer on that.

Q.   Dr. Dyer, the Government asked you a number of questions this morning asking you to provide information about what you understood different people on the Project M team did. Wouldn't it have been valuable to actually speak to the people who were on the team?

A.   It would have been valuable to know what they know.  I'm not sure, speaking to somebody -- for example, if they're not being cooperative, I'm not sure how useful that would be.

Q.   Did you ever ask the Government whether you could speak to any of the UMC employees on the Project M team?

A.   I don't know.  It's possible, but I don't ever remember that being a big consideration.

Q.   Did you ever speak to SF Tzou?

A.   No, I didn't.

Q.   Okay.  And you were aware that he was an associate vice president of memory modules in the 2016 time frame; correct?

A.   No.  I have no idea -- that title you just read off, I

don't -- that doesn't ring a bell.  But I did learn a lot about SF Tzou.

My understanding from the documents that I've seen is he is a manager of the process -- unit process group that, you know, is responsible for the individual process steps that would be -- that would go into a process flow.  He seems to be a central person in all of this being a -- you know, a key organizer of the December 7th, 2015, meeting with his -- you know, I did have a chance to look into the people on some of these lists that we've seen and traced a lot of those people in organization chart as reporting to SF Tzou.

MR. SLOAN:  Your Honor, I'm going to ask to strike the last part of his answer.  It's nonresponsive.

THE COURT:  Which part?  It was very long.

MR. SLOAN:  It was.

THE COURT:  What's the last part?

Let's see what your question was.

The question is were you aware -- and we're talking about the SF Tzou.  Okay.  That's how you started.  "And you were aware that he was an associate vice president of memory modules in the 2016 time frame; correct?"

"Answer:  No."  Then it goes on.

How much after "no" did you want to strike?

MR. SLOAN:  Everything after no, Your Honor.

THE COURT:  Well, let's see.  He followed it with "I

have no idea that title you just read off.  It doesn't ring a bell."  Then he says he did learn a lot about him but apparently not his title.  Okay.

(Pause in proceedings.)

THE COURT:  All right.  This answer, as recorded by the court reporter, is actually reported as two answers.
All right?  "No, I have no idea about the title," and then it goes on.

All right.  So everything starting with "my understanding from the documents I've seen" will be stricken.  Okay.

MR. SLOAN:  Thank you.

BY MR. SLOAN:

Q.   But, Dr. Dyer, you are aware -- and I'm going to ask you just to answer this question.  You are aware that SF Tzou was involved in Project M's memory business to -- to develop the process flow for the DRAM devices; correct?

A.   Yeah, that's fair.

Q.   And so he's someone who, presumably, would have a lot of information about the steps that Project M took in order to develop the process flow; correct?

A.   Yes, I think he was in a position to be able to shed some light on that.

Q.   But you never made any effort to speak to him, did you?

A.   Honestly, I didn't consider making an effort to speak to anybody.  You know, this -- I haven't been an expert witness in

a case.  I'm not sure how appropriate that is for me to be making phone calls to people that, you know, might have some information that I could use.

So the answer is no, I didn't even consider that that was a possibility.

Q.   Were you aware that Mr. Tzou had prepared a detailed analysis in September 2018 before UMC's technology transfer to Jinhua and found that UMC had chosen to develop a DRAM that emulated Samsung and not Micron?

A.   I'm not sure what that refers to exactly.  It's possible it connects to some of the stuff I looked at.  I'm not saying it is; I'm not saying it isn't.  But it just kind of -- to me that sounds kind of vague in general.  So I'm just going to say I don't know.

Q.   Okay.  Let me have you look at a document which is D3624. It's in Volume 1 of your binder.

Again, I apologize that I've put so many up there.  But hopefully you can find this.  I'll direct you to where it is. It's D3624.  It's about two-thirds of the way through the binder.

Why don't you take a moment to look at that and let me know whether you recognize it.

THE COURT:  Now, this is not an exhibit yet in evidence?

MR. SLOAN:  Correct, Your Honor.  It's marked as

D3624.  I apologize, Your Honor.

THE COURT:  That's all right.  In some instances you may -- if you were going to offer, yourself, or discuss with the witness the same exhibit that the Government has already put in, have you renumbered those or have you kept the Government's numbers?

MR. SLOAN:  We have tried to keep the Government's number.  I don't want to duplicate things.

THE COURT:  Okay.

MR. SLOAN:  And I should have mentioned that this was -- if it were in evidence, I would have said right away.  But I meant to say it's marked.

THE COURT:  I'll assume that anything marked D is not already in evidence unless it's coming up again, in which case, if it's already been admitted, you can say it was admitted already.  But in the first instance, I'm just going to assume it's not in.  And then if it's a Government exhibit, are you relying on any that have not been admitted?  In other words, that you found something in their exhibit you liked, they didn't offer it, and you want to offer it?

MR. SLOAN:  Your Honor, I don't think that we'll be relying on anything that's not admitted.  But if it is, I'll make sure that I note that it hasn't been admitted yet.

THE COURT:  So I'm going to assume, if you get to a Government exhibit that says P, I'm going to assume it's in

unless you indicate otherwise.

MR. SLOAN:  Okay.

THE COURT:  Okay.

BY MR. SLOAN:

Q.   Dr. Dyer, have you had a chance to look at this report?

A.   Let me just verify.  I'm looking at D3624.

Q.   Yes.  It's identified as UMC analysis and dated September 1, 2018.

A.   I may have.  Again, you know, I've seen so many documents with so many of this type of information.  I can't say for sure that I've looked at this exact document.

Q.   Okay.  But when you went through the 6 million pages of documents, did you look through -- I assume you looked through them objectively to look for information both that would support the Government's theories of the case and things that would not support it because you have an obligation to give an objective opinion; correct?

A.   Yeah, I wouldn't divide it up like that.  But it was more where did their technology come from and how might have Micron trade secrets made their way into that technology?

Q.   So would you agree that a report prepared by someone who was a senior engineer, like SF Tzou, detailing whether or not Micron -- I'm sorry -- whether or not Project M had used any Micron information would be relevant to your determination?

A.   Yes.  But it would really depend on when that document was

created, first of all.  That would be a big factor in it.

Q.   So let's look at the third page of this document.

MR. HUNTER:  Your Honor, objection.  Hearsay, before they start going into this document.

THE COURT:  Okay.  There is a hearsay objection.  What exceptions are you relying on?

MR. SLOAN:  Your Honor, I'm not -- not proving -- I'm not introducing it to prove the truth of the matter asserted. I'm proving it -- introducing it to show whether or not he considered the full range of information that was available to him.

THE COURT:  Well, at the moment there's no indication it was available to him.  He doesn't remember seeing it.  I don't know if the Government gave it to him.

So you'd have to get some acknowledgment from him or some other evidence that either it's already in evidence or whatever it is that shows he got it or you're making an offer of proof that you're going to show just so we can get past the point.

But he doesn't recognize it.  And that is somewhat understandable that a lot of these things look similar, whether those glossy presentations or other documents you look at at the first instance.  Unless you committed every page and content to memory, it's hard to tell.

So if you're using it to say, gee, didn't you see it and you didn't consider these factors, so far he hasn't said he

remembers seeing it.

MR. SLOAN:  Okay.  Fair enough.

THE COURT:  If there's something exciting in here, maybe he did note it.  I mean, you could ask him to look at a page to see if it refreshed his recollection at all as to whether he saw it.

MR. SLOAN:  Yeah, that would be a good idea, Your Honor.

BY MR. SLOAN:

Q.   Can you take a look at, for instance, page 4, "Micron vs. UMC vs. Samsung."  Do you see that?

A.   Let's see.  Page 4.  I was just going to say, as I'm flipping through, I did notice the date on this was rather late in the technology development, and that would have been a factor for me because this was several years after the initial flurry of activity where Micron information was being established into the Project M process flow.

THE COURT:  Are you saying you remember it and you noted that then, or are you saying just looking at it now, you notice that?

THE WITNESS:  Just looking at it now.

THE COURT:  Okay.

BY MR. SLOAN:

Q.   But if you look at page 3 of this document -- I'm sorry -- page 4.

THE COURT:  Let's see.  Pages are --

MR. SLOAN:  Your Honor, for some reason the hard copy that I have -- and this may be with yours as well -- doesn't have a page number at the bottom.  If you look at the screen, it actually does have a page number.

And I apologize that --

THE COURT:  Oh, I see.  It's vertical over on the left.

MR. SLOAN:  Yeah, Your Honor.

THE COURT:  Let me see.  No.  It has an entirely -- it doesn't have the pages on the hard copy.  Okay.

MR. SLOAN:  So just to orient you, I'm looking at the page that says Micron vs. UMC vs. Samsung.

THE COURT:  I'm looking at it too, plus it's on the screen.

MR. SLOAN:  Yeah.  Just -- right.  For the record, I was trying to identify it since there's some discrepancy between the page numbering.

BY MR. SLOAN:

Q.   Dr. Dyer, does this picture look familiar to you or have you seen pictures like this in presentations prepared by UMC?

THE COURT:  Okay.  Two questions.  Are you asking him does he recognize this?  That was your first question.  And the other was does this look like something you've seen possibly elsewhere?  Which one do you want to go with?

MR. SLOAN:  Let's start with the first, Your Honor.

BY MR. SLOAN:

Q.   Do you recognize this picture?

A.   I can't say that I've seen this picture.

Q.   Do you recall -- I'm sorry.  Do you recall seeing other pictures like this, sir?

A.   I've seen pictures similar to this showing, you know, that aspect of a process technology.

Q.   Have you seen pictures that were prepared by UMC comparing or contrasting UMC's technology with Micron or Samsung?

A.   One thing I did notice, among all the material, is after the February 2017 time frame, there did seem to be some effort to compare it with other manufacturers more than I recall seeing before that -- that date.

Q.   Well, sir, there are a lot of documents in the record that show that Project M was trying to reverse-engineer Samsung 20-nanometer DRAM flows well before February 2017, weren't there?

A.   I believe there were some reverse-engineering reports prior to that date, but I think the nature of those reports was more what I would characterize as routine reverse -- you know, or construction analysis to see what other companies are doing. I've even seen Micron reverse-engineering reports among that information, that was in that body of information.

Q.   Okay.

**A.**   It did -- go ahead.

**Q.**   We'll take a look at some of those reports.  Okay.

Let me just move on from this exhibit for now and let me ask you a question.

Did you speak to any of the other engineers or -- UMC employees who were involved in the DRAM effort at Project M?

**A.**   I don't think I talked to any UMC engineers on this. Yeah, I don't -- I don't think that came up at all.

**Q.**   Let's take a look at -- at what you've called the meeting minutes, 482.

**MR. SLOAN:**  That's P482, Your Honor, and I think you'll find that in Exhibit -- I'm sorry -- Volume 6.

**THE COURT:**  Okay.  Just a minute.  You think there is some objection, but first I have to just get there.

**MR. HUNTER:**  No objection.  We just would request that the monitors be turned off for the gallery for this exhibit.

**THE COURT:**  Okay.  If you could do that, Ms. Geiger.

I think these are going to fall over.  Just a moment.

BY MR. SLOAN:

**Q.**   This is P482, what you called the meeting minutes; correct?

**THE COURT:**  Okay.  Just one minute.

**MR. SLOAN:**  Your Honor, there is an electronic document; so it's --

**THE COURT:**  Oh, it's not in a binder?

MR. SLOAN:  There is a tab in the binder, but it just --

THE COURT:  It's not worth going to.

MR. SLOAN:  It's not worth going to.

THE COURT:  It's D -- what's the number?

MR. SLOAN:  P482, Your Honor.

THE COURT:  482?

MR. SLOAN:  Yes.

THE COURT:  It's on the screen only.  Go ahead.

BY MR. SLOAN:

Q.   So you testified earlier about this document; correct?

A.   This appears to be a translation of that what we've been calling meeting minutes document.  I can't see all the tabs here.

Q.   Okay.  Sir --

A.   I'm more used to looking at the untranslated version, but it appears to be.

THE COURT:  Can you get the number?  It looks like -- did you say 1482 or 482?

MR. SLOAN:  P482.

THE COURT:  That's what I thought I said, but someone is attributing 1482 to you in the transcript.  So okay.  I just want to make sure.

Wait a minute.  Did you say D or P?

MR. SLOAN:  I said P.  This is a plaintiff's exhibit,

Your Honor.

THE COURT:  All right.  It's in.

Let's keep going.  Where do your exhibits start, with what number?  Are you in the 3000s, before you get to it --

MR. SLOAN:  Your Honor, I'm in Volume 6.

THE COURT:  No, I'm -- just generally.

MR. SLOAN:  Where do the defense exhibits start?  3000, yes.

THE COURT:  Okay.  Fine.  So anything before that is going to be a plaintiff's exhibit.

MR. SLOAN:  Correct, Your Honor.

THE COURT:  You're in a plaintiff's exhibit.  It's been shown before.  It's only available on the screen.  All right.

What's your question?

BY MR. SLOAN:

Q.  So did you speak to -- there are some people mentioned under A as team members.

Did you -- you said you then speak to Zou Shifang; right?  That's SF Tzou; correct?

A.  I didn't talk to any of the project engineers.  I -- or the UMC.  You asked me that earlier.

Q.  Okay.  I want to ask you a couple of questions about this document, though.  Under A, the team members, Stephen Chen is not listed anywhere, is he, sir?

**A.**   He's not listed on this particular page, no.

**Q.**   You didn't see any e-mails sending this document to Mr. Chen, did you?

**A.**   No.   I saw e-mails where he was helping to arrange the meeting and encourage people to show up and apologizing for not being able to make it the first day, but I don't -- I don't think I have anything that shows this document sent to Stephen Chen.

**Q.**   Sir, are you aware that, in October 2020, after UMC reached an agreement with the Government, that they issued a press release in which they said that UMC had undertaken significant efforts to remove any unauthorized information from the process technology that --

        **MR. HUNTER:**   Objection, Your Honor.   Hearsay.   Lack of foundation.

        **THE COURT:**   Sustained.

        **MR. SLOAN:**   Your Honor, I'm asking it again for his state of mind.

        **THE COURT:**   How is his state of mind relevant?   In other words, are you suggesting he should have investigated the allegations made in the indictment?   He's saying he just thought he was, you know, a tech guy who was supposed to look for things and see if they're there, not supposed to be doing the behind-the-scenes kind of investigation.

        But you want to ask him about a press release.   You could

start with was he aware of any press releases?  If he says yes, you can see where you want to go from there.  But I don't know how far it's going to go.

But you can keep on.  I mean, I get your point.  There are all kinds of people out there.  If you actually talk to them, maybe they could have shortcutted your whole investigation. But they're also people who the Government says are all complicit in committing a crime.  So I think it's probably thinking they're not going to cooperate if it's even okay for him to talk to them.

But that's up to you to clear up one way or the other. I'm just not sure it's going to show that there's something wrong with his analysis.  If you're saying the Government should have done something more or looked into something more, maybe they should have.  They had a cooperation agreement. Okay.  But I don't know if it's his job to do that.

Anyway keep going if you want.

MR. SLOAN:  Sure.

BY MR. SLOAN:

Q.   Dr. Dyer, were you aware that UMC had reached some type of an agreement with the Government?

A.   I think I already mentioned it before.  I had heard something about some kind of cooperation agreement, but I don't have any details on that.

Q.   Were you -- I assume that you've generally followed the

media coverage of this case?

A.   I wouldn't even say that.  No, I wouldn't say that at all.

Q.   Do you have a general interest in what's going on in the case beyond your role as an expert?

A.   Of course, my interest is primarily the technology.  I -- yes and no.  I mean, I'm happy to stay focused just on how this technology seemed to come about and the nature of the Micron information that was on hand and the connection between -- between those.

Q.   You said you were generally aware of some type of an agreement; correct?

A.   Again, I had heard that term or a term that sounded like that.  But, again, I don't know what it all means.

Q.   Did you ever hear that UMC had issued any press releases in connection with that?

A.   Now I'm two steps away from what I didn't focus on.  So, no, I don't know of any press releases related to a -- at least it doesn't ring a bell.

Q.   Did you ever hear any statements that UMC indicated that they had tried to remove information that Micron -- that might have contained Micron information from the technology that was delivered?

        MR. HUNTER:  Objection, Your Honor.  Foundation.

        THE COURT:  Foundation.

        MR. HUNTER:  Hearsay.

THE COURT:  Okay.  Hearsay.  Sustained.

BY MR. SLOAN:

Q.   Let me move on to another subject, Dr. Dyer.

Your expert disclosure says that you understood that Micron had acquired Rexchip and Elpida and acquired their trade secrets through that acquisition; correct?  Is that correct?

A.   Could you repeat that.

Q.   Yeah.  So you're aware that in 2012, 2013 Micron acquired Elpida and also acquired a majority share in Rexchip; is that correct?

A.   Generally, roughly, yeah, something like that.

Q.   You're not sure about the date, but I'm correct --

A.   Yeah.  I'm not -- again, that's kind of a business transaction.  I don't know the details on all of that.  Yeah, dates.  I know -- I remember it being 2013-ish time frame. But, yeah, I'm not -- yeah, that's what --

Q.   The main thing I'm trying to establish is really not the date but that you're aware that Micron purchased Elpida, which is a Japanese company; correct?

A.   I think I can answer yes to that, that Micron in some sense acquired those companies and came to own the companies and the technology that they had.

Q.   And are you generally aware that the 25-nanometer DRAM that you have testified about for the past five days was developed primarily by Elpida?

**A.**   That's my understanding, yeah.

**Q.**   And Elpida transferred that design to Rexchip in part for Rexchip to manufacture chips in Taiwan.  Is that a fair statement?

**A.**   Yeah.  Just to qualify it a little bit, part of, I think, my understanding what Micron did acquire when they acquired those companies was 25-nanometer technology, but I think there was a lot of development that happened even after Micron took over.

So the point I'm making here is technology is kind of a fluid thing.  It changes over time.  And I think Micron, acquiring that technology, probably represents, you know, a point in time where things changed according to Micron's needs.

**Q.**   Remind me, Dr. Dyer, were you here when Scott DeBoer testified earlier in this trial?

**A.**   I was not here when he testified.

**Q.**   Have you read the transcripts of his testimony?

**A.**   I did read the transcripts.

**Q.**   And so you're aware that Mr. DeBoer -- Dr. DeBoer said that Micron had purchased Elpida in part for the technology involving their 25-nanometer DRAM?

**A.**   I don't remember that specifically in his testimony.

**Q.**   Do you dispute that that's accurate?

**A.**   Could you repeat it, what you just said?

**Q.**   Yeah.  Would you agree that Micron's 25-nanometer DRAM

chip is based largely on Elpida's intellectual property that they purchased as -- in connection with the Elpida acquisition?

A.    Yeah, I think at least some of it is.  I mean, I think that was an important part of it.

Q.    And in your expert disclosure -- the Government's expert disclosure, you've indicated that you believe that alleged Trade Secrets 1 through 8 are the culmination of many successive generations of technology development, representing years of complex engineering, development, and refinement by teams of engineers.  Is that accurate?

A.    I agree with that statement, yes.

Q.    And in the context of the 25-nanometer DRAM chip, most of that development would have been done by Elpida; correct?

A.    Yeah.  Certainly the state that it was at when Micron acquired those companies, I think you could credit Elpida with that technology.

Q.    Do you know who at Elpida developed the technology, the trade secrets involved with the 25-nanometer DRAM?

A.    You mean individuals?

Q.    Yeah.

A.    Not -- I can't say that I do.

Q.    Do you know what steps, if any, Elpida took to protect the secrecy of those trade secrets?

A.    You know, again, that's kind of a broad thing.  I have seen some documents with "Elpida" written on them.  Some of

them, I believe, had confidential markings.  But I am also aware that that's not required for a trade secret, from my own experience.

So, no, I don't know specifically what measures Elpida took.  I can comment generally about my experience in the industry, but, you know, I have no inside information on Elpida.

Q.   Is it your understanding that, pursuant to -- well, let me step that back a second.

Were you aware that there was a joint venture agreement between Elpida and Powerchip to form Rexchip?

A.   Again, this is something I really don't have any details on.  So, you know, in the interest of answering accurately, it's something I've heard a little bit about.  I mean, it sounds kind of familiar, but it's not something I've studied really at all.

Q.   Well, you're aware that Rexchip had a fabrication plant in Taiwan that Micron obtained in connection with that purchase in 2012-2013; correct?

A.   That is my understanding.

Q.   And that's the fab that ultimately became -- I think it's F16.  Is that correct?

A.   That is my understanding as well.

Q.   Okay.  And so -- and it used to be called R1; correct?

A.   That is also my understanding.

Q.   Okay.  So R1 was manufacturing products for Elpida, DRAM for Elpida; correct?

A.   I believe that is correct.

Q.   So, presumably, Rexchip had access to all kinds of Elpida confidential information; correct?

A.   Yes, I think that would be true.

Q.   Okay.  They probably had travelers; is that correct?

A.   That, I really can't say.  For one thing, I don't know what sort of documentation they used.  You mean -- when you say traveler, I think of the Micron travelers that we talked about. I don't know that they had comparable sort of documents and things.  So I -- I don't know.

Q.   Well, Rexchip had the Rexchip process flow, didn't they?

A.   Yeah.  Sure.

Q.   And isn't that the process flow that is part of what you called the meeting minutes, Exhibit 482?

A.   Yes.  That is -- that spreadsheet information with all the details is different than the traveler documents that we've been referring to for Micron.

     It contains different, in some ways much more detailed, information about the, you know, process details and that.  But I wouldn't call that a traveler.

Q.   I didn't call it a traveler; I called it a process flow document.

A.   Okay.

Q.   And that's what it is; correct?

A.   Could you please repeat your question.

Q.   Exhibit -- the last tab on Exhibit 482, you've referred to that, I believe, as the Rexchip process flow; correct?

A.   The source of the Micron information or the Rexchip information in that meeting minutes document, I would say is a -- not just Rexchip, but it's a comparison between the Elpida process as it's implemented in Japan and the Rexchip process as it's implemented in Taiwan.  So it's sort of a -- it lists all the details.  And I think the purpose of that was to compare the two processes.

Q.   Do you have any knowledge about what, if any, steps Rexchip took to protect the secrecy of its confidential information?

A.   Again, just from, you know, I suppose, markings that I've seen on documents and, you know, what you might be reasonable to assume knowing how valuable this sort of information is and how the industry in general handles that sort of information.

Q.   But you have no information, for instance, whether or not Rexchip allowed its employees to take confidential information home with them on USB devices, do you?

A.   Well, I can comment on that in a couple of ways.

     One, that in itself doesn't -- if you're implying that that's somehow not confidential or not important information because engineers can use it at home or wherever, it's not

unusual in the industry for engineers to have access to process information.  It's what enables them to do their jobs.

Companies I've worked for encourage employees to learn the process.  And if they want to work from home, nobody is going to stop them from doing that.

THE COURT:  Okay.  Well, that may not be the point he was even trying to make.  Okay.  But leaving that aside, don't worry about arguing the point.  You'll probably get out of here faster if you stick to shorter answers.

BY MR. SLOAN:

Q.   But you would agree that, if people took home information on USB devices, that that might be a way that information could leak out; is that correct?

A.   In my mind, that doesn't raise a red flag.  Most engineers -- most people are honest.  They're not going to do that.  This is their technology.  I think it's unusual -- very unusual for somebody to see that as an opportunity to steal something or do something improper.

Q.   So you think it would be usual for an engineer, for instance, to keep a copy of a process flow on their USB device and take it around with them?

A.   I've done that myself on many occasions.  There is nothing to prevent it.  There is no -- you know, we're -- we do get training on -- in general, there's a sense.  You know what information is valuable, and you know how valuable, and you

know you want to be extremely careful with that sort of stuff. But at the same time, you don't want to put up too many barriers on people doing their job.

So that doesn't raise a flag for me.  I don't necessarily see anything improper about that.

Q.   Do you know whether Rexchip took any steps to prevent its confidential information or Elpida's confidential information from being disclosed to third parties?

A.   Yeah, again, my view into that is limited by the documents that I've seen.  And it looks like they did follow practices where, you know, certain documents that exist in sort of a final form or a formal form, that -- generally those might have confidential markings.  That's just my recollection of looking through this stuff.

Working documents, engineers don't generally go to the trouble to mark things confidential if it's just something that they happen to be working with or it's working with -- you know, in cooperation with a group of people, a small group of people.

Q.   Beyond purportedly marking some things confidential, you have no knowledge whatsoever about what steps Rexchip took to protect its confidential information or Elpida's confidential information from being disclosed to third parties, do you, sir?

A.   I believe I just said -- I just answered that.  And the answer is I don't have any insight -- knowledge or inside view

as to how they did things.  All I saw is the documents that, you know, came from those companies.

Q.   The answer is no, isn't it, sir?

A.   Well, if you want to include markings on documents, then it's not an absolute no because that is an indication that they're managing their confidential information in -- like a routine industry standard way.

Q.   I want to move on to a new topic.

I wanted to ask you some questions about the travelers. And I think you testified about this last week.  And you recall in particular, I think you spoke about the traveler for the 90 series Micron device which you called ATS, alleged Trade Secret 2 and alleged Trade Secret 6 and alleged Trade Secret 7.

Do you recall those documents, the travelers?

A.   I think you're referring to the Micron process travelers. And yes, Trade Secret 2, 6, and 7 in particular.  You could include 8 as well, but that was related to Trade Secret 7.

Q.   And you explained last week that those documents used to travel around with the wafer to people in the fabrication plant; correct?

A.   No, not exactly.  Those documents didn't, but those are sort of the, you know, evolved version of documents that used to travel around with the wafers, where the operators would actually initial after a process has taken place.

THE COURT:  The old days when they had people, the

people would sign off on documents as they went from one step to the other. So then when they started showing steps, they just called them travelers. But they are not -- people aren't doing it. Okay.

MR. SLOAN: Fair enough.

BY MR. SLOAN:

Q. But there are still lots of operators in these fabrication plants; correct?

A. It depends on who -- I mean, it can depend. In some cases, yes, there still are operators. And in others, I think there's a lot more automation.

Q. Well, let's, like, turn the clock back to 2015, 2016. Fair to say that most of the fabs building DRAM at that time had hundreds or thousands of people working in them?

A. I wouldn't say that for sure. I mean, even in that time frame, robots and, you know, wafer transport tracks and things were pretty common.

So -- and these big manufacturing fabs, I think there's even a lot more than that in some of the development fabs I've worked at. So I wouldn't conclude that, even in that time frame, there were -- that they heavily relied on operators in all these fabs.

Q. But you said that the purpose of the travelers was to provide training to people in fabrication plants; correct?

A. Again, that might have been -- you know, we can maybe go

back and see exactly what I said if you just want to know what I said.  But my view on these travelers is, yes, one purpose of those, they would be very useful for training.  But they could also be used for reference by experienced process people, integrators, unit process people, managers.  So there could be multiple purposes.  These are very useful documents for a range of purposes.

Q.   So they could provide reference material for people working in the fabrication plant; correct?

A.   Yes.  I think that's one of the functions they could serve.

Q.   And since they were widely distributed, you wouldn't want them to include all of the recipes needed to copy the full design; correct?

A.   I mean, first of all, what do you mean "widely distributed"?  I don't see where -- I don't know what you mean by that.

Q.   Well, they were distributed as reference materials, you said, to people in the plant; correct?

A.   No, I don't think I said they were distributed to anybody.  They may have been available.  I don't -- you know, again, I don't -- in my experience, you know, something like that might be, you know, something that could be available.  If you were seeking out certain information, there might be certain people, you know, that, you know, have access to these things.  But I

don't think they're going to be, like, distributed automatically.

THE COURT:  If you were comparing, like, a traveler and a process flow, is it just the traveler is at a higher level, more general, and then the process flow has all the little details?

THE WITNESS:  That's largely true.

The traveler also has some additional information; but, again, it's at a higher level.  They do list all of the steps. They generally give the purpose of each step and the targets, like the thicknesses and that sort of thing, and also key information that one needs to be aware of, something that could go wrong, and what it might mean if that does happen.

THE COURT:  Okay.  A little bit of what the end product might look like but not all the steps to get to it. Just at this point, we need to have this thing?

THE WITNESS:  Yes.

THE COURT:  And then -- and watch out for whatever -- well, here at that point --

THE WITNESS:  Yes.

THE COURT:  -- but not all the little details that you were saying that, if you reverse-engineered, you wouldn't be able to come up with?

THE WITNESS:  That is completely correct.  You wouldn't have all the detailed recipe parameters cluttering

this up or all the tool information in there.

THE COURT:  If you have -- if you did reverse-engineer, could you figure out the traveler or not even from the traveler?

THE WITNESS:  No, you could not, because the traveler does represent the full sequence of important steps.

THE COURT:  All right.  And they could vary?

THE WITNESS:  And they could vary.  And only a very small percentage of all of those steps even has a feature that would be detectable in the final product.

THE COURT:  Oh, okay.  All right.

Okay.  Sorry, Mr. Sloan, to interrupt you.

MR. SLOAN:  No, Your Honor.  Those were helpful questions.

BY MR. SLOAN:

Q.   Lot me ask you some questions about recipes.

I think you just indicated in your colloquy with the judge that the process -- the travelers didn't contain full recipes; is that correct?

A.   Yeah, that's generally true.  I'm just -- I'll just leave it at that, generally true.  Not necessarily always the case, but yeah.

Q.   Would it be fair to say that a recipe is a detailed set of parameters or instructions for a specific tool to perform a specific function?

**A.** That sounds pretty good. I might have to think about it a little bit more to -- you know. But yeah, that sounds reasonable.

**Q.** And are they generally -- fair to say that, generally, recipes are specific to a particular machine?

**A.** Well, now, I do have to qualify. There's recipe information such as just indicating what chemicals may be present and that sort of thing, and then there's other recipes that actually give detailed machine language, like a software code telling the machine what to do. So you have both types of recipes.

**Q.** And those detailed machine recipes telling machines what to do, those aren't included in the traveler documents that we've seen here, are they?

**A.** Well, again, the detailed recipe information generally is not included in the traveler documents.

**Q.** And isn't it true that the recipes are often provided by the tool vendors?

**A.** When you say "the recipes," to me that means the recipes that the manufacturer is using to manufacture their parts. And, in general, a company like Micron, absolutely not. They would have their own recipes that are optimized. And they would not want that information back-fed to vendors without some kind of a nondisclosure agreement.

So no, the companies -- the recipes that Micron would be

inclined to use in their DRAM fabrication would -- very unlikely to have come from the vendor.

Q.   You don't have any firsthand evidence of that, though, do you?  You said unlikely.  That's your speculation; correct, sir?

A.   It's a little more than speculation.  I just -- I think it's fairly well known in the industry that any major manufacturer does not rely on vendor BKMs.  BKM stands for best-known method.  And vendors do have recipes that they can kind of include to give maybe an inexperienced -- you know, or evaluation of a tool or something like that.

But, number one, it just isn't -- not the way the industry operates.  Number two, I did talk to -- I believe it was Jan Bissey at Micron and asked him that specific question.

And the answer was, "No, we do not use vendor BKMs.  In fact, we often work with the vendor to modify the tool for custom functionality that wouldn't even be available to other manufacturers."

So I do want to stress, you know, these company -- the recipe, there's a lot of technology behind it that comes from manufacturing experience.  And even to the extent that they are modifying equipment to affect certain recipe parameters and recipe capabilities that the industry at large wouldn't have available.

MR. SLOAN:  Your Honor, I was just about to move on to

a new subject, and this is probably a good time to take a break.

THE COURT:  Okay.  Well, I'm just going to push it up to 2:30 and say come back at a quarter to 3:00.

MR. SLOAN:  That's fine.  Thank you.

THE WITNESS:  Thank you.

(Recess taken at 2:27 p.m.)

(Proceedings resumed at 2:46 p.m.)

THE CLERK:  Please remain seated and come to order.

Okay.  All right.  Whenever you want to proceed.  That's fine.

BY MR. SLOAN:

Q.   Dr. Dyer, I want to switch to a new topic now.

Based on your testimony this week and this morning, it seems that you have thoroughly reviewed e-mails involving the Project M team; is that fair?

A.   I particularly focused on technical documents and not so much on the e-mails.  But in many cases, the e-mails did help, you know, build on overall story and a context to the technological development.

Q.   But in trying to determine what development efforts Project M took, you looked at the e-mails of the team on technical issues; correct?

A.   Again, the -- sort of the procedure was more looking at the technical information.  And oftentimes, you know, that

would lead to look at some e-mails that might have been surrounding some of that information.  And it helped put together, you know, who's communicating what to whom and, you know, some of the collaborative efforts that went on.

Q.   So fair to say, though, that, when you're trying to determine what steps the Project M team was taking in order to develop the DRAM process, that you would look at e-mails where they're exchanging technical documents; correct?

A.   Yeah.  Again, usually it was the technical information that piqued my interest and an e-mail that it might have been attached to or something like that.

Q.   And during your search of documents you found numerous documents showing that UMC was looking at Samsung designs, didn't you, sir?

A.   Could you repeat that.

Q.   Yeah.  You found numerous documents showing that UMC was trying to reverse-engineer Samsung designs; is that correct?

A.   "Numerous" makes it sounds like it was a lot compared to just the body of information.  And a word that comes to mind is maybe "a few."

Q.   Okay.  But -- so you did see some documents showing that Project M was looking to reverse-engineer Samsung's designs; correct, sir?

A.   No, I don't think -- you got to be careful how you characterize that.

The reference to the Samsung construction analysis that I saw just appeared more the usual sort of thing that one might do in developing a technology.  And that is just take a look at what your competitors are doing with that same technology.

Q.   Let me ask you this:  Would it be fair to say that, as of late 2015 -- well, let me step back for a second.

You're generally familiar with the DRAM industry; correct?

A.   Yeah, generally.

Q.   Oh, just generally familiar, or are you an expert in it, sir?

A.   That's what you asked me.  I'm somewhat familiar with the DRAM industry.

Q.   You're somewhat familiar.

As of late 2015, would it be fair to say that Samsung and hynix were considered to be the leaders in the DRAM field in terms of market share?

A.   I wouldn't single out Samsung and hynix.  I would mention the three dominant DRAM makers, which, you know, all have significant market share and, combined, constitute 90-plus percent of the -- that advanced standalone DRAM market.

Q.   But as of late 2015, it's true, isn't it, that Samsung and hynix had substantially larger market share than Micron?

A.   In my recollection, you know, these market shares kind of fluctuate over time.  And I don't ever remember a point where Micron wouldn't be fairly included as one of the top three DRAM

manufacturers.

Q.   That's not what I asked, sir.  I asked isn't it true that, as of late 2015, that Samsung and hynix had substantially more market share than Micron, yes or no --

A.   I'll answer that --

Q.   -- in DRAM?

A.   I don't know.  I am not a businessperson.  I don't study details of the market share and memorize what it is every year.  But I can tell you that, from that time frame to sometime before and sometime after, Micron was among the top three dominant DRAM makers.

Q.   You said that you reviewed Scott DeBoer's testimony; correct?

A.   I did review it.

Q.   And he was the -- essentially the chief technology officer of Micron?

A.   I think I heard that, yes.

Q.   I don't think that was his exact title; but, in essence, that's what his role is; correct?

A.   Yeah, again, I'm going to be a little bit careful.  My understanding, he is one of the top technical guys, but I don't know about the title.

Q.   And do you recall Dr. DeBoer saying that, as of late 2015, that Micron was about a year and a half behind Samsung when they started producing the 20-nanometer chip and about a little

over a year behind hynix?

A.    That does kind of ring a bell; but, you know, I didn't really study that report.  I just reviewed it.  I didn't really have time to go over it in detail.

Q.    Do you have any reason to dispute that?

A.    No, I don't.

Q.    So is it fair to say, then, that hynix and Samsung were ahead of Micron in terms of DRAM developments if you're looking at the size of the nodes as of late 2015, early 2016?

A.    Yeah.  If you're just looking at the size of the nodes and, you know, where they fall on a -- let's say a chart where you're just listing node sizes, I don't think that's a full reflection of their market position or their, you know, technological position in the industry.

      But, you know, I did read the report.  And like I say, some of that does ring a bell.  And I don't have any reason to dispute what you said about them being a little behind in the technology node.

Q.    And as of late 2015, Samsung and hynix were sort of mass producing DRAM that had a 3x2 cell structure; correct?

A.    Could you please repeat that.

Q.    As of late 2015, early 2016, Samsung and hynix were mass producing DRAM chips that had a 3x2 cell architecture?

A.    Yes, I believe that is true.

Q.    And Micron was not?

A.   Micron was producing its own 6F2 cell which is in a 2x3 configuration.

Q.   And, in general, the industry was moving in the direction of 3x2 because that was considered to be superior in terms of minimizing the RowHammer effect; correct?

A.   Yeah, first, I think on the last question, it's also, I think, important to point out you mentioned mass producing.  So I -- we're talking about the more mature, you know, technology node in manufacturing.

What was in development might be a completely different story.  And I -- in fact, from the documentation that we have, we know Micron was already on 3x2 in that time frame.

Q.   Now, I had started by asking you again whether you had seen any e-mails reflecting the fact that UMC was looking at Samsung and hynix designs as potential targets for their process flow development.

Did you see any e-mails regarding that, sir?

A.   What exactly -- so please repeat the question.  I want to understand exactly what you're asking.

Q.   Let's take a look at some examples, some e-mails, to see whether you've seen some of these.

Let's start with what's been marked as defense -- D4812, which is in your binder.  I believe it's binder Volume 3.

THE COURT:  It should be fairly early, I'd think, in 3.  Let's see.

BY MR. SLOAN:

Q.   Take a look at this document and let me know whether it looks familiar to you, sir.

A.   I can't say that this is one of the key documents that I relied on.  I'm not even sure I -- I've looked at this.

Q.   Well, let's take a look at it to see whether it refreshes your recollection.

THE COURT:  As to what?  That he did look at it or some other point?

MR. SLOAN:  Refreshes his recollection that he -- that he looked at it, yes.

THE COURT:  Okay.  In other words, take a closer look at it.

MR. SLOAN:  Yes.

BY MR. SLOAN:

Q.   So let me just direct your attention to the -- I guess bottom of page 2 and page 3, which an e-mail from LT Rong to Stephen Chen from January 7th, 2016.

And Mr. Rong says, "SVP Chen, reports done by Chipworks" --

MR. HUNTER:  Objection, Your Honor.  Hearsay.

THE COURT:  Okay.  I'm not even sure -- oh, I see. Okay.  This -- let me look.

Okay.  This is from Rong to Chen?

MR. SLOAN:  Yes.

THE COURT: The first thing is I'm just trying to figure out whether it -- why you're asking him -- before we get into all these hearsay objections, why you're asking him if he saw certain e-mails.

I think you want to put into evidence in some way that UMC was not just focused on Micron; they were looking at other companies' technology, trying to do it legitimately, something like that?

MR. SLOAN: Correct, Your Honor. And I think --

THE COURT: Do you have somebody else other than this witness who might be able to do that? Otherwise, you're just essentially trying to get these e-mails in while he's up on the stand. I mean, we can do it that way, but there's a hearsay objection. And there may be -- just like you objected to all their, you know, e-mails, they're now probably going to object to all yours.

Okay. So --

MR. SLOAN: Yeah.

THE COURT: They're trying to prove there's a conspiracy. You don't want to say this in the course of the conspiracy -- or maybe you do as long as you're not -- but I think you don't want to make Stephen Chen part of it even if somebody else was conspiring.

So what exception do you want to rely on, then, because he's saying this attachment compares Chipworks and

TechInsights.  I don't know what those are.

I don't know if he does either.

**MR. SLOAN:**  Your Honor, it's not offered for the truth of the matter asserted; it's offered because it's relevant to whether or not he is an expert in terms of his making his determination as to --

**THE COURT:**  Which one?  Which determination?

**MR. SLOAN:**  He's opined that UMC Project M has sort of blindly followed Micron's design.  I think it's relevant that, in fact, they were looking to reverse-engineer and targeting --

**THE COURT:**  Okay.

**MR. SLOAN:**  -- Samsung information.  And it's relevant to whether or not his opinion is objective.  And experts are allowed to consider hearsay.

**THE COURT:**  Well, you generally objected to him giving any testimony about backstage activity.  In other words, he looks at a document and he says, well, I see here that if you tell me or I have found, either way, a particular Micron document in UMC's files somewhere, somebody had it, and now I see UMC has their own document, and I looked at it, and, gee, they look pretty much the same, that's mostly what he's been asked to do.  And I don't think he has been asked to say how people were handling things behind -- behind those documents.

However, if you want him to do it, even though you were objecting earlier -- but if you want him to do it, you're

essentially just asking him didn't they look at other things.

Okay.  And then he -- his testimony is really not based on the e-mails; it's based on the documents that he says the e-mail kind of puts it in context so he knows kind of where it came from.  But he's really looking at the document.

I don't know if there are any documents that went with like, for example, this e-mail that shows they were comparing or doing a reverse-engineering or whatever, where he could look at it and say yeah, that looks like reverse-engineering.

If you're just asking him to read that somebody is saying they're comparing something, then the Government is objecting, well, that's a declarative statement.  You know, they're comparing.  And what -- what do you want to rely on, or do you want to say, well, they're arguing it's part of the conspiracy and you want to show that the conspiracy was broader, or I'm not sure what.

So I'm not sure where it's going to fit in.  I'm just thinking of things you could say.

At the moment it's just like an out-of-court statement by somebody at UMC saying we're comparing something and then -- actually, is there an attachment?  I don't see one.

MR. SLOAN:  This one, there is not, Your Honor.

THE COURT:  Okay.  So we don't even know if it's just self-evident, that that's what they were doing if he looked at the document and you showed it to him and said let's assume

this came out of a UMC file, does that look like somebody is comparing hynix with UMC or Micron or whatever they were doing. I'm not sure what Chipworks and TechInsights are.

But, anyway, I think I have to sustain the objection until you come up with some, you know, exception that you want to articulate and it sounds like it would work.  So . . .

MR. SLOAN:  Well, Your Honor, I think it goes to the state of mind.

THE COURT:  Whose?  Whose state of mind?

MR. SLOAN:  State of mine of the Project M engineers.

THE COURT:  It may if you have something that -- I don't quite know where to fit -- these are not mutually exclusive ideas.  In other words, you could try and reverse-engineer and go, well, that didn't work.  Let's see. We've got the Micron documents.

I mean, there are different ways that you can approach this, but if you -- if it were relevant, let's just look at --

MR. SLOAN:  Your Honor, if we look at the first e-mail in -- I mean, the last-in-time e-mail --

THE COURT:  Well, in looking at it, this is not from, for example, Chen to -- it's LT Rong.  And I'm not sure if he is, like, an alleged conspirator in some way or where that fits in.  At some point they were trying to say anything Project M did, anybody there, you know, it could be the typist, you know, somebody in the typing pool, they're all in it together and

you're responsible for everything they do, and they've kind of backed off that a bit and focused on more prominent players, if you will.

But where's Rong supposed to fit in in all that?

**MR. SLOAN:**  Your Honor, maybe a better example of what I'm talking about is the last-in-time e-mail at the very top of page 1, which is an e-mail from Stephen Chen to LT Rong and Bowen Huang in which he says, "We like to memory reverse-engineer reports of both" --

**THE COURT:**  Wait, wait.  Where am I seeing --

**MR. SLOAN:**  On the top of page 1, Your Honor.

**THE COURT:**  Okay.  Wait a minute.  Oh, I see.  Page 1. All right.  Stephen is writing Bowen.

**MR. SLOAN:**  And, again, I think he's saying that we're --

**THE COURT:**  Okay.  Let me just look at it for a minute.

(Pause in proceedings.)

**THE COURT:**  Okay.  Just let me think about your offer.

They have argued that all of Chen's statements during the time frame that he came over, and even a bit before he actually showed up physically at UMC, are relevant as evidence of a conspiracy, not yet joined necessarily at a certain point by Jinhua because they didn't exist at certain point.  Afterwards they did.

So you're saying, well, here's another statement by him showing that he was not necessarily focused on unlawful ways of developing DRAM.

MR. SLOAN:  Yes, Your Honor.

THE COURT:  Is that sort of it?

MR. SLOAN:  Yes.  It goes to the absence of any conspiratorial intent or knowledge, and it goes to his state of mind which is --

THE COURT:  Okay.  You said.  I got it already.  I got the point.

All right.  I don't know if you have any response to that that you want to make.  If not, Mr. Hunter, it sounds like he may have a point on showing that Chen was looking at other things besides Micron, you know.

So all right.  I'll overrule the objection.

This man doesn't know anything about the e-mail.  Okay.  Almost for sure.  But you can ask him something and see if he comes up with something.  Okay.  Such as what are TechInsights and Chipworks, if that's even relevant.

MR. SLOAN:  Well, actually, Your Honor --

THE COURT:  I'll just ask.

Have you ever heard of Chipworks or TechInsights?

THE WITNESS:  Yes.  These are companies that buy products from different semiconductor manufacturers and provide construction analysis.  They cut into them, and they provide

images of the structure.

THE COURT:  So if someone were trying to reverse-engineer, they might hire them to provide that kind of information?  Or not?

THE WITNESS:  Yes.  Reverse-engineering conjures up actually even looking at this circuit and how things operate. Nowhere in any of that is -- is extracting a detailed process flow.

THE COURT:  No, I understand.  But you're not saying that Chipworks or TechInsights do that, do they?

THE WITNESS:  Again, they just cut into it, and they show pictures of what's inside.

THE COURT:  Well, that's what I was asking, if that's part of reverse-engineer.  I mean, why are you hiring them if not to reverse-engineer?

THE WITNESS:  In my experience, I'm used to the term "construction analysis," but it's the same idea.

THE COURT:  Okay.  All right.  All right.  And you can follow up if you want to ask him other questions about this or . . .

BY MR. SLOAN:

Q.   Yeah.  Dr. Dyer, now that you've had a chance to look at the e-mail -- have you actually looked at the e-mail?

A.   I glanced at it.

Q.   Why don't you take a look at that first e-mail between

Stephen Chen and LT Rong and Bowen Huang.  Let me know when you've read it.

A.    Yep, I've read it.

Q.    And does this look familiar?  Have you seen it before?

A.    It doesn't conjure up any recollection.

Q.    But do you recall seeing other e-mails indicating that Project M was looking to reverse-engineer or buy reverse-engineering reports for Samsung or other competitors?

A.    Yeah.  I think there's a couple of things that I might be able to help people understand about these kind of reports.

MR. SLOAN:  Your Honor, I would ask that he just answer the question.

THE COURT:  Okay.  Well, hold off.  Maybe Mr. Hunter will ask you to explain.  Okay.

BY MR. SLOAN:

Q.    Do you recall seeing instances in which UMC employees, Project M employees, were purchasing or talking about purchasing reverse-engineering reports for Samsung and hynix products?

A.    All I can really say in answer to that is I have seen some information that they were looking at the construction of those companies' products.

Q.    And when you say they were looking at the construction of those products, you mean -- well, let me ask you this:  Did you see that they actually purchased reverse-engineering reports

for those -- for Samsung and hynix?

A.   I believe they had some prior, but those prior obtained reports might have come from Micron, from the information that I saw.  And I did see some information to the effect that they were going to go out and buy -- legitimately buy some copies of that.

Q.   And those reverse-engineering reports, right, they provide detailed electron microscopic pictures of the cell structures of DRAM devices that have been cut by TechInsights or Chipworks?

A.   Electron micrographs are a common technique for construction analysis, and that just gives you information about the structure of the final product and very little information about the detailed sequence of steps and recipe details that go into making it.

Q.   But they give you a picture of how a particular device is constructed; correct?

A.   Yes, it gives you the structure.

Q.   Let me ask you another question.  This e-mail says, "It is very crucial to technology benchmark study for development."

     Have you seen other references in e-mails to Project M using Samsung as the benchmark?  Do see that?

A.   I'm sorry?

Q.   If you look at the last sentence.  Let me look at the last two.

"Can you help to get internal approval for reports?  It is very crucial to technology benchmark study for development."

This indicates that they were using Samsung and hynix as the benchmark for their technology development; correct?

A.    Again, that question could be misleading to people. Clearly, Micron was the standard by which they were comparing things in those early e-mails that had already been discussed in this trial.

I have seen other documents where they might have three benchmarks and, you know, they're looking at all of them.  And so, yeah, this activity is, as I say, not unusual for a manufacturer to want to see what the competition's products look like.

Q.    But this e-mail says that they're using Samsung and hynix as a benchmark, doesn't it, sir?

A.    It does use the word "benchmark," and it is referring to Samsung and hynix in this e-mail.

Q.    And this is in January 2016, just a little after the -- the meeting minutes you've testified about?

A.    Yeah.

Q.    Let's look at another e-mail, sir.  If you can look a little deeper in your binder at 4817.

And if you can look at the e-mail that starts at the bottom of the page -- actually, it starts kind of halfway down from SF Tzou --

MR. HUNTER: Objection, Your Honor. Hearsay.

THE COURT: Well, he is just identifying at the moment that the -- hang on.

Are you going to offer it eventually?

MR. SLOAN: If I can establish that it is admissible, I would, Your Honor.

THE COURT: Okay. Are you relying on this witness to make it admissible or not? I think that -- you haven't offered it yet. So I think just jumping up may be a little premature on Mr. Hunter's part. But, anyway, you just wanted to focus him in that it's an e-mail from Tzou to --

MR. SLOAN: Yes.

THE COURT: Who is it to? Excuse me. Who is this supposed to be?

MR. SLOAN: It's to JJ Lee, who --

THE COURT: That's not Neil.

MR. SLOAN: It is -- I don't think it is.

THE COURT: It's some other Lee.

MR. SLOAN: I think it is someone who is a vice president at UMC.

THE COURT: Well, we don't know. Anyway at -- wait a minute. UMCG. That's still UMC. What's the G supposed to be? Oh. Well, let me just see here.

Anyway, you want him to look at it, and you were going to ask him about the content; is that right?

MR. SLOAN:  First of all, I was going to ask him, yeah, whether he's -- this e-mail looks familiar to him.

THE WITNESS:  Not at all.

THE COURT:  You said no?

THE WITNESS:  Not at all.

THE COURT:  Not at all.  Okay.  So he has -- he hasn't seen it or he doesn't remember seeing it.

But do you still want to ask him questions about it?  If you do, then I want to read it through to see what the objection is and how I might rule on it.

MR. SLOAN:  Yes, I would, Your Honor.

THE COURT:  Okay.

(Pause in proceedings.)

THE COURT:  You're offering this whole thing; right?  Because it goes on and on.

MR. SLOAN:  Your Honor, I would -- I would offer the e-mail from SF Tzou to JJ Lee.

THE COURT:  Just that one?

MR. SLOAN:  And the -- and the e-mails above it.

THE COURT:  Because there's this really long description that's going on for pages and pages.

MR. SLOAN:  Your Honor, I think that that's a -- if you're talking about the "What to expect in 2016 in the Chipworks," that is apparently, like, an article or something that has been copied.  I'm -- I'm not necessarily moving that.

I think it's the e-mails that are significant.

THE COURT:  It's kind of weird.  It starts out -- maybe it's an article.  Whoever wrote it, it says, "It's time in the media world that we see a frenzy of predictions for the coming year.  They are mostly business or tech trends.  So I figured I may in chip in (ha ha)."  This is supposed to be an article?  All right.  Anyway, you don't care about that; right?

MR. SLOAN:  I don't, Your Honor.

THE COURT:  Okay.  Just this bottom one.

MR. SLOAN:  And the --

THE COURT:  Well, this is Tzou, or however you pronounce his name, which he's -- again, is he supposed to be part of the conspiracy?  If he's not, then his state of mind is perhaps not terribly relevant.  And there's no showing anybody else was made a party to this, you know, e-mail, copied on it or anything like that, in other words, the Government is asserting.

Do you understand they're asserting that this individual is a conspirator to take and use some Micron trade secrets?

MR. SLOAN:  I'll ask Mr. Hunter to address that.

MR. HUNTER:  Yes, Your Honor.  And if that's the case that we're agreed on that, I'd like to move in redacted versions of SF Tzou's e-mails -- I think at 1523 -- when the time comes if we're going to agree that he was a coconspirator.

THE COURT:  Well, you aren't agreeing.  What they're

saying is, if you're asserting it, then they want, I guess, to show that he really wasn't doing that; he was looking at these other things.

Is that wrong?  It's not a bad argument if you were going to --

MR. SLOAN:  Your Honor, I think that that's a fair argument, but another argument is simply that we don't think he's a coconspirator, and we think that this shows that, in fact, that he had a -- he was clearly focusing on Samsung and hynix, not Micron.

THE COURT:  Nobody even asserted that he might be a coconspirator but you just now.  But previously, I didn't know that they had.  If they were, then we would have to go back and see why they were saying it and whether there was any potential evidence to show it and then, if so, statements that he made that arguably are in the furtherance of the conspiracy might be admissible, et cetera, et cetera.

So you're not conceding.  Your point is it sounds like you folks are saying that this guy is part of the conspiracy, and I want to show that he was doing other things and he wasn't focused on stealing Micron trade secrets.

MR. SLOAN:  That's fair, Your Honor.

THE COURT:  Okay.

MR. SLOAN:  And to be clear, they had made the statement before, that they believed he was party of --

THE COURT:  Well, at one point everybody.  If you walked in the door and, you know, just had a chat with somebody, you're in the conspiracy.

Okay.  So all right.  I'm going to overrule the objection.  And I think we have to get clear that it's to the March 3, 2016, e-mail.

So how are you pronouncing his name, Mr. Hunter?

MR. HUNTER:  I say it SF Tzou.

THE COURT:  Is that how you understand -- if it is, then that's what we'll call him.  I don't know.  Is it?

MR. HUNTER:  I always look to Agent Ho.  She usually makes fun of me, the way I say things.

THE COURT:  So if she's telling you it's Tzou, then we'll go with Tzou.

Tzou to one of the many Lees in the case, this one being JJ.

Now, do we need to have an amended, or can we leave it at just that -- that's a question.  In some instances the Government was asked to and did submit amended versions of exhibits.  So . . .

MR. HUNTER:  Yeah, Your Honor.  We would ask that the rest of the e-mail, which I think Mr. Sloan represented is some sort of news article -- I don't even know what it is -- be redacted.

THE COURT:  What about, then, the response from Lee to

Tzou, where -- well, it's another guy who likes these exclamation points.

"Good morning.  Looks like you're on top of the project.  Hope you enjoy it.  Best wishes."

Do you really care about that?

MR. HUNTER:  No, not about that part.

THE COURT:  Okay.  Fine.  So we'll say, then, that it's the e-mail exchange minus the bottom half of page 2.  And that goes all the way through -- I don't know how many pages we have here.  So maybe I'll just say I'm admitting page 1 through the -- I'm trying to see who's -- is "Best regards, SF" the end of the e-mail you want to try and put in?  Or -- because there is something after it.

MR. SLOAN:  I think what's after it is the e-mail from JJ Lee to SF Tzou that attaches this --

THE COURT:  Okay.

MR. SLOAN:  -- what appears to be an article called "What to Expect in 2016."

THE COURT:  All right.  So I'm admitting page 1 and page 2 through the closing, "Best regards, SF."  The rest would be out.

(Trial Exhibit 4817 received in evidence.)

THE COURT:  All right.  So you need to do some amended version of that, I guess.

Is that what you're asking me to do or not, Mr. Hunter?

MR. HUNTER: Yes, Your Honor, that's what we would ask.

THE COURT: All right. Nobody knows what's buried in this article. So just we'll take it out.

MR. SLOAN: That's fine, Your Honor.

THE COURT: All right.

BY MR. SLOAN:

Q. Dr. Dyer, let me ask you this: With respect to this e-mail, it says at the bottom again, "Samsung is already in 20-nanometer mass production. Samsung's mass production roadmaps are 25" --

THE COURT: You're going very fast.

MR. SLOAN: I'm sorry.

THE COURT: Every time you start to read, it's like you just want to get through it really fast. But our reporter has to take it down. It's 3:25. So . . .

MR. SLOAN: Let me start over, Your Honor. I apologize.

THE COURT: All right.

BY MR. SLOAN:

Q. So SF Tzou writes:

"To my understanding, Micron is behind Samsung one year above. Samsung is already in 20-nanometer mass production. Samsung's mass production roadmap are 25-nanometer, 22-nanometer, and 20-nanometer

now" --

THE COURT:  I didn't say drop your voice.

MR. SLOAN:  I'm sorry.

THE COURT:  I just said slow down.

BY MR. SLOAN:

Q.   "But Micron is still at 25 nanometers now."

Dr. Dyer, is that generally consistent with your understanding of the industry in March of 2016, that Micron was behind Samsung by about a year?

A.   Yeah.  I think, as measured by the technology node, the feature size dimension, I think that's -- again, I -- as far as these exact dates, I couldn't tell you.  But I think that's consistent with what we were just discussing about Dr. DeBoer's testimony, that Micron's product was at a larger feature size.

Q.   And this, the next sentence says:

"We already bought TechInsights
reverse-engineering report of Samsung 20-nanometer
DRAM and hynix in 21-nanometer (but did not buy
Micron's report)."

Is that consistent with what you've seen?  I believe you said that you did see indications that they, Project M, was buying reverse-engineering reports for Samsung.  Is that correct?

A.   I've seen -- I can't -- I do not recall anything about specifically getting Micron, but then I also know that they had

a lot of Micron information on hand already.

And, you know, again, I just would like to not get the wrong impression out there about what people use these reverse-engineering reports for.

They're used to see the structure of your competitors, and that can be insightful as to where you want to be and where you want to go.  It's something that I've have direct experience with.

Q.    I'm sorry.  Something that you what?

A.    It's something that I have experience with.  And also I should really stress, it really doesn't indicate where their process technology came from.  You're not going to get a process out of a construction analysis report; you're just going to see a final structure.  You're going to see what structures they use in their product.

MR. SLOAN:  Your Honor, I would move to strike his response to that which is nonresponsive.

THE COURT:  Well, your question was very broad.  Immediately preceding it, the witness says, "It's something that I have direct experience with."

The question was "I'm sorry.  Something that you what?"  And then he gave his answer.

So I will overrule the objection to his going on.  You called for just about anything he wanted to say.

MR. SLOAN:  I'm sorry, Your Honor.  I literally didn't

hear him.  I just wanted to have him repeat the word.

THE COURT:  Which word?  Do you want the reporter to read back his answer?  No.  Well --

MR. SLOAN:  I'm going to ask the question.  I missed the last word.

THE COURT:  I see.  You're saying you didn't hear him. You're just asking him, "What did you say?"

MR. SLOAN:  Yes, Your Honor.

THE COURT:  Well, he didn't understand it that way. Maybe you should have said it.  So I'm overruling.  Okay.

BY MR. SLOAN:

Q.   Dr. Dyer, have you seen some of the reverse-engineering reports I think you said that Project M had purchased?

A.   I'm not sure that I've seen the specific reports that they -- it looks like they're considering purchasing.  I'm not sure if they did or if I came across those.

Q.   Okay.  Well, let's -- can we look at 4 -- D4806?

THE COURT:  Okay.  First exhibit.

MR. SLOAN:  I'm sorry.  It's the first exhibit in the binder.  We were looking at the binder number -- Volume Number 3.

THE COURT:  That's what I was trying to say.

MR. SLOAN:  Yes.

THE COURT:  Because you kindly have put these in numerical order or proper sequence.  So it makes some sense in

going through them.

BY MR. SLOAN:

Q.    Dr. Dyer, do you recognize this report?

A.    Offhand, I don't.  This -- I'm just looking through the table of contents.  There's a lot of sections.

      If it was on the Hard Drive 48, it's possible I came across it.  But I don't recognize it offhand.

Q.    Well, sir, this has a UMC DOJ Bates number at the bottom.

      Doesn't that reflect the fact that it was produced by UMC?

A.    Yeah, I think that would indicate that it was in the database that I had access to.  But, again, I've seen a lot of reports and a lot of documents.  Some documents I thought directly pertained to my job of determining where the technology came from, how it was developed.  Some of them were huge reports that might have had a lot of information, but, you know, I wouldn't have necessarily spent a lot of time on those.

Q.    Is this typical of other TechInsights reverse-engineering reports that you've seen?

A.    From what I see here, flipping through it, it looks to be like a, you know, typical TechInsights report where they do a very detailed construction analysis.

Q.    And in this case it's a structural analysis of a 20-nanometer node, Samsung 8GB DDR4 SDRAM; correct?

A.    Yes.  Structure analysis.  And, again, I think that

describes, you know, what they're doing.  They're looking at the structure.

Q.   And it's dated May 2015?

A.   Yes, I see that.

THE COURT:  This is a really detailed document.  Do you know how much they charge for something like this?

THE WITNESS:  I think we saw it in the e-mail, about $16,000.  And from my recollection, $20,000 for a, you know, detailed report seems about right.

THE COURT:  This is a lot of material, a lot of material in here.

All right.  Are you offering this report?

MR. SLOAN:  Yes, Your Honor, I would offer it.

THE COURT:  Okay.  Objection.

MR. HUNTER:  Objection, Your Honor.  I don't know what the foundation is for this report.  It's just something that exists on a database, is all we've heard.

THE COURT:  Well, the database is what?  The UMC -- I don't know -- server or --

MR. SLOAN:  Your Honor, this was --

THE COURT:  Just a minute.  Just a minute.

What do you understand database to be?

MR. HUNTER:  I understand it to be the database of all the documents that Dr. Dyer had available to him.

THE COURT:  In other words, just everything he was

given wherever it came from?

MR. HUNTER:  That's right.

THE COURT:  However, then, the defendant is relying on this kind of discovery -- you know, call it Bates stamp on the bottom from UMC to whoever -- I guess the Government.  And the Government was -- was this, then, part of the material that UMC turned over as part of the cooperation agreement?  Or was this part of some discovery in a civil case?  Or what is it?

MR. HUNTER:  Your Honor, based on the Bates number, I would understand this to be something turned over by UMC.

THE COURT:  To the Government?

MR. HUNTER:  To the Government.

THE COURT:  Okay.  Now, there was a stipulation that the defendant and the Government entered regarding the -- there were documents the Government received from UMC, but it didn't cover, for example, documents that the Government wasn't looking to introduce, I guess.

MR. HUNTER:  That's correct.

THE COURT:  Mr. Sloan, did Jinhua ever think about saying, well, what about our documents?  Do you want to agree that those came out of the same thing?

You don't have a stipulation, but if it came out of the same group that the Government is saying they got from UMC and understood to come from their files, be they electronic or otherwise, then I guess it would be treated similarly as far as

a foundation goes.

MR. SLOAN:  Yeah.  Your Honor, we didn't ask in advance, but it was produced by UMC in the same way the other documents were produced.  I don't think the Government has a valid authenticity objection.

THE COURT:  Well, we could -- if -- it could always be shown by some witness who was the recipient such as Agent Ho or someone who got whatever came from UMC.  But is there any dispute that this was part of that same kind of delivery?

MR. HUNTER:  No, there's no dispute that this came from UMC.

THE COURT:  Okay.  And the request to UMC that produced the delivery to the Government was what again?

MR. HUNTER:  It was a request -- this one, based on the stamp that we provided, was the request for the technology transfer package which we discussed this morning.

THE COURT:  Well, it -- that particular set was just a subset, wasn't it, of all kinds of things that you got?  You're saying this came as part of that?

MR. HUNTER:  That's what I would understand from this Bates number at the bottom.

THE COURT:  In other words, out of some file that had that name?

MR. HUNTER:  Correct.

THE COURT:  Okay.  Well, then I would overrule.

Okay.  Overrule the objection.

MR. SLOAN:  Thank you, Your Honor.

THE COURT:  You're looking at me like --

MR. SLOAN:  No, no, Your Honor.

THE COURT:  Okay.

MR. SLOAN:  So it's admitted?

(Trial Exhibit 4806 received in evidence.)

Q.  Dr. Dyer, can we just take a look at the table of contents which is on page 3 of the document.

And this indicates that it covers package and die, the process, the layout and structural analysis of SDRAM cell, the material analysis of the cell.  Chapter 5, I guess, is critical dimensions of the cell.  And 6 is major findings, including findings regarding the front end of line and back end of line; correct?

A.  Yep.

Q.  And is that sort of fairly standard for a report like this to cover those areas?

A.  Yeah, I think so.

Q.  And, for instance, if we looked at Chapter 5, which is on page 209, this has about five pages detailing the critical dimensions of this Samsung 20-nanometer DRAM chip; correct?

A.  Yeah, again, I'm not real familiar with this document, but what I see here is some numbers associated with various features; so typical sort of information you'd get out of a

construction analysis report.  I mentioned earlier materials and dimensions.

Q.   And in your experience in general, is TechInsights considered to be a reputable company that produces accurate reports?

A.   Yeah, they're known for, like, especially intellectual property investigations.  Companies use them to see if their patents might be infringed upon by other companies.

Q.   And just to give a couple of examples, why don't we take a look at -- if you can look at page 79.  And you'll see that is a scanning electron microscopic picture of the metal 1 and contact to bitline at the edge of the SDRAM array.

Can you describe what this scanning electron microscopic picture details?

A.   Sure.  It shows a cross-section mostly of what I would call the front end of line; so not the wiring levels, which would be above out of the view of this picture.

The big square light-contrast square is a shallow-trench structure, STI.

The series of dark-contrast structures with the light feature around them, those are buried wordlines.  So that array of buried wordlines looks to be the edge of a memory array.

Let's see.  If you move up above that, you know, you see very -- you see a contact -- actually, this might be a good opportunity -- so the -- I mentioned the dark features.  And

those dark features are the buried wordlines.  That's a metal material recessed below the surface.

And if you look up above that, there's a plug of material. And then just above that, that's the surface of the silicon. So those pieces of silicon that are extending up to that common surface, those are the active areas.

And then you've got contacts touching down on those.  And then you have your redistribution layer or your local interconnect contacts which connect those up to the capacitors. And you can see where they label capacitors, and you can just kind of get a shadow of that.

But you can kind of see the level of information that an electron micrograph can provide on this.

Q.   And have you seen photographs like this in the technology development documents that were produced by UMC in connection with the process development for Project M?

A.   Within that collection of information, yeah, I saw -- I've seen this kind of diagrams among the material.

Q.   And have you seen, in fact, diagrams showing that Project M was using those electron scanning microscopic pictures as a target in terms of developing their structure for their DRAM device?  Yes or no, sir?

A.   Please repeat the question.

Q.   Yes.

Have you seen technology development documents prepared by

Project M that show that they were looking at these electron scanning microscopic pictures of the Samsung 29-nanometer chip in order to develop Project M's DRAM cell?  Yes or no?

A.    It's hard to say.  I can't really answer that yes or no. I don't know what people are thinking behind documents.

Yeah, it's just really -- I guess I can answer there wasn't anything that clearly spelled out that that's what they were doing that I can recollect.

There may be some that were looking at certain features of these other competitors and maybe -- you know, the sort of thing you would use in a construction analysis just to see if there's anything interesting that you might be interested in moving towards.

Q.    So the answer is yes, you actually have seen pictures or production documents from UMC showing that they were looking at these scanning electron microscopic pictures to develop their DRAM process?

A.    I can't give you a hard yes because it -- it sounds like you're asking something very specific.  And I can't really say exactly what engineers were trying to do in any given document to that degree.

Q.    Okay.  Well, let's look at -- let's look at some documents that show that they were, in fact, looking at these things.

Let's look at D3049.

MR. SLOAN:  And, Your Honor, I think that would be

in --

THE COURT:  That's the first document in Volume 1 I, it looks like.  Just a moment.

MR. SLOAN:  Right, Your Honor.

THE COURT:  Okay.

BY MR. SLOAN:

Q.  So can you take a look at this document, Dr. Dyer.  The first page is labeled the "AA sketch" -- or "AA etch."  Sorry.  Do you see that?

A.  I see it on the monitor.  I haven't found it.

Q.  It might be easier for you to look through the actual document.  It's in Volume 1.  It's the very first document.

A.  Okay.  I got it.

THE COURT:  It's very colorful.

MR. SLOAN:  It is.

BY MR. SLOAN:

Q.  If you look through that, it has a number of pages with scanning electron microscopic pictures at the top and then seems to have cartoons or diagrams of the structure and process for the development of a DRAM cell below; is that fair?

A.  I'm sorry.  What -- what's the question?

Q.  Well, let's start -- the document shows -- numerous pages have at the top left corner scanning electron microscopic pictures from the TechInsights report that we just looked at.  Isn't that accurate?

**A.**   I don't know.  I don't know where that came from.  I don't -- I'd have to do a close comparison between that document that you're suggesting that it came from and these actual pictures.  It may be.

**Q.**   Have you seen this document before?

**A.**   I'm not sure I've seen this exact document, but the type of diagrams that are shown here, this is something I've seen, you know, examples of in other documents, possibly this one.

**Q.**   Let's look at the document on page --

       **MR. SLOAN:**  And I apologize, Your Honor.  For some reason when we printed these, the pages numbers -- we have the exhibit numbers, but the page number did not come out.

       And if you see on the screen we have the page number, but it's not on the document.  And I apologize.  We can try to fix that, Your Honor.

       **THE COURT:**  It's okay for now.  I don't know there's going to be a marked difference in the pages.  But what one did you want the witness to look at?

       **MR. SLOAN:**  If he could look at the very first page.

       **THE COURT:**  Just where it says "AA etch" or the first color --

       **MR. SLOAN:**  Well, let's start with that.

**BY MR. SLOAN:**

**Q.**   "AA etch," that refers to the active area etch; is that correct?

**A.**   I think that's fair to say.

**Q.**   And the active area is --

MR. HUNTER:  Your Honor, objection.  Foundation.  I have no idea what this document is or where it comes from.

THE COURT:  Well, he's just trying to get a definition of AA etch.  Is that a term that would be used in the industry?

THE WITNESS:  Yes.  If you recall, AA was short for --

THE COURT:  No, I remember.  Just is it a term that's used in the industry?

THE WITNESS:  Yeah.

THE COURT:  Active area etch?

THE WITNESS:  Yes.

THE COURT:  Okay.  All right.  So AA etch stands for active area etch.  That's as far as we got.  Okay.

Now, you have some questions about these sort of Mondrian sort of looking drawings on here?

MR. SLOAN:  Yeah.  If you can turn to the second page that says "AA LT."

THE COURT:  Okay.  So the first colored page.  Page 2; is that right?  Yes.  Okay.  Now, up at the top it's supposed to say AA LT, may be slightly punched on your copy in the --

MR. SLOAN:  Yeah, that's what I'm looking for.  Yeah, page 2.

THE COURT:  All right.  It's clear on the screen.  When it got hole-punched, it took a little bit of the T out and

maybe part of the L.  But okay.

**BY MR. SLOAN:**

**Q.**   And, again, the -- what is -- do you have an understanding of what AA LT stands for?

**A.**   Probably AA litho, lithography.

**Q.**   And lithography is the process where they lay down layers of film in order to etch the active area; is that fair?

**A.**   A little bit more involved than that.

**Q.**   But if I can direct your attention to the -- this scanning electron microscopic picture at the -- at the top left, do you recognize that as a picture that's taken out of the TechInsights report that we just looked at?

**A.**   There's no way, from just flipping through a few pages in the TechInsights report, I can attribute this particular image to that report.

**Q.**   All right.  Let's look back at the TechInsights report, 4806.

        **THE COURT:**  Let's go back to Volume 3.  Maybe you can just show it up there.  Then you don't have to pull it.  You're trying to connect something in the TechInsights report to this document?

        **MR. SLOAN:**  I am, Your Honor.

        **THE COURT:**  Do we even know where this document was found?

        **MR. SLOAN:**  Your Honor, I believe this is also a

document produced by UMC, but I recognize it doesn't have a UMC DOJ Bates number on it, and -- so, Your Honor, I would ask that we be able to see if we can find a copy that -- my understanding is that that is where this came from.

THE COURT:  Well, let's see if there's any dispute as to that.  Is there any disagreement as to whether this came in the same package as that other exhibit we were looking at with the Bates number at the bottom?  This one doesn't bear a Bates number on the bottom.

MR. HUNTER:  Your Honor, the document that is not on the screen that I thought we were talking about, I don't know what that is.  And I don't see a Bates number on it, I have no idea where it came from.

THE COURT:  Okay.  You don't recognize it?

MR. HUNTER:  No, I don't recognize it.

THE COURT:  Do you have any idea how you got it?

MR. SLOAN:  Your Honor, I believe it is a document that was produced by UMC.  But for some reason --

THE COURT:  I would ask you to wait until you go back and look at the history of -- whatever you can possibly do. Maybe talk to Government's counsel about it.  If it's part of a package you received from them -- are there any documents in your binders that you did not get from the Government?

In other words, are there some Jinhua-produced documents that they didn't have but you have access to, or is it all

Government-produced documents?

MR. SLOAN:  Your Honor, I'm 99 percent sure that they're all Government-produced.  I don't think there are any Jinhua documents.  To the extent that there are other documents, they are things like articles or things from third-party sources, but they're not sort of production documents.

THE COURT:  Okay.  I guess maybe you could talk to Mr. Hunter afterwards to see if you can trace the source of this.

I don't think this is like -- in fact, I don't know why, in the copying process, the page numbers came off.  It still shows trial exhibit number in that far right -- if you want to call it vertical aspect on this exhibit and the earlier one, where it also didn't have the page numbers when it was produced in this format.

And yet if one were just saying, oh, it was out of the -- you know, the copy frame or something, it's just part of the same line.  It should have been there.  It's kind of strange.

Do you have any reason to think that a Bates number was not copied that was on here or just this didn't have a Bates number?

MR. SLOAN:  Your Honor, in my --

THE COURT:  Oh, hang on.  Help is coming.

MR. SLOAN:  Oh, okay.  I'm sorry.  My understanding

from Ms. Reitmeier is that it was produced in native format and it was found on the Taiwan -- one of the Taiwan hard drive documents.

THE COURT:  Okay.

MR. SLOAN:  So that's --

THE COURT:  Okay.  Now, that's how you think it came to be.  Okay.  If -- I guess you need to maybe confirm that with Government counsel because, at the moment, I don't want to have to start having people from your office have to, you know, put in some kind of testimony or anything.  So hopefully we could just get that squared away just like the Government didn't have to do it on their end.

All right.  But for the moment, assuming -- just assuming that this came off of somebody's drive at -- or out of their e-mail or something on a server that somebody collected back at UMC, it doesn't sound like this witness has any understanding of it.

You can try again.  But if you just put it in, I don't know what it's going to show.  It's -- do you think it's some kind of report presented by a third party, like, again, one of these TechInsights type things or what?

MR. SLOAN:  Your Honor, my understanding is that this is something that was prepared by UMC in the course of their development.  That's my understanding.

THE COURT:  Oh.  Well, I -- gee, I don't know.  I

don't know that he can say anything about that, at least at the moment.

You could -- you could see if he just has some comment that he can make about it.  But -- and then we'll get to whether you can put it in.  But if you put it in, it's just a bunch of fancy pictures.  It's not going to tell anybody much.  Somebody else may know what it is.

MR. SLOAN:  Your Honor, I wanted to see if he had seen it and ask generally whether it was representative of other --

THE COURT:  All you'd have to do is ask him.

Did you see it before?

THE WITNESS:  I don't recall seeing this specific report, but I did mention that some of these diagrams are kind of familiar.  I could talk a little bit to what they're doing in the diagrams.

THE COURT:  In other words, what the diagram depicts --

THE WITNESS:  Correct.

THE COURT:  -- rather than doing?

THE WITNESS:  That's correct.

THE COURT:  Okay.  All right.  Well, you got about five minutes.  If you want to explore that, he's all yours.  Okay?

MR. SLOAN:  Your Honor, maybe what we should do is figure out -- and I apologize that -- sort of the derivation of

this.  I had thought this was a UMC-produced document.

THE COURT:  Well, maybe -- maybe it is or maybe it was found by the MJIB.  It doesn't really matter as long as it came off of somebody's server somewhere, I guess.  Although, if you can't show it was being dealt with at some time, place, and by somebody, I'm not sure how far it goes.

But do you want to just give a little sort of short discussion of what these diagram-type things that he's seen, if not here, elsewhere, similar ones, are or not?  Maybe you don't want to do it.  And if we keep talking, it will be 4:00 and we can all go home.  Well, not home but leave here.  Okay.

MR. SLOAN:  Let me just return to this page, then.

BY MR. SLOAN:

Q.  Again, I was asking you specifically about -- Dr. Dyer, about the electron scanning microscopic picture at the top left of the page.

THE COURT:  Does it say that anywhere, or is that you just knowing that that's what it is?

MR. SLOAN:  Your Honor -- that's me saying it, Your Honor, but I think Dr. Dyer will affirm that that's accurate.

THE COURT:  He wasn't really given an opportunity to, but is he using the correct term for whatever this picture is up at the -- well, this blowup of the gray here?

THE WITNESS:  Yes.  More or less, I do recognize that picture as a scanning electron micrograph.

THE COURT:  Okay.  What is that?  A fancy microscope or --

THE WITNESS:  It is a fancy microscope.

THE COURT:  Okay.

THE WITNESS:  These features are too small to be seen with visible light.  So we have to use electron imaging.

THE COURT:  Okay.  Given how many of these exhibits look, it's hard to remember just how small the items are we're talking about.  It's all pretty amazing, actually.

THE WITNESS:  Yes.  I'd love to go on.

THE COURT:  But, anyway -- well, do you want to keep everyone in suspense until tomorrow, or do you want to ask him a couple of questions?

MR. SLOAN:  Yes, I do, Your Honor.

THE COURT:  Okay.

BY MR. SLOAN:

Q.  Sir, if you could look back at 4806, which is the TechInsights report that we looked at earlier.

THE COURT:  Okay.  You've got the front page up there; right?  Do you want him to look at a particular page?

MR. SLOAN:  I do, Your Honor, and I'm trying to find the right page.

THE COURT:  Maybe you want to wait until tomorrow.

MR. SLOAN:  Your Honor -- given the time, I think maybe I will, Your Honor.

**THE COURT:** Yeah, why not? Okay. You're not going to get that far with it. So okay.

All right. So we'll break now. We'll start tomorrow at 9:00. I suggest you do -- you know, do check and have some kind of conversation with the Government about not just this exhibit but other ones coming up that you believe he received from them with some representation about where they were found. Okay? And whether everybody can just agree that that is not in dispute. If you can't, then you can come back and talk to me about it. Okay?

**MR. SLOAN:** Thank you, Your Honor.

**THE COURT:** All right. We'll be in recess, then, until tomorrow. Obviously, you'll be back then, Dr. Dyer.

**THE WITNESS:** See you guys.

**THE COURT:** All right.

(Proceedings adjourned at 4:01 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, March 29, 2022

_____

Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court