**ORIGINAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable MAXINE M. CHESNEY, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Status Conference** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 18-00465 MMC |
| | ) | |
| FUJIAN JINHUA INTEGRATED | ) | Pages 1 - 25 |
| CIRCUIT, CO. LTD., | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, April 11, 2022 |

**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM WEBINAR:**

For Plaintiff:          Stephanie M. Hinds, Esq.
                        United States Attorney
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                 BY:    LAURA E. VARTAIN,
                        ASSISTANT UNITED STATES ATTORNEY

                        US Department of Justice
                        National Security Division
                        9t50 Pennsylvania Avenue N.W.
                        Washington, DC 20530
                 BY:    NICHOLAS O. HUNTER,
                        STEPHEN J. MARZEN, TRIAL ATTORNEYS

                 (Appearances continued next page)

Reported By:            Raynee H. Mercado
                        CSR. No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1

**A P P E A R A N C E S (CONT'D.)**

2

3

4     For Defendant:            Skadden, Arps, Slate, Meagher &
                                Flom LLP
5                               525 University Avenue
                                Palo Alto, California  94301
6                          BY:  JACK P. DICANIO,
                                EMILY A. REITMEIER, ATTORNEYS AT LAW
7

8

9                                 --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Monday, April 11, 2022                        10:03 a.m.

 2                       P R O C E E D I N G S

 3                        (Zoom Webinar)

 4         THE CLERK:  Calling criminal case number 18-465,

 5   United States of America versus Fujian Jinhua Integrated

 6   Circuit.

 7      Will counsel please state your appearances for the record

 8   starting with the government counsel.

 9         MS. VARTAIN:  Good morning, Your Honor.  Laura

10   Vartain, Nick Hunter, and Steve Marzen for the United States.

11         THE COURT:  Thank you.

12      And for the defendant?

13         MR. DiCANIO:  Good morning, Your Honor.  Jack

14   DiCanio, Matt Sloan, and Emily Reitmeier for the defendant.

15         THE COURT:  Very good.  Thank you.

16      The purpose of this conference is -- as you well know, is

17   to try to first get an update as to what's happening in the

18   People's Republic of China, to confirm whatever the defendant

19   understands the circumstances are pertaining to its proposed

20   witnesses, and to get some kind of feedback also from the

21   government as to their views of what these various new facts

22   are.

23      I received in the interval -- well, a notice; then

24   declarations from Wu Junsheng; Wu Kunrong, who's as Albert Wu,

25   You Zhenfu and Jinfu Zheng.  And is that the correct order of
```

1    that declarant's name, or did they flip them because they did

2    it in English?

3            **MR. DiCANIO:**  No, that's the correct order, Your

4    Honor.

5            **THE COURT:**  All right.  So the last name or family

6    name is Jinfu.

7            **MR. DiCANIO:**  Correct.

8            **THE COURT:**  Okay.  Then also filed recently is a

9    notice of errata from the government.  This concerns their

10   motion -- I'm sorry.  I keep doing that.  From the defendant,

11   and I have no excuse except it was kind of a long conference I

12   was at.

13       But in any event, notice of errata that the defendant

14   filed which makes various corrections to cites or other things

15   in their motion for acquittal.

16       Now, so --

17       Okay.  I'm not sure who wants to start.  Have -- have you

18   received -- maybe I'll ask Mr. DiCanio, have you received any

19   information since the time that you filed the various

20   documents that I just referenced?

21           **MR. DiCANIO:**  Thank you, Your Honor.

22       Yeah, I received an update last night and then again this

23   morning with the latest.

24       So as of this morning our time, which would be Tuesday,

25   Monday evening China time, all three of the witnesses are

1    still unable to travel and are still considered in that

2    lockdown state as described in their declarations.

3        The one bit of good news, though, we received from our

4    co-counsel is it does seem that conditions in Jinjiang are

5    improving in terms of COVID counts.  And I asked them whether

6    they could determine whether the 14-day period had started or

7    not.  And they did a review of the government websites and

8    haven't seen anything that can confirm that the 14-day period

9    has started.

10       But they did indicate that things seem to be getting

11   better, which is -- so a little bit of -- some positive --

12   positive news.

13           **THE COURT:**  Now, the only problem is that they

14   apparently wants a zero -- you know, a zero positive report

15   before they'll start the 14 days in effect.  And it -- I mean,

16   they have to have 14 days of nobody having tested positive.

17   That is a very high bar, you know, to -- to get over.

18       And there was like an article -- I don't remember what

19   paper I read it in -- about Shanghai because we've been

20   reading about that, and they -- the article kind of mirrored

21   some of the things you said, that there's, like, this

22   precautionary level and there's control level and they were

23   hoping that they could do better -- you know, the things were

24   better.  They were maybe making it a little easier, but nobody

25   was getting out.

```
1          And I don't know.  The whole thing sounds pretty iffy and

2     grim, frankly, so let's see.  Ms. Vartain, are you going to

3     take the lead on this or --

4          MS. VARTAIN:  Yes, Your Honor.

5          THE COURT:  If not -- okay.  Fine.

6     So what do you have to say?

7          MS. VARTAIN:  I don't have any response specifically

8     to what Mr. DiCanio raised.  I do have one item as follow-up

9     from the Friday filing, which I'm happy to raise now or -- or

10    wait, as the court prefers.

11         THE COURT:  Well, why don't you go ahead and -- and

12    raise the one matter that -- that you do have something to say

13    about.

14         MS. VARTAIN:  Sure.  So I'm specifically going to

15    reference paragraph 19 and 20 of the Jinfu Zheng Jinfu [sic]

16    declaration, which is the last declaration in the set of

17    filings.

18         THE COURT:  Right.  Let me get that.

19         MS. VARTAIN:  And those -- yes.

20         THE COURT:  Okay.  And did you say 19 -- which ones

21    were they again?

22         MS. VARTAIN:  Well, I'm referring to paragraph 19 and

23    20.

24         THE COURT:  Twenty.

25         MS. VARTAIN:  Twenty of the -- it's Docket 450-4.
```

```
 1              THE COURT:  I have it in front of me.  I have it in

 2   front of me.  I just -- I just wanted to confirm -- I thought

 3   you said 19 and 20, and I just wanted --

 4       Okay.  You have something to say about those.

 5              MS. VARTAIN:  Yes.

 6              THE COURT:  Okay.  Go ahead.

 7              MS. VARTAIN:  Yes.

 8       These refer to the applications that Jinhua has made to

 9   the PRC.  And as the -- as the court knows, the government is

10   asking for specificity as to the application, what was granted

11   and who granted it.

12              THE COURT:  Oh.

13              MS. VARTAIN:  And the reason for the specificity is

14   that the government then needs to run it through the state

15   department.  And then through our diplomatic channels, we will

16   go back to the PRC to confirm.

17              THE COURT:  Okay.

18              MS. VARTAIN:  And so I need more.

19              THE COURT:  Yeah, what's -- can you tell me a little

20   more specifically and then particularly for Mr. DiCanio also

21   because he may have that information.  It just may not have

22   been included, or he can get it.

23       What -- what specifics would you be looking for beyond

24   that there was an application pursuant to this International

25   Criminal Judicial Assistance Law of the People's Republic of
```

1    China, Article 4.  And he then says what it provides.  And so

2    he says that's the proper government approval they needed and

3    that he says that they got it now.

4        Maybe -- do you need to see something in writing?

5        **MS. VARTAIN:**  Yes.  And to -- I need to know -- says

6    it was submitted to the "relevant government Chinese

7    authorities."  Who is the relevant government authority?

8        **THE COURT:**  Okay.  That should --

9        **MS. VARTAIN:**  What --

10       **THE COURT:**  -- be something they could find.

11              (Simultaneous colloquy.)

12       **THE COURT:**  Sorry.

13       Just -- for example, do you have an example of what you

14   were thinking, or it just has to be more specific?

15       **MS. VARTAIN:**  It needs to be more specific.

16       **THE COURT:**  Okay.

17       **MS. VARTAIN:**  As specific as possible, please.

18       **THE COURT:**  Okay.

19       But you had something else that -- no?  Yes?

20       **MS. VARTAIN:**  Yes.  Yes.  It says Jinhua received

21   approval of the application, so the scope of what was approved

22   I will need to know.

23       I know it was originally for documents and I believe also

24   for testimony.  I -- I suppose I don't need to know what the

25   document approval was, but certainly for the scope of the

1    testimony approval, you know, I believe that it was for

2    testimony at Jinhua's facilities.

3       If it covers something else, that would be helpful to

4    know.  And then, likewise, as the next approval that I

5    understand is going through is happening, the same type of

6    details for that will be helpful so that we can move -- we can

7    take those and -- and move it through the state department.

8          **THE COURT:**  Other than what they've already got,

9    you're envisioning they'll need something more?

10         **MS. VARTAIN:**  I believe -- and Mr. DiCanio will

11   correct me if I'm incorrect, but I thought they had applied

12   for additional approvals.  And if I'm wrong about that, please

13   let me know.

14         **THE COURT:**  Okay.  I have some recollection along

15   those lines as well.

16      Let's see, Mr. DiCanio, first of all, for what has already

17   been sought and obtained, I'm assuming that was done in

18   writing and if it was that you should then be able to have

19   both the application and the response to that application in

20   writing.  It will be in Chinese, but someone could then

21   translate it, and then the government would have exactly what

22   was sought and obtained.

23         **MR. DiCANIO:**  Yes, Your Honor.  And I -- I apologize.

24   I thought I had mentioned this at the hearing last week,

25   but --

1   So the first level of approval was the one that dealt with

2   providing testimony and documents, documents in connection

3   with discovery in the case, testimony that would apply

4   wherever it was given, whether it was in the United States or

5   in China.

6   Your Honor, that approval was made to the Chinese Ministry

7   of Justice.  That's located in Fujian Province, so it would be

8   the local branch of the Chinese Ministry of Justice.  That

9   approval application was made.  They received approval orally

10   from the Ministry of Justice.

11   **THE COURT:**  Hmm.

12   **MR. DiCANIO:**  And that's the basis upon which our

13   client feels it has the authority to move forward.

14   **THE COURT:**  Shouldn't it be in writing?  Do we know

15   why they don't have anything, even just a stamp on whatever

16   they applied for, saying "approved"?  You know, something.

17   **MR. DiCANIO:**  Your Honor, I did ask the client about

18   that, and they didn't indicate that that would be anything

19   atypical that the oral authorization is what they can rely on

20   in these circumstances.

21   And certainly our client has put a declaration where he is

22   attesting to that process.  I would also say that the client

23   would be the person or the persons and entity most subject to

24   consequences if they didn't get the appropriate permission.

25   And so, you know, we feel confident that we have what we need

 1   to comply with local Chinese law, so --

 2       But we don't have anything in writing, Your Honor.  That

 3   is kind of an official approval.

 4           **THE COURT:**  Who got the so-called oral approval?  Who

 5   was on the receiving end of that conversation?

 6           **MR. DiCANIO:**  Your Honor, I don't know the specific

 7   person, whether it was a representative of the client or a

 8   representative of our co-counsel.  I certainly can -- can --

 9   you know, figure that out.

10           **THE COURT:**  See if you can find that out and exactly

11   who they talked to.  I mean, this is the kind of thing where

12   somebody could just say we're revoking it or you didn't get it

13   or you misunderstood or who knows what.

14       It just seems very strange that an official -- do they

15   have an application form?  Or do you just do that kind of by

16   phone or some kind of handwritten note?

17       Do you know?

18           **MR. DiCANIO:**  My understanding -- yes, I do.

19       My understanding is that they did submit a written

20   application and then they would have a series of discussions

21   where they talk about the nature of the case and why the

22   evidence is needed.  And then what comes back is really the

23   collective decision of the Ministry of Justice.

24       So it isn't as if there's one person within the ministry

25   that would say "I approved it."  It's more of a agency

```
 1    approval.
 2              THE COURT:  Yeah, but somebody's got to convey it.
 3    Somebody has to convey that oral agency approval.
 4              MR. DiCANIO:  Understood, Your Honor.  And I could
 5    dig into those facts.
 6              THE COURT:  I mean, and you say a written
 7    application.  Is this on a form?  Or do they just write up,
 8    Dear sir, we have a trial, and we'd like to, you know, give
 9    evidence in it?
10                   (Simultaneous colloquy.)
11              MR. DiCANIO:  I don't.  I don't how -- what the form
12    was, Your Honor.
13              THE COURT:  All right.  If it's a form -- in other
14    words, that the Ministry of Justice has some kind of
15    application form, it would be very unusual that somebody
16    doesn't then have a written approval of it.
17        If it's a handwritten -- not handwritten but typed-up
18    thing -- you know, just somebody writes a letter to them in
19    effect, was an application, that may be different.  But it
20    still sounds a little bit strange.  I think you should find
21    out as much detail as you can about that.
22        I understand they have no reason to misrepresent
23    something, your client, but never --
24        That's a phone ringing here.  Somebody will pick it up.
25        But the -- it just doesn't sound, frankly, very official
```

1  for lack of a better word, so -- and -- and, of course, you're

2  not given anything that -- no, it's not like you apply for a

3  permit, and then you get -- you either have the permit in your

4  hand or you don't have the permit.

5      There's nothing physically in that regard, apparently, to

6  represent a decision that may not have been given formally in

7  writing, and so it's just -- I don't know.  There's something

8  that just seems a little bit casual about the whole matter

9  given that it's all focused on legal, and everybody involved

10  has probably got some legal training and, yet, they don't have

11  anything that's looks or sounds legal to me in format.

12      Okay.  So that's one.  But whatever you can do to -- to

13  nail that down so that then Ms. Vartain can check it out,

14  including this oral idea, where maybe somebody at her end

15  says, yeah, that's how they do it.  It's a little weird, but

16  that's how they do.

17      But, you know, but get as much as you can to fill in those

18  gaps.

19      Let's see.  What else was on that list of needs,

20  Ms. Vartain?

21          **MS. VARTAIN:**  Your Honor, I -- that covers the -- the

22  prior application that I understand Jinhua made.  And I

23  believe that there's also a more recent application, and

24  similar details as what we've just discussed for the first one

25  will be -- we'll need for the second one as well, if I'm

1    understanding the status correctly.

2         **THE COURT:**  It may be that goes to whether they could

3    show up at the embassy or not, which wasn't an inquiry

4    originally made of the ministry.

5        Is that correct, Mr. DiCanio, or not?

6         **MR. DiCANIO:**  You're correct, Your Honor.

7         **THE COURT:**  Okay.

8        Is that pending?  Are they having little chats about it,

9    or what's going on over there?

10        **MR. DiCANIO:**  So let me give you an update on -- on

11   that piece of it.  And Ms. Vartain is correct, that is a

12   separate process.  And my understanding of the reason it

13   needed to be separate is because it was going to be conducted

14   at an embassy, which was different than what the original

15   approval contemplated.

16       That approval was also made in writing to the same agency,

17   which is the Ministry of Justice in Fujian Province, so, like,

18   the local branch of the Ministry of Justice.

19       It was also made in writing, is my understanding.

20   Discussions were had about that as well.

21       As of this morning, Your Honor, we still don't have a

22   response yet.  I can tell Your Honor in all candor given

23   passage of time, I am a little bit more concerned about how

24   quickly we could get a response.

25       I know that our client and our co-counsel are pushing

1    very, very hard with their relationships, you know, at the

2    Ministry of Justice to try to get a response.  But I'm getting

3    increasingly concerned that we may not be able to get that as

4    quickly as maybe we all would hope.

5        But as of this morning, Your Honor, we still had not

6    gotten word back, although there is an -- a very significant

7    push to try to get an answer.

8            THE COURT:  Okay.

9        Could I ask you just a question about these declarations

10   while we're on it, just the content.

11       For Albert Wu's declaration, he says "I am the vice

12   president of Fujian Jinhua Integrated Circuit Company

13   Limited."  And for Jinfu Zheng's declaration, he says, "Your

14   Honor, I am the vice president of Defendant Fujian Jinhua

15   Integrated Circuit Limited."

16       How many VP's do they have?

17           MR. DiCANIO:  Your Honor, like the United States,

18   everybody at a certain level is a vice president.  And so it's

19   not uncommon either there or here to have several.

20       My understanding is that Mr. Jinfu Zheng is more like a

21   legal -- on the legal side of the house, where Albert Wu is

22   more operational.  But they do have several vice presidents.

23           THE COURT:  Well, in this country, we have one.  If

24   you worked for Bank of America, there could be, you know, 500

25   or more, but -- I -- I don't know about countries.  Usually

```
 1        they've got one.
 2            But, again, this is a company, so they could have, I
 3        guess -- you know, a lot of vice presidents of various
 4        divisions or departments or specialties or what-have-you.  But
 5        they didn't specify that.  It's -- well, actually, the --
 6        the -- Jinfu Zheng did say he's responsible for overseeing
 7        legal affairs, so yes.
 8            Okay.
 9            MR. DiCANIO:  Correct.  And he's been our main
10        contact, Your Honor, on the legal matters.
11            I do have another update if the court would allow me to
12        get into that now.
13            THE COURT:  Go ahead.
14            MR. DiCANIO:  So, Your Honor, this is something that
15        I -- I have learned just this morning.  And I do not have
16        anywhere near my arms around this.  But it seems like one of
17        the reactions of the Chinese government to the COVID
18        situations is to start to limit the number of passengers
19        coming back into the United States per flight.
20            And the way that it's being expressed to me is that
21        there's a situation where if they reduce by a very significant
22        percentage, let's say the number of passengers that could fly
23        from point A into China, that because of the summer months, it
24        may create an issue with travel back to China.
25            There's an awful lot of youngsters who study abroad and
```

1    then start to may [sic] their -- make their way back home, so

2    there may be some issues with respect to getting someone from

3    the U.S. back into China.

4              THE COURT:  Well --

5         MR. DiCANIO:  What concerned me this morning is I was

6    thinking maybe more in terms of days, and what -- the response

7    I got back is, no, it may be months.

8         I just say this because I need to dig into it, and I will

9    this week and -- and give you an update on it.  But it's a

10   further complicating factor.

11        We've also -- Ms. Reitmeier did some quick research and it

12   looks like it may be difficult to even transfer -- let's say

13   if we want to go from the U.S. into another country and then

14   into China.

15             THE COURT:  Ah, I see.

16        MR. DiCANIO:  -- that there are some restrictions

17   about that as well.  So we're -- I don't have my hands around

18   that, Your Honor, but I just wanted to let you know there

19   seems to be this other issue that's percolating that I have to

20   figure out.

21             THE COURT:  Okay.

22        Well, we're not at sort of summer vacation yet, but we're

23   getting closer.  And, frankly, I don't think anybody wants to

24   wait until when we are at summer vacation for these witnesses.

25   That's -- you know, we're -- we're in mid-April.  And you're

 1    talking about -- about a month and a half off or so.  And I

 2    don't think we want to wait or even -- maybe a month for that,

 3    but --

 4        I don't know.  It's beginning to look more like remote may

 5    be the way that we end up going unless there's a really rapid

 6    change in the COVID situation.  That decision has been left

 7    pretty much to the government as to what they prefer.  And, of

 8    course, they could change their mind as circumstances change

 9    as well.

10        But I think we need a plan of some sort.  Otherwise we're

11    just going to be in limbo here, so -- does anyone have any

12    suggestions other than --

13        Mr. DiCanio, you have to get some more info for

14    Ms. Vartain, and as much as you can have that is actually a

15    written either supplemental declaration or something and any

16    kind of documentation that might support it would be good.

17        But other than that -- and we can talk -- I'm not sure how

18    long that might take.  But you have to get translated, too, in

19    all likelihood, so that could be a week, let's say.  Maybe not

20    that long, but around a week.

21        So what are we talking about in terms of regrouping, you

22    know -- I don't want this to just be kind of going off, you

23    know, into the sunset and we never know when we're -- we're

24    coming back for act two here.

25            **MR. DiCANIO:**  Your Honor, I did have a suggestion for

1   everyone's consideration.  You know, one thing we could do is
2   maybe every Friday provide something in writing where let's
3   say by 10:00 a.m. on Friday, we submit kind of like a status
4   report, and then everyone could take a look at it.  And then
5   if Your Honor feels that we should get together on Monday or
6   even Friday afternoon, we could do that.  But that could be
7   one way for me to kind of give you updates without having to
8   gather.
9       I am concerned, Your Honor, that I don't know what the
10  endpoint is in all of this.  And so I am a little bit -- I
11  understand your concern about, you know, how this will -- will
12  trend.
13      But I certainly could keep the court and everyone aware of
14  where we are in the moment by some type of written filing that
15  we file on a particular time and date with the court letting
16  us know whether you want to have a hearing about it or not.
17          **THE COURT:**  Ms. Vartain, let me ask you a question.
18  I'm not sure about that plan by the way.  We'll get back to
19  that in a second, but --
20      Even if they have approval to go to the embassy, for
21  example, the -- given the time differential, it just seems to
22  be so problematic unless, you know, the embassy were open at a
23  really bizarre hour on Beijing time.  And I'm beginning to
24  think more and more like that -- that's really not perhaps
25  going to work.

 1     And Mr. DiCanio's sort of the split session idea where you

 2  show up first and you're sworn in a more formal setting, and

 3  then you repair to a law office after that, I don't know that

 4  that really changes the dynamic enough from just starting in a

 5  law office to make all of the efforts that would go along even

 6  with that worthwhile, although if the government felt that it

 7  was better than nothing, then certainly we could do that.

 8     I just don't see you're going to get, you know, foreign

 9  service here to be showing up, you know, at what are just

10  ungodly hours in -- in China for this one case.  I -- it's

11  possible but unlikely.

12     And we may be looking at talking about a proceeding in

13  Fujian.  Now, I don't know even know if anybody from your team

14  would want to be present during that type of proceeding, and I

15  don't even know if they'd let you in.

16     But it wouldn't have to go through a letters rogatory

17  proceeding as far as I understand so that if you were in a law

18  office -- and as you said, if they'd only told us sooner, we

19  would have done letters rogatory.  Maybe we could sort of try

20  to recreate that.

21     Do you know anything about the people from the U.S.

22  getting into China, Mr. DiCanio?

23     And with --

24          **MR. DiCANIO:**  Your Honor, I --

25               (Simultaneous colloquy.)

1    **MR. DiCANIO:** I'll need to check, but I -- I think

2    that that's still possible. And certainly we could arrange

3    for neutral sites in -- not in Fujian -- in Jinjiang where the

4    witnesses could travel even today to do that. But I'll --

5    I'll double-check that for you, Your Honor.

6        **THE COURT:** I don't know. I just thought if we

7    can't -- you know, maybe we can bring people from here there.

8    If that were at all possible at -- I don't know if they'd --

9    if they could get slightly out of Fujian, then somebody could

10   do it somewhere where they might not get stuck -- I don't want

11   anyone to go there from the U.S. and get locked down. You --

12                (Simultaneous colloquy.)

13       **THE COURT:** -- get out.

14       **MS. VARTAIN:** There is certainly a quarantine of at

15   least two -- I think sometimes three weeks -- two weeks in a

16   hotel, one week out. Mr. DiCanio may know more. But,

17   certainly, if Mr. Hunter or Mr. Marzen or myself wanted to go,

18   the burdens on us would be extreme.

19       **THE COURT:** Yes.

20       **MS. VARTAIN:** Not to mention the uncertainties of

21   whether we could get in or get out. So to me, Your Honor,

22   this sounds like a burden-shifting that wouldn't be

23   necessarily fair or appropriate given timing of the shifting.

24       **THE COURT:** Well, even if it were earlier -- I mean,

25   even if were back when you had said if we'd known, and then we

1  got the formal approval and all, I think we would still be

2  looking at -- because it would still be during COVID, because

3  the illness people, for example, are all based on COVID --

4  COVID concerns.

5      And we been at this for quite some time now with COVID.

6  And China at the beginning was really -- that was very much a

7  concern.  And I don't know that you'd even want to go in

8  there.  But I don't know if it was any better before than now.

9  Either way it's not great.  And I'm not suggesting you should

10  do it or should have to do it.  I was just saying, is that at

11  all a possibility.  And -- I don't know.

12      Anyway, I'm just trying to think any other model that we

13  could possibly use to allay some, not at all -- some of the

14  concerns that the government expressed about an atypical way

15  of taking testimony is all.

16      Well, I don't know about this status report idea.  When I

17  hear, like, status report, I think months go by and, you

18  know -- I think maybe we ought to have a -- maybe a date for

19  you to get the additional information to government's counsel.

20  And then maybe we meet once more at least on a day of your

21  choice in -- in person unless --

22      And in the interval, if you decide that it's not necessary

23  collectively, and you want to just suggest some other way of

24  keeping track, I just -- you know, I -- just picture the ship,

25  you know, before Columbus sailing off and dropping off, you

1   know, the edge of the earth, and that's what's going to happen

2   to this case.  And I don't want that to happen, so -- yeah.

3      Does anybody want to take it from that point and say

4   something?

5      **MR. DiCANIO:**  Sure.  Yeah, sure, Your Honor.

6      Whatever you think is best we're happy to do.  Maybe if

7   you could allow me to just consult with my client -- which

8   would be my evening -- I'll try to get a sense of when we

9   could pull that information together.  I'll confer with the

10  government.  And maybe we could make a joint proposal as to

11  when we'd get back together either this week or next --

12      **THE COURT:**  Sure.

13      **MR. DiCANIO:**  -- for the court's consideration, if

14  that works for everybody.

15      **THE COURT:**  Ms. Vartain, what's your idea?

16      **MS. VARTAIN:**  That's fine.  I -- we share the

17  government -- or the court's concern about the timing.  And so

18  I'll look for Mr. DiCanio to let me know what works on his

19  end.

20      **THE COURT:**  Okay.

21      Mr. Marzen, are you at home in your living room, or where

22  are you?

23      **MR. MARZEN:**  Yes.

24      **THE COURT:**  Yeah, it looks very nice.  And it looks

25  like the weather is okay there.

1    Is that correct or not?

2         **MR. MARZEN:**  Yes, it is.  And if the court wants to

3    indulge (indicating).

4         **THE COURT:**  Oh, yes.  Okay.  Oh, beautiful.

5    Very nice.  And it looks like, Mr. Hunter, are you at your

6    home, too?

7         **MR. HUNTER:**  Yep I am as well, Your Honor.  There's

8    construction going out outside my window.

9         **THE COURT:**  Okay.  Well, I only can see a little bit

10   of your background, but I could see a lot of his, and it did

11   not look like an office in any way, shape, or form.  It looked

12   pretty nice, so --

13        **MR. MARZEN:**  It will be quite nice, but we'll be back

14   in your Courtroom 7 whenever you need us.

15        **THE COURT:**  All right.  Thank you.

16   Well, it rained here this morning, but then it's -- it's

17   sunny now, so it's fine.

18   Okay.  Well, then I'm going to go with the last state of

19   proposal, which means I'll wait to hear from you, and --

20        **MR. DiCANIO:**  Thank you, Your Honor.

21        **THE COURT:**  -- I won't put a specific deadline on it.

22   But if we haven't heard from you after some period of time of

23   a week or so, somebody's going to get back in touch with you

24   and say --

25        **MR. DiCANIO:**  Understood.

1        **THE COURT:**  Okay.

2     All right.

3        **MR. DiCANIO:**  Thank you, Your Honor.

4        **THE COURT:**  Ms. Geiger, do you need anything else?

5        **THE CLERK:**  No, Your Honor.

6        **THE COURT:**  Okay.  So then that concludes our

7   proceeding at this time.

8     Thank you.  And everybody stay well.

9     Okay.

10          (Proceedings were concluded at 10:36 A.M.)

11                    --o0o--

12

13

14              **CERTIFICATE OF REPORTER**

15

16          I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18   I further certify that I am neither counsel for, related to,

19   nor employed by any of the parties to the action in which this

20   hearing was taken, and further that I am not financially nor

21   otherwise interested in the outcome of the action.

22

23   _____

24     Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

25               Tuesday, May 3, 2022